UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KEVIN SULLIVAN, VINCENT DUDLEY, MARK MEHRINGER, JASON SLEEPER, And MICHAEL TROMBLEY, Plaintiffs<br><br>v.<br><br>CITY OF SPRINGFIELD, MASSACHUSETTS, Defendant | Civil Action No: 05-30004-MAP |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I.  INTRODUCTION.

In this case the plaintiffs allege that in 2003, the Springfield Police Department violated the Equal Protection Clause by its consideration of race as a determinative factor in how to layoff and recall Springfield police officers. As a result, the plaintiffs were subjected to layoff or subjected to layoff for a greater duration than would have been the case had race not been a factor. Indeed, as demonstrated below, the defendant utilized race in establishing the seniority of the plaintiffs and similarly situated police officers in a manner which not only violated the Fourteenth Amendment, but also violated the very consent decree (Castro v. Beecher) to which the defendant was allegedly trying to achieve compliance.

1

Because there are no material facts in dispute regarding this issue, and plaintiffs are entitled to judgment on liability as a matter of law, they hereby move for summary judgment on liability.

II.   STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO DISPUTE.[1]

    A.   The Beecher Decree.

1.   Because the City of Springfield's actions in this case arise out of and are related to the remedial orders in the case of Castro v. Beecher, 365 F.Supp. 655 (D. Mass. 1973), a history of that case is herein provided. See also Castro v. Beecher, 522 F.Supp. 873 (1981); DeLeo, et al. v. City of Boston, et al., Civil Action No. 03-12538-PBS (D. Mass. 2004) (decision attached hereto as Exhibit L).

2.   In or about 1972, a federal district court held that the entry-level civil service examination for police officers in the Commonwealth of Massachusetts had a disparate impact on minority applicants, and therefore was unlawful under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000(e), the equal protection clause of the Fourteenth Amendment, and 42 U.S.C. §1981. See also Quinn, et al. v. City of Boston, 325 F.2d 18; DeLeo v. City of Boston, supra, at pp 3-4; Mackin v. City of Boston, 969 F.2d 1273, 1274 (1st Cir. 1992).

3.   As a result of that litigation and decision, the plaintiffs in that case and the Commonwealth of Massachusetts negotiated and the court subsequently entered a consent decree commonly referred to as the Beecher Decree. Castro, supra, 522

---

[1] Most of the non-background facts relating to the instant case come from the depositions of Captain William Cochrane and Peter Albano. These two Springfield police officials were primarily responsible for, and had direct knowledge of, the material facts relevant to this case. Their depositions are attached as Exhibits A and B, respectively, and the exhibits referenced in those depositions are attached as Exhibits C through K, respectively.

2

F.Supp. at 655. According to that decree, in those cities within the Commonwealth of Massachusetts who had significant minority populations, and who had a complement of minority police officers significantly below the number of minorities in the general population of that city, such municipalities were to do future entry-level hiring for police from a civil service list prepared by the Commonwealth of Massachusetts that would rank one minority on it for every one non-minority. See DeLeo, supra, at pp. 3-5; Mackin, supra; Quinn, supra; Castro v. Beecher, supra.

4.   Under the Beecher Decree, when a municipality like Springfield sought to hire a certain number of entry-level police officers, it would requisition a list from the Commonwealth, Human Resources Division ("HRD") which contained two times the number of police officers to be hired plus one. (Exhibit C.) (This is known as the two plus one formula.) The Commonwealth of Massachusetts, HRD was to arrange the list in rank order so that there would be one minority ranked together with every one non-minority and so on down the list. DeLeo v. City of Boston, supra; Castro v. Beecher, supra; Quinn, supra.

5.   The Beecher Decree was intended to create a more diverse applicant pool from which final selections would be made. Id.

6.   The Beecher Decree did not require the hiring of one minority for every non-minority, but only that the applicant pool considered had one minority for every non-minority. Beecher, supra. It was recognized that after the list was compiled (one minority then one non-minority), applicants would then go through a series of hiring prerequisites in order to be actually offered a position and begin the police academy. In Springfield these prerequisites involved (1) a background check; (2) a residency check;

(3) an interview; (4) a conditional offer of employment after which there would be a medical exam; (6) psychological exam; and (7) successful completion of a physical abilities test. (See Deposition of Cochrane attached hereto as Exhibit A, pp. 14-18); see also DeLeo, supra; Quinn, supra. From 1975 until the present, the City of Springfield has been required to conduct its entry-level police officer hiring as described in the Beecher Decree. Id.

B.     Facts Underlying The Present Case.

7.     Because this layoff case relates back to the hiring done for the position of police officer in the City of Springfield for the years 1996 through 1998, the procedure utilized by the defendant for hiring police officers in those years will be described here.

8.     Pursuant to the Beecher Decree, when the City elected to hire some 100 or more police officers during the years 1996, 1997, and 1998, each time that the City was ready to hire entry-level police officers, it requisitioned a list from the Commonwealth's HRD in accordance with the Beecher Decree. On each occasion the Commonwealth's HRD sent to the City of Springfield a list of candidates, arranged with the highest ranking minority and non-minority paired together and so on down the list until the requisite number of police candidates, two times the number of positions to be filled, was provided to the City of Springfield. (Deposition testimony of Cochrane, Exhibit A, pp. 20-24; see also Exhibit C attached hereto.)

9.     After receiving this one-for-one certified list from the Commonwealth, the defendant then proceeded to ascertain which of these candidates still wanted consideration by having them come in and sign the list. (See Cochrane deposition,

Exhibit A, p. 13.) After this task was performed, the City performed a background check on the highest ranked candidates. It chose a sufficient number of such candidates so as to cover at least the number of openings that existed with some leeway built in. Exhibit A, pp. 8-13.) The background checks eliminated a number of candidates due to criminal convictions, poor work records, etc. (Exhibit A, pp. 13-18.)

10. After the background checks were completed and certain individuals eliminated, candidates were then given oral interviews before the Board of Police Commissioners. This resulted in some further candidates being eliminated by the Board. (Exhibit A, pp. 14-16; see also Arbitration Award, Exhibit D, p. 6.)

11. Those individuals still being considered who had passed the background check and the Board of Police Commissioners interviews, were then conditionally offered the job and required to undergo a medical examination, see M.G.L. ch.31, §61 a psychological test, and finally a physical aptitude test. Those tests resulted in the elimination of a significant number of candidates. (Deposition of Cochrane, Exhibit A, pp. 14-23; Exhibit D, pp. 6-7.)

12. During the entire process, as an individual was knocked out of elimination by failing to pass one of the tests or criteria set forth above, upon such elimination, that individual would be replaced from the civil service list as follows: If the individual eliminated was a minority candidate, the next highest ranking minority left on the list would be selected to fill in the slot and go through the hiring process. (Exhibit D, pp. 6-9; Exhibit A, pp. 24-30.) If a white person was eliminated, the next ranking white person would be selected to fill in the slot. This was done in order to meet a target one-for-one hiring ratio of minority to Caucasians. Id.

5

13. Utilizing this process, after a sufficient number of candidates had been selected and met all of the criteria for being hired and after successfully completing training at the police academy, the City of Springfield would fill out a so-called "Form 14." This form was utilized by the Commonwealth and had to be filled in by the City listing who ultimately was hired from the original certification list. The Form 14 was filled out by the defendant so as to list one minority for every one non-minority hired so that the list would reflect a one-for-one hiring ratio (minority to non-minority). (Exhibit A, pp. 26-30.) The list would then be sent to the Commonwealth HRD as the official hiring list. Id.

14. At the completion of their police academy training, and upon formally beginning work as a Springfield police officer, successful candidates would be assigned a "badge number." (Exhibit A, pp. 32-37; see also Exhibits D and E.) The assignment of one's badge number was the equivalent of determining their seniority ranking in the police department. Id. For all those candidates hired at the same time and attending the same police academy class, badge numbers and, hence, seniority was determined by going down the Form 14 list submitted by the City to the Commonwealth's Human Resources Division, and assigning badge numbers in order that the name appeared on the Form 14 list. (Exhibit A, pp. 33-35; Exhibit D; Exhibit E.) Thus, seniority (badge number) was determined by a method which essentially ensured that for every one non-minority, one minority would receive alternating seniority. Id. Accordingly, seniority or "badge number" was determined not by score on the original civil service examination, or by how well one had done through the testing and academy process, nor was it assigned based upon original placement on the civil service list, but, rather, was

determined solely by the reconstituted one-for-one designation set forth on the Form 14. <u>Id</u>.

15. As a result of this procedure, the plaintiffs who were hired in 1996 had, as of November of 2002, badge numbers ranging from 406 to 411, meaning that they ranked 406th to 411th in seniority on the Springfield Police Department. (See Exhibit F.)

C. <u>The Layoffs</u>.

16. In the winter of 2003, because of declining revenues, the City of Springfield ordered the Police Department to cut its budget and, thereby, to layoff police officers and civilian personnel. (Exhibit D; see also Albano Deposition, Exhibit B, pp. 8-12.) Eventually, the Department decided that it would have to layoff 76 uniformed police officers. <u>Id</u>. As required by the collective bargaining agreement, for those individuals who were hired on the same date, seniority for the purpose of deciding who would be laid off and/or recalled first, should have been determined by reason of where that individual's name ranked on the original civil service list (Exhibit C, provided from the Commonwealth) that was utilized in the original hiring process for such individuals. (See Exhibit D, pp. 12-14.) Because this list (Exhibit C) was already arranged by pairing one minority for every one non-minority, utilizing such civil service list (instead of utilizing one's civil service exam score) benefited minority police officers who would have to be laid off.[2] <u>Id</u>. (See also Exhibits G and H.)

---

[2] Prior to the provision in the collective bargaining agreement providing for placement on the original civil service list as determining badge number, the parties had used examination scores to determine seniority. This changed in 1994. (See Arbitrator's Award, Exhibit D, pp. 6-9.) If the parties had continued to adhere to examination score, minorities would have been far more adversely impacted. (Exhibit D, pp. 17-19.)

7

17. Instead of utilizing the original civil service list (Exhibit C) to determine seniority for purposes of layoff and recall, the City of Springfield actually laid off officers by going straight down the reorganized Form 14 (Exhibit E) in order to ensure that exactly the same number of minorities and non-minorities were laid off. (Exhibit B, Albano Deposition, pp. 19-21; Exhibit D; Exhibit I.)

18. As a result, approximately 76 police officers were laid off in the spring of 2003, half of which were minority, and half of which were non-minority. (See Exhibits D and I.)

19. In February of 2004 the Springfield Police Union, filed a grievance alleging that the City's seniority ranking, which was utilized for layoff purposes, was violative of the collective bargaining agreement, because it did not utilize rank on the original "merged" civil service list. Hearings were held before an arbitrator appointed under the parties' collective bargaining agreement and in June of 2004, the arbitrator issued an award holding that the City had in fact violated the collective bargaining agreement by utilizing the Form 14 (Exhibit E) reorganized list, and not the original civil service list (Exhibit C) to determine layoff and recall. (See Exhibit D; see also Exhibits C, H and I.)

20. As stated above, approximately 76 police officers were laid off in the spring of 2003. As the City obtained more money through grants, retirements, etc., it brought back laid off police officers as slots became open and financially affordable. Over time between July of 2003 and the end of 2004, all of the laid off police officers were either brought back or they elected to take other positions elsewhere. (Exhibit B, pp. 24-27; see also Exhibit I.)

C.  Facts Demonstrating That Plaintiffs Were Adversely Affected By The City's Actions.

21. The plaintiffs in this case were all hired on the same date, April 6, 1997. On that date, April 6, 1997, the City hired approximately 50 police officers. (Exhibits J and K.) At that time, because of the City's system for hiring (wherein as individuals were disqualified in the hiring process, they were replaced by an individual of their own race), because the plaintiffs (white males) were in the original group sent through the hiring process, the plaintiffs should have received higher seniority rankings (lower badge numbers) if the City had not reorganized the hirees on the Form 14, pairing them one minority for every one non-minority. This can be seen from Exhibits C, J and K. Exhibit C is the original civil service list from 1997 ranked according to score and the one-to-one formula required by Beecher. The plaintiffs appear on pages 12 and 13, while police officers Angel Perez and Mike Rivera appear at page 17, and are 25 places below the plaintiffs. Id. Yet, as of the time of the layoffs, Perez and Rivera were given greater seniority than the plaintiffs. (Exhibits F and K.) Exhibit I shows that Angel Perez was recalled from layoff on March 7, 2003, while the plaintiffs were not recalled for many months later. Id.

22. A review of Exhibits C, I, J and K demonstrates that each of the plaintiffs would have had greater seniority had the City not reorganized the hiring list after completion of the hiring process, to pair one minority for every one non-minority on the Form 14. Id.

23. Specifically, as found by the arbitrator, and uncontested by the City, in the spring of 1997, because the individuals initially disqualified during the hiring process were more heavily minority, if seniority had been determined correctly under the

9

collective bargaining agreement (i.e. ranking on the original one-for-one civil service list), 17 non-minority officers would have had greater seniority than that given to them. (See Arbitration Award, Exhibit D at p. 9.) This includes the plaintiffs.

24. Because if the plaintiffs had had greater seniority, they would have been either not laid off at all or recalled more quickly than they were, the plaintiffs have been adversely affected by the City's conduct. (Exhibits C, I, J, and K; see also Exhibit B, pp. 37-40.)

25. As a result of the City's actions, the plaintiffs lost back pay, overtime, details, health insurance contributions, time served for purposes of promotional exams, pension eligibility, etc. (Exhibit B, p. 32.)

26. In his award, the arbitrator did not give any remedy to the plaintiffs, because of the Union's late filing of the grievance. (See Award at pp. 18-19.)

III. <u>BECAUSE THE CITY'S SENIORITY DETERMINATIONS WERE IMPROPERLY RACE-BASED AND VIOLATED BOTH THE BEECHER DECREE ITSELF AND THE FOURTEENTH AMENDMENT, THE PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON LIABILITY.</u>

A. <u>The System For Layoffs, Which Was Based On Racially Configured Badge Numbers, Is Unconstitutional.</u>

The facts are clear that the layoffs (and corresponding recalls) were based upon a strict race-based system of laying off one Caucasian for every one minority. As demonstrated below, not only does such a race-based layoff system expressly violate United States Supreme Court precedent on this very issue, it also violates the <u>Beecher</u> Decree itself, as that Decree has been interpreted by the First Circuit for the last 25 years.

When a governmental entity utilizes race as a factor in making employment-related decisions, such determinations are subjected to strict scrutiny under the United States Constitution, Fourteenth Amendment. See Wygant v. Jackson Board of Education, 476 U.S. 267, 280-81 (1986); Quinn v. City of Boston, 325 F.3d 18 (1st Cir. 2003); DeLeo, et al. v. City of Boston, supra. In order to pass muster under strict scrutiny, the government must have a "compelling state interest" justifying the use of such race-based considerations. Such race-based considerations will only survive when they are required in order to remedy a documented history of past discrimination, and are narrowly tailored in scope and time. Mackin, supra, at 1274; Quinn v. City of Boston, supra.

However, when the issue is layoffs, the Supreme Court has expressly held that even where a governmental entity is under a remedial decree to hire more minority employees, it cannot require that layoffs based upon seniority be altered in order to prevent minority employees from being laid off in disproportionate numbers. Fire Fighters Local Union 1784 v. Stotts, 467 U.S. 561 (1984).[3]

In the present case, it is clear beyond doubt that the City utilized racial preferences in effectuating layoffs in 2003. Indeed, the City has freely admitted that its layoffs were based upon badge numbers, and that badge numbers were distributed during the years in question by strict racial quotas, one minority for every one non-minority, regardless of where the individual stood on the original civil service list, or what

---

[3] Significantly, Stotts involved fire fighters in Nashville, Tennessee. However, a companion case, decided that same term, involved Boston Fire Fighters and layoffs in communities covered by the Beecher Decree. After deciding in Stotts that racial considerations and layoffs were impermissible, the Supreme Court reversed and remanded the First Circuit's decision in the Boston Fire Fighters' case which approved of racial preferences to prevent minority layoffs. See Boston Fire Fighter Local 718 v. Boston Chapter NAACP, 468 U.S. 1206 (1984).

11

his civil service examination score was. Simply stated, for those 50 police officers hired at the same time in April of 1997, seniority was, by contract, required to be determined in accordance with standing on the original civil service list. (Exhibit C.) Instead, the City rearranged that list to pair one white with every one minority for badge number purposes. Thus, seniority (i.e. badge numbers) was determined based on race. Under Stotts, requiring one-for-one racially balanced layoffs instead of the system required by the union contract (which still favored minorities) is unlawful under the United States Constitution, equal protection clause. Stotts, supra. at 579-583.

    B.    Because The Defendant's System For Assigning Seniority Went Far Beyond Its Obligations Under The Beecher Decree, The City Cannot Justify Its Actions Based Upon That Remedial Decree.

What is particularly troubling in the present case, and makes the defendant's actions particularly egregious, is that the City of Springfield not only violated the Equal Protection Clause, but also the terms of the Beecher Consent Decree, under which it purported to act. As described above, and as argued by the Commonwealth in the Quinn case, the Beecher Decree did not require strict racial quotas in hiring, i.e. one-for-one hiring; rather, it required civil service lists that had racial preferences, i.e. mandated that the lists be arranged one minority for every one non-minority. Beecher contemplated that once the lists were organized in such a way, the candidates would be disqualified for a number of legitimate reasons (medical exam, psychological exam, background check, etc.) and, hence, the Beecher Decree did not contemplate, nor require, that final hiring decisions strictly adhere to a racial quota of one minority for

12

every one non-minority.  Castro v. Beecher, supra. 365 F.Supp. 655-660; Mackin, supra. 969 F.2d at 1278; Quinn v. City of Boston, supra. 325 F.3d at 23-26.

The City of Springfield clearly did not adhere to the Beecher requirements, but, instead, went way beyond those requirements. First, the City of Springfield actually implemented its hiring system in such a way as to produce strict one-for-one hiring. It did so by maintaining two separate reserve lists of candidates, and once one candidate was disqualified through the hiring process, a person of that same race was substituted to replace the disqualified candidate. By doing so, the City ensured not just that minorities would receive preference consideration for hiring, but that the City would actually hire based upon a strict quota-based one-for-one system.

Under the Equal Protection Clause, this system was clearly unconstitutional and, moreover, was not narrowly tailored in time and scope, nor done pursuant to the requirements of a lawful consent decree and, therefore, was unconstitutional. Stotts, supra; Quinn v. City of Boston, supra; Wygant, supra; Mackin, supra.

The seniority system challenged here is the direct byproduct of the City's unlawful system for hiring back in 1997. As stated above, at the end of the hiring process the City of Springfield reorganized the list of hirees, placing them on the Commonwealth's "Form 14" on a strict one-for-one basis, one minority for every one non-minority. This action was not authorized by the Beecher Decree, and was certainly not permitted under the Equal Protection Clause.

Moreover, as the arbitrator held in his decision, the City's actions were not authorized under and indeed were violative of the collective bargaining agreement. There is no dispute, but that the collective bargaining agreement between the

Springfield Police Officers Union and the City of Springfield was amended in the early 1990's to provide that badge numbers, or seniority, must be assigned according to where the officer stood on the initial civil service list provided to the City of Springfield by the Commonwealth at the time the hiring process began. See, for example, Exhibit D, pp. 4-8, see also Exhibit C.[4]

If the City of Springfield had calculated seniority as required by the collective bargaining agreement (Exhibit D), based on original standing on the civil service list, there would still be a significant legal question as to whether such seniority determinations were lawful under Stotts, supra. The plaintiffs, however, do not challenge here the agreement between the Union and the City to base seniority determinations and, hence, badge numbers, based upon rank on the original civil service list, even though that list itself is the product of a one-for-one race-based formulation. However, at least with respect to that original list, since there would be significant disqualifications during the hiring process, not every one on that list was actually hired, and therefore the actual hiring would not have resulted in a strictly one-for-one ratio of hiring. Accordingly, the original civil service list, while creating racial preferences, was not an absolute quota, and, therefore, seniority was not assigned solely on the basis of race.

However, what is clear is that the City violated the express terms of the Beecher Decree when, during the hiring process, every time a minority was disqualified from the process, he or she was replaced with a minority in order to maintain a strict one-for-one hiring result. These actions pervert the Beecher Decree, rather than adhere to it, and

---

[4] Exhibit C is the original civil service hiring list for the class in question here.

14

take what was intended to be a racially diverse hiring pool, and turn it into a strict quota system, one that clearly violated the Equal Protection Clause.

As stated above, because seniority, or badge numbers, were assigned based upon this clearly unconstitutional race-based quota hiring system, the City determined seniority in 1997 based upon impermissible racial considerations. Because layoffs and recalls in 2003-2004 were based upon this illegal seniority system, both the layoffs of the plaintiffs and their delayed recall to service, were unconstitutional. Had their badge rankings not been based upon these impermissible race-based factors, some would not have been laid off and virtually all would have been recalled sooner. They would have possessed lower badge rankings and, hence, greater seniority.

It is not necessary at this stage of the litigation for the court to determine exactly what remedy is due each plaintiff. The plaintiffs are only now seeking judgment as to liability. With respect to that inquiry, it is only relevant that at least one of the plaintiffs has demonstrated that absent the unconstitutional actions of the City, they either would not have been laid off at all, or, conversely, would have been recalled earlier. As demonstrated in the statement of facts, it is clear that virtually all of the plaintiffs would have been recalled earlier had their seniority been determined in accordance with the collective bargaining agreement, and not based upon the Form 14 reorganized list, and, therefore, at this stage the plaintiffs have shown harm entitling them to a judgment on liability. In DeLeo v. City of Boston, Civil Action No. 03-12538-PBS (attached hereto as Exhibit L), Judge Saris specifically held that so long as one of the plaintiffs in that litigation could demonstrate having been harmed by defendant's actions, a judgment on liability was warranted. Id. at 10-13.

15

## CONCLUSION

For the reasons statement herein, this court should grant plaintiffs summary judgment on liability.

Respectfully submitted,
KEVIN SULLIVAN, VINCENT DUDLEY,
MARK MEHRINGER, JASON SLEEPER,
and MICHAEL TROMBLEY,
By their attorneys,

/s/ Harold L. Lichten
Harold L. Lichten, BBO #549689
Pyle, Rome, Lichten, Ehrenberg &
  Liss-Riordan, P.C.
18 Tremont St., Ste. 500
Boston, MA 02108

Dated: November 2, 2005            (617) 367-7200

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served on the attorney of record for each party by overnight delivery on November 2, 2005.

/s/ Harold L. Lichten
Harold L. Lichten

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CLERK'S NOTICE

This document can not be scanned due to its size, or the way in which it was bound.

The original is available for viewing in the Clerk's Office.