UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

KEVIN SULLIVAN, VINCENT DUDLEY,                    )
MARK MEHRINGER, JASON SLEEPER,                     )
And MICHAEL TROMBLEY,                              )
    Plaintiffs                                 )
                                                  )   Civil Action No:
v.                                                )   05-30004-MAP
                                                  )
CITY OF SPRINGFIELD, MASSACHUSETTS,               )
    Defendant                                  )
_____)

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS'
MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

I.    <u>INTRODUCTION.</u>[1]

    Having essentially conceded all of the plaintiffs' factual assertions regarding

liability, and having failed to submit a counterstatement of material facts as required by

Local Rule 56.1, the defendant, instead, has made an assortment of arguments, none of

which are properly supported in the record.  In addition, the several legal arguments

made by the defendant are both legally without merit and, in some instances, based

upon assertions of fact that are without foundation.  For the reasons set forth herein, the

---

[1]    Plaintiffs would note at the outset that they have moved for summary judgment on Count I, their
equal protection claim, but not with respect to their three statutory claims under Chapter 151B, Title VII
and 42 U.S.C. §1985.

court should deny defendant's cross-motion for summary judgment, and grant plaintiffs'

motion for summary judgment as to liability.[2]

II.    PLAINTIFFS' SUPPLEMENTAL STATEMENT OF MATERIAL FACTS AS TO
       WHICH THEY CONTEND THERE IS NO DISPUTE.[3]

27.    When they were first hired in 1997 as entry-level police officers, and then

sent to the police academy for training, none of the plaintiffs had any knowledge of the

procedures being utilized by the City of Springfield to assign badge numbers to

determine seniority.  In addition, none were aware as to how layoffs would be carried

out in the City of Springfield Police Department, if and when that eventuality ever

occurred.  (See Affidavits of Plaintiffs attached hereto as Exhibits A through E.)

28.    From 1997 until February of 2003, the plaintiffs were not aware of any

tangible harm which they had suffered by reason of the assignment of their badge

numbers or seniority status.  Id.

29.    The plaintiffs first learned that they were being laid off in February of 2003.

They received a formal notice of layoff from the City and were notified of their right to a

hearing before the appointing authority.  (See Exhibits A through E attached hereto; see

also M.G.L. ch.31, §41.)

30.    Even when they were notified in February of 2003 that they were being

laid off, the plaintiffs still had no knowledge that they were being laid off ahead of others

who were ranked lower on their civil service list as a result of the City's reordering of

---

[2]    At the very least, to the extent the court finds any material facts unresolved, such issues must be resolved by a trial.
[3]    The plaintiffs start with paragraph 27 because their first statement contained 26 separately numbered paragraphs.

such list on a one minority for every one non-minority basis.  (See Exhibits A through E attached hereto.)

31.    The first knowledge any of the plaintiffs had that their layoffs were the product of a possibly illegal and unconstitutional race-based formula is when plaintiff Sullivan read the arbitrator's award in detail and realized that the original civil service list from which he had been hired had been rearranged by the City on a strict one-for-one basis, and that layoffs were then conducted based upon that reordered one-for-one list. (See Affidavit of Sullivan, Exhibit A; see also Exhibits B through E.)

32.    Under the civil service statute, which the City of Springfield has obligated itself to follow, all layoffs and recalls must be determined by the "appointing authority" who, by law, controls all hiring, layoff and recall policies in the City of Springfield Police Department.  (See G.L. ch. 31, §1.)  Further, pursuant to G.L. ch.31, §41, only the appointing authority may conduct layoffs, and such layoffs must include formal notice from the appointing authority of the proposed layoff, with a right to a hearing to contest such notice.  (See M.G.L. ch.31, §41.)

33.    In 1989, the City of Springfield also had to layoff police officers due to budget restrictions.  At that time, like in 2003, the City made the decision to layoff based upon a one-for-one formula.  (See Affidavit of Attorney Peter Murphy attached to Defendant's Cross-Motion for Summary Judgment.)

34.    In negotiations between the Police Union and the City in 1995, the parties specifically discussed the fact that in 1989 layoffs had been conducted based upon a one-for-one formula, and the Union and the City negotiated a new policy which required

seniority to be determined by one's original ranking on the civil service list for those officers hired on the same day.  (See Affidavit of Murphy at ¶¶ 7-11.)

35.    From 1995 until 2004, the City regularly published official seniority roster pamphlets officially giving each officer's seniority ranking in the Springfield Police Department.  (See Exhibit F to Plaintiffs' Initial Statement of Material Facts; see also Murphy Affidavit at ¶11.)

36.    A review of Exhibit F, attached to Plaintiffs' original Statement of Material Facts, reflects that between 1995 and 2004, more than 100 police officers were hired by the City and given seniority rankings over this eight- to nine-year period.

37.    When the plaintiffs were hired, after the City reordered seniority by ranking everyone on the so-called Form 14 on the basis of one minority to every one non-minority, that form was signed by Gerald Phillips, then Chairman of the Board of Police Commissioners.  (See Exhibit C, p. 3.)

38.    In 2003, the Springfield Police Union, upon learning that there would be new layoffs, raised with the City and the Board of Police Commissioners the fact that layoffs were being made in a manner inconsistent with the collective bargaining agreement, and that such layoffs should be based upon a police officer's ranking on Exhibit C, the original civil service list.  (See Arbitration Award, Exhibit D at pp. 7-9; Affidavit of Attorney Peter Murphy at ¶13.)

39.    Since at least the mid-1970's, the City of Springfield has been fully cognizant of the Beecher litigation, and, indeed, has participated in that litigation at various times.  See Boston Chapter NAACP, Inc. v. Beecher, 423 F.Supp. 696 (D.Mass. 1976) (rejecting a motion from the City of Springfield to modify the Beecher Decree).

40.     The seniority rankings of the plaintiffs were assigned in late 1997/early 1998 by Captain William Cochrane who, at the time, held the title of "Commander of the Springfield Police Academy."  (See Exhibit A to Plaintiff's Initial Statement of Material Facts, p. 7.)

41.     As Commander of the Springfield Police Academy, Captain Cochrane had charge over all issues relating to new hires and recruits before their graduation before the academy.  Id. at 11-14.  He assigned the seniority rankings described above after consultation with "the Chief's office" and the "Human Resources Division of the Commonwealth of Massachusetts."  Id.

42.     In addition, Captain Cochrane testified by deposition that the filling out of the Form 14, which is what actually resulted in the unlawful assignment of seniority challenged here, was not done by him, but "was filled out by the Chief's office."  Id. Further, as stated above, the Form 14 was signed by the Chairman of the Board of Police Commissioners.  (See Exhibit C, p. 3; deposition of Cochrane, p. 27.)  It was the Springfield Police Chief's office which made the decision as to who exactly would be laid off in 2003.  The clerical work for such layoff was performed by Sgt. Peter Albano, who was the "Chief's aide."  (See Exhibit B, pp. 12-13 to Plaintiff's Initial Statement of Material Facts.)  Sgt. Albano testified that the Chief's office made the determination as to who would be laid off by using the City of Springfield Official Seniority Rosters.  (See Exhibit F to Plaintiff's Initial Statement of Material Facts.)

43.     Each civil service list provided by the Commonwealth's Human Resources Division to a City who is subject to the Beecher Decree, lists each candidate by the following designations:  CH, CB, or D.  (See Deposition of HRD Official Sally McNeely,

Exhibit F, pp. 50-52 attached hereto.)  According to Sally McNeely, Director of Local

Services for the Commonwealth's Human Resources Division, the CH stands for a

minority Hispanic candidate, CB stands for a minority Black candidate, and D stands for

a non-minority.  Id. at 50-52.


III.    THE DEFENDANT'S FAILURE TO FILE A PROPER COUNTERSTATEMENT
        OF MATERIAL FACTS REQUIRES THE COURT TO ACCEPT ALL OF
        PLAINTIFFS' FACTUAL ASSERTIONS AS TRUE, AND, IN ADDITION, TO
        HOLD THAT ANY FACTUAL ASSERTIONS MADE BY THE DEFENDANT IN
        ITS CROSS-MOTION ARE NOT PROPERLY SUPPORTED.

        Both Local Rule 56.1 and decisions of this court make clear that where the

moving party submits a statement of material facts with appropriate citations to the

record, such material facts "will be deemed for the purposes of the motion to be

admitted by opposing parties unless controverted" by a counterstatement filed by the

party opposing the motion.  See generally, Bogdahn v. Hamilton Standard, 973 F.Supp.

52 (D.Mass. 1997) (Ponsor, J.).  Similarly, this court has held in accordance with the

dictates of Local Rule 56.1 that where a moving party requesting summary judgment

fails to "include a concise statement of material facts of record as to which the moving

party contends there is no genuine issue to be tried," any such resulting motion for

summary judgment "must be denied on procedural grounds."  See Dale v. H.B. Smith

Company, 910 F.Supp. 14 (D.Mass. 1995) (Neiman).

        In their motion for summary judgment, the plaintiffs filed a concise "statement of

material facts as to which there is no dispute" which contains 26 separately numbered

paragraphs, each stating facts with appropriate citations to record evidence.  The

plaintiffs submitted at least 12 exhibits, including two (2) full depositions, in support of

their factual showing, and made appropriate citations to the record throughout the statement of material facts.

Shockingly, in response, the City of Springfield has failed to file a counterstatement of material facts, or, indeed, any statement of material facts.  Indeed, its memorandum of law in support of its cross-motion for summary judgment and opposing plaintiffs' motion, fails to even include a statement of facts.[4]  Ironically, in its opposition, the defendant cites several First Circuit cases holding that "a party who opposes a properly substantiated motion for summary judgment, but fails to muster counter affidavits or other evidentiary materials, does so at his peril."  See defendant's brief at page 6 citing and quoting from Corrada v. Sea-Land Service, Inc., 248 F.3d 40, 43 (1st Cir. 2001).

Whether defendant's failure to file a statement of material facts is based upon its tacit admission that all of the facts stated in plaintiffs' "statement" are true, or whether it was oversight, either way, plaintiffs' statement of material facts must be taken as true, whereas here, it is properly based upon actual evidence supported by appropriate citations to the record.  Moreover, defendant's cross-motion for summary judgment must be denied as it is not supported by an appropriate statement of material facts. See Dale v. H.B. Smith Company, Inc., supra.[5]

---

[4] The City does provide an affidavit of one of the attorneys of record, Peter Murphy, who has represented the City of Springfield in this action.  He makes a number of statements, many of which are not based on personal knowledge, or are otherwise simply statements regarding legal issues.

[5] As argued in other sections of this reply brief, defendant does seem to make factual assertions. For example, the defendant asserts that plaintiffs have not demonstrated that they suffered actual harm as a result of defendant's improper racial quota for layoffs.  Even though the court should not permit this assertion because defendant has not provided a statement of material facts with appropriate citations, below, the plaintiffs will nevertheless demonstrate conclusively, as they believed that they did in their first statement of material facts, that the City is wrong in this assertion.  Similarly, the defendant attempts to escape Section 1983 liability by claiming that the defendant's action was not "official policy or custom." Once again, this assertion should be stricken because it is not based upon a properly supported

IV.    THE PLAINTIFFS ARE WELL WITHIN THE STATUTE OF LIMITATIONS FOR
       CHALLENGING THEIR RACIALLY BASED LAYOFFS IN FEBRUARY AND
       MARCH OF 2003.

In its brief, the defendant makes two (2) arguments which directly contradict one

another.  First, the defendant claims that plaintiffs are beyond the statute of limitations

because their cause of action ran when they knew or should have known of their

assigned seniority or "badge number" which they received in 1997/1998.  At the same

time, defendant argues in its brief that plaintiffs cannot prevail because they failed to

show that their "assignment of seniority based on a one-for-one [formula] caused any

injury in fact to a cognizable interest."  (See defendant's brief at p. 17.)  The irony of this

argument should be readily apparent.  While the plaintiffs received badge numbers or

seniority rankings back in 1997, at that time they indeed had no "cognizable injury"

because they had no reason to believe that they would ever be laid off or otherwise

adversely affected by their assignment of badge numbers.[6]

The "cognizable injury" which the plaintiffs suffered occurred in February or

March of 2003 at the earliest, when they were officially notified of their layoff, or from the

period July of 2003 to February to 2004, when the plaintiffs were recalled to duty in a

manner violative of the Equal Protection Clause.  Unanimous case law makes clear that

the statute of limitations in a case such as this does not run at the earliest until the

layoffs occurred and, therefore, plaintiffs' claims are clearly timely.  In this Circuit, this

---

statement of material facts.  Still, and with an abundance of caution, the plaintiffs will demonstrate that
this assertion, too, wrong.

[6]    Indeed, as described herein, the plaintiffs, young, just hired police officers, had no way of
knowing how their badge numbers were being assigned or whether it was proper.  They certainly did not
know that the procedures being utilized by the City of Springfield to assign badge numbers on a one-for-
one basis, were in violation of the terms of the collective bargaining agreement or federal law.  (See
Affidavits of Plaintiffs attached hereto as Exhibits A through E.)

issue was definitively resolved in <u>Thomas v. Eastman Kodak Company</u>, 183 F.3d 38 (1st Cir. 1999).  In that case, the employee had received a series of negative performance appraisals, all of which she believed to be the result of race discrimination.  However, she did not file a claim of discrimination until she received an actual notice of layoff. The employer argued that her claim was untimely because her action had accrued when she received what she believed to be discriminatory performance appraisals.  The First Circuit held otherwise, holding clearly that an employer's action only triggers the running of the statute of limitations "if that action has concrete, negative consequences for an employee" and that the employee is made aware of those consequences.  In other words, discriminatory actions must have "crystallized" into some "tangible affects." <u>Id</u>. at 48-49.

In <u>Lorance v. AT&T Technologies</u>, 490 U.S. 900 (1989), the Supreme Court held that where a seniority system is alleged to be neutral on its face, the limitations period begins to run when the employer adopts the system, not when an employee is demoted pursuant to that system.  <u>Id</u>. at 912-13.  However, the court went on to hold that where the seniority system is facially discriminatory, as plaintiffs claim in this case, the limitations period begins to run each time application of the seniority system negatively impacts an aggrieved employee.  <u>Id</u>. at 914-15.  In 1991, Congress overruled that part of the Supreme Court's decision in <u>Lorance</u>, which required employees to challenge a neutral seniority system "when the system is adopted" and provided instead that such individuals could challenge such a system when "a person aggrieved is injured by the application of the seniority system."  See 1991 Civil Rights Act, Pub. L. No. 102-166, Section 112, 42 U.S.C. § 2000e-5(e)(2).

The seniority system at issue here did not operate to adversely affect the plaintiffs until the winter of 2003, hence their claims are timely.  Moreover, since even the defendant admits that the seniority and layoff system here was based upon a one-to-one quota system arranged by the City of Springfield over the last ten (10) years, even if Lorance had not been overruled, the plaintiffs' claims would still be timely under Lorance because the system here is facially discriminatory.[7]

Perhaps the case most directly on point is EEOC v. Kentucky State Police Department, 80 F.3d 1086 (6th Cir. 1996).  There, the EEOC brought an action against the State Police Department and other defendants alleging that the Department's policy of mandatory state trooper retirement at age 55 violated the ADEA.  On appeal, the State defendants argued (as defendant argues here) that because the Kentucky state troopers involved in the case had become aware of the mandatory retirement age on the date that they were hired, they could not challenge the policy years later when they were actually forced to retire.  The Sixth Circuit disagreed and held, in line with Lorance, that the plaintiffs' claims only became ripe when the statute is applied, i.e. "when the trooper is mandatorily retired."  Id. at 1093.

In the present case, the evidence does not demonstrate that the plaintiffs were even aware that the setting of their seniority back in 1997, which was, in itself, discriminatory, would be used years later to lay them off unlawfully.  They were simply

---

[7]     In Martin v. Wilkes, 490 U.S. 755 (1989), the Supreme Court again demonstrated its reluctance to cut-off the claims of individuals affected by discreet employment discrimination actions.  In that case, the court held that a group of white fire fighters who had failed to intervene in an earlier employment discrimination proceeding in which a consent decree had been entered, was still free to challenge employment decisions taken pursuant to those decrees, because they had not been parties to the earlier action.  Similarly, in the instant case, none of the plaintiffs had any involvement in any earlier proceedings relating to how the City of Springfield ended up utilizing its one-for-one system of assigning seniority, in violation of a collective bargaining agreement, or in any of the other proceedings involving the union or the City.

newly hired recruits going through academy and they were not made privy to any information regarding the setting of seniority or badge numbers.  (See Affidavits of Plaintiffs attached hereto as Exhibits A through E.)  Moreover, and just as importantly, even if the plaintiffs had been aware that their seniority date had been altered based upon their race, they still had no "tangible harm" in that there is no evidence to suggest that their employment was in any way adversely affected by reason of the date of the seniority date given to them back at the time.  Moreover, there was certainly no way that they could have imagined that they would be laid off in 2003 based upon a racially based one-for-one quota system.  Indeed, prior to the early 1990's, seniority was set under the collective bargaining agreement by exam score (for those hired on the same date).  (See Arbitrator's Award, Exhibit D, pp. 4-5.)  Even if they had known this information and had sued back in 1997, undoubtedly the City would have argued that they had no claim, because they had not shown any adverse harm.

Moreover, it was not until an arbitrator ruled in June of 2004 that the collective bargaining agreement, fairly construed, mandated that seniority be assigned according to standing on the original 1997 civil service list, and not the reconfigured list utilized by the City, that the plaintiffs were actually aware that the City had used a seniority system different from that which was required by the contract and by law.  Indeed, as the Affidavits of Plaintiffs attached hereto make clear, it was not until the arbitrator's decision came out in June of 2004, that any of the plaintiffs understood what the City had actually done, and that such actions might constitute unlawful reverse discrimination.  Id.

Strikingly, the defendant's brief fails to grapple with any of these issues. First, it provides no evidence to suggest that the plaintiffs knew that their rights had been violated before June of 2004, indeed, it makes no factual showing at all on this issue. Second, it fails to even mention the many cases such as <u>Thomas v. Eastman Kodak</u> and <u>Lorance</u>, or the Civil Rights Restoration Act of 1991. The City admits that the equal protection claim here is subject to a three-year statute of limitations, which would mean that when plaintiffs filed this action in January of 2005, it was properly filed as long as they suffered adverse discriminatory action after January of 2002. Clearly, that is the case here as they had no idea that they would be laid off until 2003. For all of these reasons, the plaintiffs' claims are clearly timely.

V.    <u>THE DEFENDANT'S ARGUMENT THAT THE CITY CANNOT BE HELD LIABLE FOR ITS FIFTEEN-YEAR PRACTICE AND POLICY OF ASSIGNING SENIORITY AND CONDUCTING LAYOFFS PURSUANT TO AN UNLAWFUL RACIAL QUOTA SYSTEM IS WITHOUT MERIT</u>.

Without submitting any statement of material facts to support its assertion, but simply based upon argument in its brief, the City claims that it cannot be held liable for how it laid off and then recalled to work more than 70 police officers, claiming that such actions were not authorized by anyone holding policy making authority. The City relies almost exclusively on one Supreme Court case, <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112 (1988), a case which dealt with one unauthorized act of First Amendment retaliation by an individual who had no policy making authority. <u>Praprotnik</u>, and its progeny, reflect a concern by the courts to limit municipal liability where isolated and unauthorized acts are taken by municipal officials who are without authority to set municipal policy. <u>Baron v. Suffolk County Sheriff's Dept.</u>, 402 F.3d 225, 236-237 (1st Cir. 2005). These cases

12

are not even remotely applicable here, where the City of Springfield utilized an official system for determining layoffs going back 15 years, affecting more than 100 police officers (see discussion below).  Indeed, when the issue was raised by the police union in 2003, the Board of Police Commissioners declined to change the practice, and instead ratified it.

First, when the City conducted layoffs and recalls based upon a one-for-one formula, first in 1989 (see discussion below) and then in 2003, that action could, by law, only be taken by the "appointing authority" after official notice and hearings had been held pursuant to G.L. ch.31, §41.  Thus, under the civil service statute which governs Springfield's police department, the layoffs and recalls are official policy taken by the "appointing authority" who, by law, controls all hiring, layoff, and recall policies in the City of Springfield Police Department.  See G.L. ch. 31, §§ 1 and 41.  As made clear in plaintiffs' additional supplemental statement of material facts, filed herewith, the policy challenged here has been in existence for at least 15 years, from 1989 until 2004.  For example, the Affidavit of Attorney Peter Murphy, submitted by the City, specifically states that the City's policy started in at least 1989.  (See Murphy Affidavit at ¶¶ 9-10.) Attorney Murphy also states that in 1995 the union and the City negotiated a policy which required seniority to be determined by original ranking on the civil service list, but that apparently the City never complied with the policy which it negotiated between 1995 and the arbitrator's award in June of 2004.  (See Murphy Affidavit at ¶¶ 7-9.) Further, Attorney Murphy's affidavit shows, as does Exhibit F attached to plaintiffs' statement of material facts, that the City regularly posted official seniority roster pamphlets between 1995 and 2004.  Those represented the official rankings of seniority

based upon the City's unlawful racially based rankings.  A review of Exhibits C, D, J, and K reflect that between 1995, when the new policy was negotiated, and 2003, more than 100 police officers were hired and given improper seniority rankings over this eight (8) to nine (9) year period.

Further, when, in 1997, the City reordered seniority by ranking everyone on the so-called Form 14, on the basis of one minority to every one non-minority, that form was signed by Gerald Phillips, then Chairman of the Board of Police Commissioners.  (See Exhibit C, p. 3.)  These Form 14's, which the City used to illegally reorder seniority, are official state forms which must be filled out and signed by the "Appointing Authority" for the City.  (See Exhibit E.)  Indeed, as stated above, Exhibit F, which is an official City of Springfield, Massachusetts Department of Police Roster dated November 1, 2002, reflects that well over 100 police officers were hired since 1996, and their seniority is officially listed under the insignia of the Springfield Police Department.  (See Exhibit F.)  Further, the City concedes (see Affidavit of Peter Murphy, ¶ 3) that the matter was raised with the City in 2003, but the City and the Board of Police Commissioners decided not to voluntarily stop its practice of granting seniority based upon a racial quota system.  (See Arbitration Award, Exhibit D, pp. 7-9.)  Certainly then this cannot be characterized as an isolated act of lower echelon employees who were acting without apparent authority.

Further, the City's own Affidavit from Peter Murphy, along with the attachments thereto, demonstrates an additional compelling and persuasive reason that the City should be subjected to liability.  It is undisputed that back in the 1970's and 1980's, the City of Springfield was one of the so-called "Beecher" Decree communities subject to

the Beecher Consent Decree.  (See City's brief at pp. 9-10.)  As the City correctly notes

in its brief, the issue of layoffs and recalls first occurred in many cities throughout the

Commonwealth, including Boston, in the early 1980's and was the subject of a

supplemental court decree by Judge Caffrey, that was later affirmed by the First Circuit,

Boston Chapter NAACP v. Beecher, 679 F.2d 965 (1st Cir. 1982).  The First Circuit's

affirmance of one-for-one layoffs and recalls was vacated by the United States Supreme

Court in light of its decision in Fire Fighters Union, Local 1784 v. Stotts, 467 U.S. 561

(1984).  See 104 S.Ct. 3576 (1984).  Thus, as one of the Beecher communities, the City

of Springfield is presumed to have been on notice of the seriousness of its continuing to

effectuate layoffs and recalls based upon a one-for-one formula.

     Yet, in its brief, and in the Affidavit of Peter Murphy, along with the attachments

thereto, the City concedes that in 1989, it again laid off and recalled on a one-for-one

basis (during a period of budgetary cutbacks at that time), and had several MCAD

complaints filed against it because of its conduct.  (See City's Brief at p. 12; see also

Affidavit of Peter Murphy at ¶¶ 9-10.)  Thus, the City essentially concedes that its policy

of laying off and recalling on a one-for-one basis actually begins back as far as 1989

(possibly further), and was done and continued despite no less than a United States

Supreme Court warning that such actions were unlawful.  Thus, it is hard to fathom that

the City now essentially suggests to the court "policy, what policy?"

     Additionally, even the facts cited by the City do not support its contention that this

was an unauthorized act.  The seniority rankings of the plaintiffs were assigned in 1997

by Captain William Cochrane who, at the time, held the title of "Commander of the

Springfield Police Academy" (see Exhibit A, p. 7) and who thereby had charge over all

issues relating to new hires and recruits before their graduation from the academy.
(See Exhibit A, pp. 11-14.)  As described below, the policy he developed was done in consultation with "the Chief's office" and allegedly in consultation with the Human Resources Division of the Commonwealth of Massachusetts.  Captain Cochrane was placed in this job in 1996 by the new Police Chief, Paula Meara, who had been appointed by the new Mayor, Michael Albano.  Id. at 9-10.  Determining the process for hiring and assignment of seniority, Captain Cochrane testified under oath that he consulted with "people . . . in the Chief's office," including Lt. Michael Finn who was the Chief's aide.  Id. at 12.  Further, Captain Cochrane testified directly that the filling out of the Form 14, which resulted in the unlawful assignment of seniority challenged here, was not done by him, but "was filled out by the Chief's office."  Id.  In other words, the challenged act was not done by Captain Cochrane, but was done at the highest level of the Police Department, namely in the Chief's office.  Indeed, as mentioned above, the Form 14 is signed by the Chairman of the Board of Police Commissioners.  (See Exhibit C, p. 3; see also Deposition of Cochrane, Exhibit A, p. 27.)  Accordingly, Captain Cochrane testified that the final decision as to how to constitute the Form 14 was done in the Chief's office and signed by the Chairman of the Board of Police Commissioners. In addition, Captain Cochrane had no involvement in the decision in 2003 as to whom to layoff, Exhibit A, p. 35, as that decision was made exclusively in the Chief's office.  Id. at 35.

The actual 2003 layoff decisions were made by the Springfield Police Chief, Paula Meara.  The actual administrative clerical work was performed by Sgt. Peter Albano, who was then the Chief's "aide."  Sgt. Albano testified that in determining who

would be laid off, the City used the official rosters, Exhibit F, which listed seniority. (Exhibit B, pp. 12-13.)  The City was then required by Chapter 31, Sections 41-43 to send official notices of layoff along with providing each officer a right to a hearing to contested his layoff.

42 U.S.C. § 1983 permits damage actions against municipalities providing that the action alleged to be unconstitutional constitutes a policy, statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Monnell v. Department of Social Services, 436 U.S. 658 (1978).  In addition, liability attaches for unconstitutional actions where that action is the result of a governmental "custom" even though such a custom has not received formal approval through the body's official decision-making process.  Id.  Thus, a plaintiff can prevail by showing that the unconstitutional actions at issue were part of a "custom or policy of the municipality." Id. at 692.  As Seventh Circuit Appeals Court Judge Coffey has deftly summarized the standard:

> In order for a claimant to prevail on a Section 1983 claim against a
> municipal corporation, he or she must establish that the violations were
> part of a custom or policy of the municipality. . . .  Three types of municipal
> policy variants implicate Section 1983 when constitutional rights are
> violated: (1) an express policy . . .; (2) a widespread practice that although
> not authorized by written law or express municipal policy, is so . . . well
> settled as to constitute a custom or usage within the force of law; and (3)
> the actions of a person with final policy making authority.

See Looper v. City of Indianapolis, 197 F.3d 908 (7th Cir. 1999).  In this Circuit, the Court of Appeals has repeatedly held that municipal or county liability may attach where the evidence shows that the defendant "can be said to have either actual or constructive knowledge" of the policy "yet did nothing to end the practice."  Baron, 402 F.3d 236-237; Miller v. Kennebec County, 219 F.3d 8, 12 (1st Cir. 2005); Bordanaro v. McCleod, 871

F.2d 1151 (1st Cir. 1989).  Here, where the City officially gave notice to and cause the official layoff of 72 police officers in 2003, arranged one minority for every non-minority, the City's actions constituted "official" government action.

If ever there was a policy "custom or usage" that engendered Section 1983 liability, it is here.  The City's argument boils down to this, even if it engaged in an unconstitutional policy of rigidly arranging a quota system of one minority for every one non-minority in establishing seniority and in laying off the plaintiffs, in violation of the requirements of the equal protection clause, it cannot be held liable for its 15-year long practice, because no one officially promulgated such policy.[8]  First, it should be noted that the issue here is not the City of Springfield's good faith.  Just like the City of Boston in Quinn, et al. v. City of Boston, 325 F.3d 18 (2003), and DeLeo, et al. v. City of Boston, No. 03-12538 (Saris, 2004) (attached to Plaintiffs' Initial Statement as Exhibit L), the fact that the City was attempting to afford greater rights to minorities, while laudable, does not in any way insulate itself from Section 1983 liability for unconstitutional action.  Quinn, supra.  Thus, to the extent that the City is arguing that its "good faith" or mere "negligence" should not be the basis for liability, such an argument is clearly wrong.  Quinn, supra., DeLeo, supra.

Further, the action of the City of Springfield here clearly was not some isolated or individual act unknown to the final decision makers.  Rather, as Exhibit F makes clear, between 1996 and 2002, the City hired well over 100 police officers, and each one was given their seniority ranking based upon a rigid one-for-one (minority to non-minority) formula which was not authorized by the Beecher Decree, not authorized by the

---

[8]    The plaintiffs would note that this whole issue is only relevant to plaintiffs' claim under 42 U.S.C. § 1983, and not their other statutory claims in Counts II to IV of the complaint.

negotiated seniority provisions of the collective bargaining agreement, nor permitted by the Equal Protection Clause.  See Fire Fighters Union, Local 1784 v. Stotts, supra.  Further, the challenged one-for-one layoff policy was first executed in 1989 and then extended by the Commander of the Springfield Police Academy in 1997, who was delegated the authority by the Chief to take control over all new police hires.  He, in turn, consulted with "the Chief's office" and with the "Human Resources Division" of the Commonwealth of Massachusetts.  Further, it was signed off by the Chairman of the Board of Police Commissioners in the Form 14 submitted to the Commonwealth (Exhibit E), and it made its way into the official rosters for the City of Springfield Police Department for the years between 1996 and 2004.  (Affidavit of Peter Murphy, Exhibit F.)  The policy was used to effectuate layoffs in 1989, and another 72 layoffs in 2003.  It was also used to recall officers from layoff as late as 2004.  Finally, when the issue was brought to the attention of the Board of Police Commissioners and City officials in 2003, they declined to change it.  Based upon the above, the plaintiffs assert that the City is liable for its actions under all three "variants" of municipal liability under Monell and its progeny.  First, the unconstitutional layoff and seniority process utilized by the City became an imbedded custom or usage over 15 years and thus qualified as the policy of the City.  Second, Captain Cochrane and those who implemented the policy were doing so with the express authorization and authority given to them by the Police Chief and by the Board of Police Commissioners.  They were not off on some wild goose chase.  Third, both the Board of Police Commissioners, through its then Chairman Gerald Phillips, and later on when the Board of Police Commissioners voted to continue the policy, authorized or ratified this policy.  For all of these reasons, the City cannot escape

liability under 42 U.S.C. § 1983 by arguing that the actions at issue were not

unauthorized.  Finally, at the very least, since the City has not filed a statement of

material facts, it is not entitled to summary judgment on this essentially factual issue.

VI.    THE CITY'S HALF-HEARTED ATTEMPT TO SUGGEST THAT ITS ACTIONS
       WERE NOT UNCONSTITUTIONAL IS FLATLY WRONG.

       Although the City does not make the argument with any vigor, it suggests that its

actions in laying off and recalling, based on a strict one-for-one formula, is not a

violation of the equal protection clause.  Its argument proceeds that Stotts does not

definitively address the issue in this case, and that the issue was never fully resolved in

the Beecher litigation, notwithstanding the reversal and remand by the United States

Supreme Court of the First Circuit's decision in Beecher in 1984.  See Boston

Firefighters, Local 718 v. City of Boston, 468 U.S. 1206 (1984).  This argument goes

nowhere.  First, it is worth noting that when it engaged in its actions, the City of

Springfield was not acting pursuant to any approved or authorized consent decree or

order requiring it to effectuate layoffs and recalls on a strict one-for-one basis.  Indeed,

as explained in the plaintiffs' main brief, the whole process used by the City of

Springfield in hiring and arranging badge numbers went far beyond the affirmative

action authorized by the Beecher decree.  Whereas the Beecher decree required the

City to obtain a beginning pool of candidates that were paired one minority for every one

non-minority, and then envisioned the candidates going through the rest of the hiring

process, the City turned the whole process into a quota system.  Additionally, it is worth

noting that the plaintiffs here are not challenging the City's continued compliance with

the Beecher decree, which only requires that the original civil service pool of candidates

list be compiled on a one-for-one basis.  While certainly <u>Quinn v. City of Boston</u>, <u>supra</u>, calls into question the City's continued actions in that regard, it is not necessary to the court's decision here.  Rather, the plaintiffs are only challenging here the radical departure by the City of Springfield from <u>Beecher</u> in strictly adhering to a one-for-one formula, both in the hiring, layoff, and recall of Springfield police officers.  This went far beyond anything authorized by <u>Beecher</u>.  More importantly, <u>Stotts</u> clearly bars layoffs based on a quota system that conflicts with a non-discriminatory seniority system.

Thus, and as argued in the plaintiffs' main brief, the City's actions in assigning seniority for layoff and recall purposes based upon a strict one-for-one formula, notwithstanding where individuals were ranked on the original civil service list, which list was already arranged based upon the <u>Beecher</u> formula, violates the equal protection clause.

VII.    <u>THE DEFENDANT'S ASSERTION THAT PLAINTIFFS WERE NOT HARMED BY DEFENDANT'S ACTIONS IS CLEARLY WRONG, AND, IN ANY EVENT, SUCH ASSERTION SHOULD NOT BE PERMITTED GIVEN THAT DEFENDANT FILED NO COUNTER STATEMENT OF MATERIAL FACTS</u>.

As stated initially in this brief, the City should be precluded from arguing that the plaintiffs cannot show actual harm as a result of the City's actions.  In their original statement of material facts, the plaintiffs made a clear showing that such harm occurred, and the defendant has submitted no statement of material facts to contradict this assertion.  However, since, as shown below, this is not a matter which can be seriously disputed, plaintiffs will again demonstrate through incontrovertible evidence that the plaintiffs were harmed by the defendant's actions.

The analysis is quite straightforward.  Exhibit C attached hereto, the plaintiffs' statement of material facts, is the civil service list as it was provided to the City of Springfield back in 1997, after being initially arranged in a one-for-one order to comply with the Beecher decree.  (See Exhibit C.)  As apparently all parties now agree, the collective bargaining agreement intended for seniority to be determined (for those persons hired on the same date) based upon one's ranking on such original civil service list.  (See Arbitration Award, Exhibit D.)  Instead, the City utilized a reconfigured list, Exhibit E, which was rearranged on a strict one-for-one basis, (after people had been disqualified) to assign seniority, and thus determine standing for layoffs.  Thus, a simple comparison of Exhibit C with Exhibit E reflects how racial pairing was used to adversely affect the plaintiffs.  (See discussion below.)  Moreover, this analysis is then confirmed by Exhibit F, the November, 2002 Police Department Roster, and Exhibit I, a document utilized by the defendant to track when people were laid off and when they were reinstated.

As stated above, Exhibit C is organized one minority for every one non-minority. To the right of each person's name is a designation, either "CH" or "CB" or "D."  As made clear from a deposition of Sally McNeely, an official at HRD who was deposed in the DeLeo litigation, the "D" designates a non-minority applicant, the "CH" designates a minority Hispanic applicant, and the "CB" designates a minority Black applicant.  (See Deposition of McNeely attached hereto as Exhibit F.)  In any event, the same conclusion can be drawn from the fact that the list alternates between a "D" candidate and "CH" or "CB" candidate.  The first plaintiff, Mark Mehringer, appears at the bottom of page 12 of Exhibit C.  The other plaintiffs, Sleeper, Sullivan, Trombley, and Dudley

appear on pages 13 and 14 of Exhibit C.  The following minority candidates (designated by either "CB" or "CH") appear well after the plaintiffs on Exhibit C, the original civil service list:  Kevin Bell on page 16, Mike Rivera on page 17, Angel Perez on page 17, Martin Santa on page 17, and Gregory McCain, who is listed below plaintiffs Mehringer, Sleeper and Sullivan on the original civil service list, Exhibit C, page 13.

On  Exhibit E, the reconfigured Form 14 list from which seniority was assigned and layoffs made, as a result of the City's one-for-one reconfiguration, minorities Kevin Bell, Gregory McCain, Mike Rivera, Martin Santa, and Angel Perez are all listed and thereby given seniority ahead of one or more of the plaintiffs.

In order to then determine actual economic harm – that is that the plaintiffs were actually harmed by the City's action – one need only review Exhibit I attached to plaintiffs' original Statement of Material Facts, which is the City of Springfield's list of who was laid off and when and who was recalled and when.  That list reflects the following:

| Name | Laid Off | Reinstated |
|------|----------|------------|
| Angel Perez | 2/15/03 | 3/7/03 |
| Santa Martin | 3/15/03 | 9/14/03 |
| Kevin Bell | 3/18/03 | Retroactive to 3/7/03[9] |
| Gregory McCain | 3/18/03 | 3/7/03 |
| Mike Rivera | 3/18/03 | 7/29/03 |

---

[9]     It appears McCain and Bell were recalled almost immediately.

When this group, who should have had less seniority than the plaintiffs, is compared to the plaintiffs, it is clear that the plaintiffs were adversely affected:

| Name | Laid Off | Reinstated |
| --- | --- | --- |
| Mark Mehringer | 3/13/03 | 7/29/03 |
| Kevin Sullivan | 3/14/03 | 9/14/03 |
| Michael Trombley | 3/14/03 | 9/14/03 |
| Jason Sleeper | 3/18/03 | 9/14/03 |
| Vincent Dudley | 3/27/03 | 2/29/04 |

(See Exhibit I.)[10]

Exhibit F, the official Springfield Police Department Roster dated November 1, 2002, confirms the adverse impact.  In that document, McCain, Bell, Perez, Rivera, and Santa are all given seniority rankings above one or more of the plaintiffs.  Thus, had the plaintiffs been given their rightful seniority as required under the collective bargaining agreement, without the reorganization of seniority by imposition of a strict one-for-one quota, each of the plaintiffs would have had higher seniority than the minorities listed above.  Since all of the minorities listed above were either laid off for only an inconsequential period of time, not laid off at all, or laid off for shorter periods of time than the plaintiffs, it is clear that the plaintiffs would have either not been laid off, or been laid off for substantially shorter periods of time, had the defendant not created an unconstitutional layoff system based on a one-for-one formula.  (See also Exhibits K and L.)

---

[10]    Exhibit I was a document prepared by the Springfield Police Chief's Office, tracking who got laid off and who got reinstated.  It was produced by the City as the deposition of Peter Albano, the Chief's aide.  (See Exhibit B, p. 17.)

Indeed, as can be seen from the arbitrator's award, it was only because of equitable considerations based upon the union's delay in filing the case for arbitration, that the arbitrator decided not to award the plaintiffs any remedy at all.  Thus, they received no back pay, lost overtime or detail payments, nor retroactive seniority or any other damages for their, on average, six month period of layoff.  Thus, the plaintiffs were clearly adversely affected by the defendant's actions.

For all of these reasons, and, most specifically, that the defendant has not properly controverted plaintiffs' persuasive showing that they were adversely affected by defendant's unconstitutional actions, the plaintiffs remain entitled to summary judgment on liability.

Respectfully submitted,
KEVIN SULLIVAN, VINCENT DUDLEY,
MARK MEHRINGER, JASON SLEEPER,
and MICHAEL TROMBLEY,
By their attorneys,


s/Harold L. Lichten_____
Harold L. Lichten, BBO #549689
Pyle, Rome, Lichten, Ehrenberg &
    Liss-Riordan, P.C.
18 Tremont St., Ste. 500
Boston, MA 02108
Dated: January 9, 2006          (617) 367-7200


## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served on the attorney of record for each party by first class mail on January 9, 2006.


s/Harold L. Lichten_____
Harold L. Lichten

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KEVIN SULLIVAN, VINCENT DUDLEY,<br>MARK MEHRINGER, JASON SLEEPER,<br>And MICHAEL TROMBLEY,<br>    Plaintiffs<br><br>v.<br><br>CITY OF SPRINGFIELD, MASSACHUSETTS,<br>    Defendant | )<br>)<br>)<br>)<br>)<br>)      Civil Action No:<br>)      05-30004-MAP<br>)<br>)<br>)<br>) |

**AFFIDAVIT OF KEVIN SULLIVAN**

I, Kevin Sullivan, being duly sworn, depose and state and follows:

1.      I am a plaintiff in this case, and am currently employed as a police officer for the City of Springfield.  I was hired by the City of Springfield in 1997 and sent to the police academy for training.  Upon successful completion of the police academy, I was officially sworn in as a Springfield police officer and assigned a badge number. Although at the time I was generally aware that my badge number also correlated to my seniority on the Department, I did not know, and had no way of knowing, how my seniority was calculated.  Further, I had no knowledge that my badge number would ever be used for layoff purposes, nor did I have any knowledge as to how layoffs would be carried out if any layoffs should ever occur in the Springfield Police Department.

2.      Specifically, at no time prior to 2004, did I ever have any knowledge of, or was aware, that the City of Springfield had assigned badge numbers based on a one-for-one minority – non-minority quota system.  Indeed, until 2004, I had no knowledge of

1

how badge numbers, and hence seniority, were calculated, and I further had no knowledge as to how layoffs would ever be carried out in the Springfield Police Department.

3.      Some time in February of 2003, I received an official letter from the City of Springfield informing me that I was being laid off effective in March of 2003 and informing me that the layoff was due to budget cuts.

4.      After the layoffs had been implemented, I became generally aware that some officers were contending that the layoffs had been improperly carried out, but, again, I had no knowledge of any claims that the layoffs had been carried out based upon racial or ethnic minority considerations. I was simply aware that one or more police officers were claiming that the layoffs had occurred in a way different from what the collective bargaining agreement provided. Further, I was aware that the Springfield Police Officers Union was filing a grievance and planned to proceed to arbitration on this issue. I believed at the time that the issue being raised by the Union related to what the proper method of determining seniority/layoffs was under the collective bargaining agreement.

5.      Some time in June of 2004, I became aware that an arbitrator had issued a decision finding that the method used for determining who would be laid off violated the collective bargaining agreement. I then requested to see the decision, and was furnished a copy by a fellow police officer. I read the decision carefully and it was only then that I discovered, based on a careful reading of the arbitrator's decision, that the City had organized the layoffs from a seniority list that was compiled based upon a strict one-for-one pairing of minority to non-minority candidates. Further, it was at that point

2

that I first became aware that I would receive no relief or remedy out of the arbitrator's award. It was shortly thereafter that I first formed a belief or had knowledge that the actions of the City of Springfield seemed to me to be unlawful reverse discrimination, and I began seeking legal counsel.

Signed under the pains and penalties of perjury this _5_ day of January, 2006.

Kevin Sullivan

3

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KEVIN SULLIVAN, VINCENT DUDLEY, MARK MEHRINGER, JASON SLEEPER, And MICHAEL TROMBLEY, Plaintiffs<br><br>v.<br><br>CITY OF SPRINGFIELD, MASSACHUSETTS, Defendant | Civil Action No: 05-30004-MAP |

**AFFIDAVIT OF VINCENT DUDLEY**

I, Vincent Dudley, being duly sworn, depose and state and follows:

1.      I have been a police officer for the City of Springfield since 1997.  At the time that I was hired as a Springfield police officer and went through the academy, I had no knowledge or information as to how my badge number or seniority had been calculated.

2.      In late February of 2003, I received a notice of layoff informing me that I was being laid off due to budget cuts.  At that time, I still had no knowledge or information as to how the City had decided who particularly to layoff, except that I was told it was being done by "seniority."  Again, I had no knowledge that seniority had been determined or calculated based upon a one-for-one minority to non-minority formula.

3.      After the arbitrator issued his award in June of 2004, I became aware that I would not be receiving any relief under the award.  Further, after discussing the award with Patrol Officer Kevin Sullivan, I first became aware that the award described how

1

seniority had been calculated based upon a one-for-one formulation.  It was only at that time that I first realized that my layoff may have been unlawful reverse discrimination.

Signed under the pains and penalties of perjury this ___5___ day of January, 2006.

Vincent Dudley

2

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

KEVIN SULLIVAN, VINCENT DUDLEY,
MARK MEHRINGER, JASON SLEEPER,
And MICHAEL TROMBLEY,
      Plaintiffs

v.

CITY OF SPRINGFIELD, MASSACHUSETTS,
      Defendant

Civil Action No:
05-30004-MAP

## AFFIDAVIT OF MARK MEHRINGER

I, Mark Mehringer, being duly sworn, depose and state and follows:

1.    I have been a police officer for the City of Springfield since 1997. At the time that I was hired as a Springfield police officer and went through the academy, I had no knowledge or information as to how my badge number or seniority had been calculated.

2.    In late February of 2003, I received a notice of layoff informing me that I was being laid off due to budget cuts. At that time, I still had no knowledge or information as to how the City had decided who particularly to layoff, except that I was told it was being done by "seniority." Again, I had no knowledge that seniority had been determined or calculated based upon a one-for-one minority to non-minority formula.

3.    After the arbitrator issued his award in June of 2004, I became aware that I would not be receiving any relief under the award. Further, after

discussing the award with Patrol Officer Kevin Sullivan, I first became aware that the award described how seniority had been calculated based upon a one-for-one formulation. It was only at that time that I first realized that my layoff may have been unlawful reverse discrimination.

    Signed under the pains and penalties of perjury this __5__ day of January, 2006.


                                        _Mark Mehringer_
                                        Mark Mehringer

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

KEVIN SULLIVAN, VINCENT DUDLEY,  )
MARK MEHRINGER, JASON SLEEPER,  )
And MICHAEL TROMBLEY,  )
    Plaintiffs  )
                            )       Civil Action No:
v.                         )       05-30004-MAP
                            )
CITY OF SPRINGFIELD, MASSACHUSETTS,  )
    Defendant  )

## AFFIDAVIT OF JASON SLEEPER

I, Jason Sleeper, being duly sworn, depose and state and follows:

1.    I have been a police officer for the City of Springfield since 1997. At the time that I was hired as a Springfield police officer and went through the academy, I had no knowledge or information as to how my badge number or seniority had been calculated.

2.    In late February of 2003, I received a notice of layoff informing me that I was being laid off due to budget cuts. At that time, I still had no knowledge or information as to how the City had decided who particularly to layoff, except that I was told it was being done by "seniority." Again, I had no knowledge that seniority had been determined or calculated based upon a one-for-one minority to non-minority formula.

3.    After the arbitrator issued his award in June of 2004, I became aware that I would not be receiving any relief under the award. Further, after discussing the award with Patrol Officer Kevin Sullivan, I first became aware that the award described how

1

seniority had been calculated based upon a one-for-one formulation. It was only at that time that I first realized that my layoff may have been unlawful reverse discrimination.

Signed under the pains and penalties of perjury this __5__ day of January, 2006.

Jason Sleeper

2

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

KEVIN SULLIVAN, VINCENT DUDLEY,
MARK MEHRINGER, JASON SLEEPER,
And MICHAEL TROMBLEY,
      **Plaintiffs**

    )
    )
    )
    )
    )

**v.**

    )
    )

CITY OF SPRINGFIELD, MASSACHUSETTS,
      **Defendant**

    )
    )
    )

Civil Action No:
05-30004-MAP

## AFFIDAVIT OF MICHAEL TROMBLEY

I, Michael Trombley, being duly sworn, depose and state and follows:

1.    I have been a police officer for the City of Springfield since 1997. At the time that I was hired as a Springfield police officer and went through the academy, I had no knowledge or information as to how my badge number or seniority had been calculated.

2.    In late February of 2003, I received a notice of layoff informing me that I was being laid off due to budget cuts. At that time, I still had no knowledge or information as to how the City had decided who particularly to layoff, except that I was told it was being done by "seniority." Again, I had no knowledge that seniority had been determined or calculated based upon a one-for-one minority to non-minority formula.

3.    After the arbitrator issued his award in June of 2004, I became aware that I would not be receiving any relief under the award. Further, after discussing the award with Patrol Officer Kevin Sullivan, I first became aware that the award described how

1

seniority had been calculated based upon a one-for-one formulation. It was only at that time that I first realized that my layoff may have been unlawful reverse discrimination.

Signed under the pains and penalties of perjury this __5__ day of January, 2006.

Michael Trombley

2

# EXHIBIT F

Volume:    I
Pages:   1-129
Exhibits:   18

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**ORIGINAL**

* * * * * * * * * * * * * * * *
PAUL DELEO, JR., THOMAS BARRETT,*
MICHAEL CONNEELY, MATTHEW         *
HOGARDT, BRENDAN DEVER,           *
PATRICK ROGERS, CHRISTOPHER       *
CARR, and BRIAN DUNFORD,          *
              Plaintiffs          *
                                  *    Docket No.
v.                                *    03-12538-PBS
                                  *
City of Boston Massaachusetts;    *
THOMAS MENINO, in his capacity    *
as Mayor of the City of Boston;   *
KATHLEEN O'TOOLE, in her          *
capacity as Commissioner of the   *
City of Boston; MITT ROMNEY,      *
in his capacity as Governor of    *
the Commonwealth of               *
Massachusetts; and the            *
COMMONWEALTH OF MASSACHUSETTS,    *
              Defendants          *
* * * * * * * * * * * * * * * * *

        DEPOSITION of SALLY McNEELY, a witness called
on behalf of the Plaintiffs, taken pursuant to Rule
30 of the Federal Rules of Civil Procedure, before

Elaine Hurley, a Professional Court Reporter and

Notary Public, in and for the Commonwealth of

Massachusetts, at the offices of Pyle, Rome, Lichten

& Ehrenberg, P.C., 18 Tremont Street, Suite 500,

Boston, Massachusetts, 02108, on Friday, June 25,

2004, commencing at 10:05 a.m.

Page 2

1       A P P E A R A N C E S

2    ALFRED GORDAN, ESQ.

3    Pyle, Rome, Lichten & Ehrenberg, P.C.

4    18 Tremont St., Ste. 500

5    Boston, Massachusetts 02108

6    (617) 367-7200

7           Counsel for the Plaintiffs

8    ROBERT L. QUINAN, JR., ESQ.

9    Office of the Attorney General

10   Government Bureau

11   One Ashburton Place, 20th Floor

12   Boston, MA 02108

13          Counsel for the Defendants

14   STEPHEN G. COX, ESQ.

15   City of Boston

16   Boston City Hall, Room 615

17   Boston, MA 02201

18          Counsel for the Defendants

19   ROBIN L. ALPERSTEIN, ESQ.

20   Wilmer Cutler Pickering Hale and Dorr

21   300 Park Avenue

22   New York, NY 10022

23          Counsel for Intervening Defendants

24   Also Present:   Tzung-bor Wei

Page 3

1                           I N D E X

2    WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

3    SALLY McNEELY

4    (By Mr. Gordan)         7                 125

5    (By Ms. Alperstein)            96

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
                                                                    Page ·I
 1                           E X H I B I T S

 2    NO.   DESCRIPTION                                        PAGE

 3     1    Examination Announcement for the Entry              20

 4           Level Police Officer Exam for April 28,

 5           2001

 6     2    Amended Announcement   For Police Officers          33

 7           for the April 26, 2003 Exam

 8     3    Letter from James J.   Hartnett, Jr.,               35

 9           dated 6/30/99

10     4    Letter to Tony Wolfman, dated 7/13/01               39

11     5    Certified List sent to the Boston Police            40

12           Department on 9/14/01

13     6    Form 16-11 from the   City of Boston                48

14     7    Standings For The Community for the City            61

15           of Boston as of 10/5/01

16     8    Certification List dated 8/5/02                     64

17     9    Form 16-2 from the City of Boston Police            72

18           Department

19    10    Form 16-2 from the City of Boston Police            75

20           Department

21    11    Test Item Analysis For 2001 Police Officer          78

22           Test

23    12    Adverse Impact  Analysis for the 2001 Police        80

24           Officer Exam
```

Page 5

| 1 | NO. | DESCRIPTION | PAGE |
|---|-----|-------------|------|
| 2 | 13 | Adverse Impact  Calculations by Question | 84 |
| 3 | | Number | |
| 4 | 14 | Adverse Impact Calculations by Ability Area | 85 |
| 5 | 15 | Public Safety Civil  Service Requisition | 87 |
| 6 | | from the Boston Police Department | |
| 7 | 16 | Letter from Ed Callahan to Denise Grace | 93 |
| 8 | | Singleton dated 7/23/02 | |
| 9 | 17 | Certification for 38 Permanent Full-Time | 94 |
| 10 | | Police Officers to the City of Boston | |
| 11 | 18 | Public Safety Civil  Service Requisition | 105 |
| 12 | | from the City of Boston | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

1    Q.    Correct.  Thank you.  And with that clarification

2    could you repeat your answer, what responsibilities do

3    you have with regard to the Beecher Decree?

4    A.    We ensure that the certified lists are issued in

5    accordance with the dictates of the Consent Decree;

6    that the certification ratio is appropriate for the

7    community that is under consideration.  So, for

8    example, Boston and Springfield that's the 1-1

9    certification and the other communities are a 1-3

10   certification.

11       We are also responsible for ensuring that all

12   applicants are properly considered in the appointment

13   process under the Consent Decree, that by-pass reasons

14   are submitted to us when necessary, and that the

15   communities that are appointing follow the dictates of

16   the Consent Decree.

17   Q.    Do you have any authority over the communities if

18   they are failing to comply with the terms of the

19   Consent Decree?

20   A.    The authority we have is not to approve their

21   appointments.

22   Q.    With regard -- The question was asked with regard

23   to the focus on the police officer hiring, but as a

24   matter of clarification, do you also have

Page 12

```
 1   responsibilities under the Beecher Decree that

 2   pertains to the firefighters?

 3   A.   The firefighter decree is Castro -- Oh, so yes;

 4   right.

 5   Q.   Yes.  Castro.

 6   A.   We do.

 7                 MS. ALPERSTEIN:  The firefighter decree

 8   is not Castro.

 9   A.   It's NAACP.

10   Q.   It's NAACP; right.  With regard to your work with

11   the firefighters, did you become familiar with the

12   Quinn Decision?

13   A.   Yes.

14   Q.   Are you familiar with what the Quinn Decision

15   says with regard to how minority complement is

16   measured with regard to what positions within a fire

17   department?

18                 MR. QUINAN:  Objection.

19                 MR. COX:  Objection.

20   A.   No.

21                 MR. QUINAN:  Did you understand the

22   question?

23   A.   I did; yes.

24                 MR. QUINAN:  Okay.
```

1    Q.   Following the Quinn Decision, within your

2    understanding, are you aware whether the compliance

3    with the relevant decree is measured in terms of

4    entry-level firefighters, or in terms of all

5    firefighters and officers in a department?

6    A.   I am aware that a change was made, but I'm not

7    exactly sure what the change was.

8    Q.   Following the Quinn Decision -- After the Quinn

9    Decision, did the human resources division make any

10   modifications to its policies to comply with the Quinn

11   Decision?

12   A.   Yes.

13   Q.   What are those changes?

14   A.   We reordered the entry-level list for

15   firefighters for the City of Boston.

16   Q.   And in what way did you reorder it?

17   A.   We reordered it so that the list reflected the

18   standings based on ranking, from the examination, with

19   statutory preferences applied.

20   Q.   And by statutory preferences you're referring to

21   what?

22   A.   Disabled veterans preference, veterans preference

23   special preference for the children of police or fire

24   officers who were killed or injured in the line of

Page 48

```
 1    Q.    Thank you.  I think you can put this document

 2    aside and I will show you what we'll mark as McNeely

 3    6.  Do you recognize this document?

 4

 5                    (Whereupon Deposition Exhibit No. 6,

 6                Form 16-11 from the   City of Boston, marked

 7                for identification.)

 8

 9    A.    I do.

10    Q.    And what is it?

11    A.    It's the Form 16-11 the City of Boston sent to

12    us.

13    Q.    And what is that form?

14    A.    Oh, it is the report of all candidates who were

15    considered for appointment in this particular process.

16    Q.    How does this relate if at all to Document 5, the

17    one that we just looked at?

18    A.    This reflects all the people who signed, willing

19    to accept, on the certification.

20    Q.    And looking at the current document, do you know

21    the significance of the date in the lower right-hand

22    corner, 3/15/02?

23    A.    No.

24    Q.    Do you know if the Boston Police Department did
```

1    any hiring in March of 2002?

2    A.    Yes, they did.

3    Q.    Do you know if -- I'll just ask the same

4    question.  Do you know the significance of the lower

5    -- the date on the lower right-hand corner considering

6    the fact that Boston did hire in March 2002?

7    A.    I would surmise that that's the date they

8    prepared this document.

9    Q.    I want to ask you one more question on the

10   preceding document, and it's actually a more general

11   question that you can probably answer without

12   reference to the document.  When you have people

13   within a particular veterans category or 402 category,

14   are those individuals ranked in any order or are they

15   all considered tied, who have the same status?

16   A.    They're ranked in order of the mark they receive

17   on the exam.

18   Q.    So, if you're a disabled veteran who scored a 100

19   you would have a higher ranking than a disabled

20   veteran who scored a 99?

21   A.    Correct.

22   Q.    Thank you?

23   A.    Can I correct something I told you earlier.

24   Q.    Please do.

1   A.   I forgot to mention the residence preference.

2   Well, when we talked about it the residence preference

3   is the first preference that people receive and it is

4   a statutory preference and what that does is it puts

5   all the residents above all the non-residents.

6   Q.   So, if I'm understanding your testimony, then all

7   the other criteria used would -- would be applied

8   after residency, such that --

9   A.   Yes.

10  Q.   -- the first entire group on the list would be

11  all residents of this municipality in their relative

12  ranking order based on factors and test scores and

13  then all non-residents would come after that?

14  A.   Correct.

15  Q.   Okay back to Number 6, just to remind you, you

16  said the City of Boston would prepare this?

17  A.   Yes.

18  Q.   Looking in the second column, the first column is

19  "Name", looking in the second column where it says

20  "Page".  Do you know what that number in that column

21  relates to?

22  A.   It refers to the page of the certification on

23  which that individuals name appeared.

24  Q.   So, if we were to look back at Exhibit 5, all the

1     people who show as being on Page 1 in Exhibit 6, would

2     appear on Page 1 in Exhibit 5?

3     A.    Yes.

4     Q.    Thank you.  The next column is entitled

5     "Designation", can you explain all the different

6     designations that we see there, the letters and the

7     asterisks?

8     A.    Okay.  C refers to minority, H refers to

9     Hispanic, 2 asterisks indicates disabled veterans, D

10    refers to a non-minority, B refers to a minority -- CB

11    refers to a minority who is black and one asterisk

12    indicates a regular veteran.

13    Q.    Okay.  Looking down this list is it possible to

14    determine where the last non-minority veteran appears

15    in rank order?

16    A.    On this page?

17    Q.    On this document.  Not necessarily this page,

18    this document has several pages here?

19    A.    The last minority veteran --

20    Q.    Last non-minority veteran?

21    A.    -- last non-minority veteran.

22    Q.    Non-minority veteran, if I understood your

23    testimony, would be D star?

24    A.    D star.

1   Q.   And so the last non-minority veteran here?

2   A.   Right.  It looks like it's on --

3                MR. QUINAN:  I don't think that is

4   possible.

5   Q.   I believe I see it on what would be Page 3 of

6   this document, relating to Page 11 of the other

7   document.  Correct me if I'm wrong, I'm looking at Jan

8   Stryjewski, who appears to be the last person on this

9   list with a D star?

10  A.   I would agree with you.

11  Q.   And so the individuals above that candidate who

12  do not have stars, those would be people marked CB and

13  CH.  Why would someone without a star appear earlier

14  on the list than a veteran?

15  A.   Because of the ordering of the certification

16  according to the Consent Decree dictates.

17  Q.   That was the 1 for 1 that you explained earlier?

18  A.   1 for 1.

19  Q.   Okay.  Moving on to the third column -- Well,

20  actually, while were looking at that Page 3, where Ms.

21  -- Mr. or Ms. Stryjewski appears, can you -- on this

22  list can you see -- can you tell --

23                MR. GORDAN:  Strike that.

24                MR. QUINAN:  Can I ask one question?

```
 1    You asked early about designations and I see two

 2    designations that you did not explain.  DI appears

 3    near the bottom of page the second page next to the

 4    name Sharon Woodsauntes, could you explain what DI

 5    means?

 6    A.    DI is a non-minority American Indian or Native

 7    American.

 8    Q.    Do Native Americans get preferential status in

 9    the hiring process?

10    A.    Not under the Consent Decree?

11    A.    And DA is the other one?

12                            MR. QUINAN:  See on the last

13    page -- the second to last page, next to the name

14    Matthew Jong for example.

15    A.    That would be DA, DA indicates a non-minority who

16    is Asian.

17    Q.    And do people who are Asian get any racial

18    preference?

19    A.    Not under the Consent Decree.

20    Q.    So then where would those individuals fall in

21    order?

22    A.    In order they would fall -- They would fall with

23    the non-minorities according to the mark they received

24    on the exam, after all statutory preferences are
```