UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


KEVIN SULLIVAN, ET AL.,             )
            Plaintiffs              )
                                    )
        v.                          ) C.A. NO. 05-30004-MAP
                                    )
CITY OF SPRINGFIELD,                )
            Defendant               )


MEMORANDUM AND ORDER REGARDING
CROSS-MOTIONS FOR SUMMARY JUDGMENT
(Dkt. Nos. 9 & 15)

January 3, 2007

PONSOR, D.J.

I. INTRODUCTION

In this four-count action, Plaintiffs Kevin Sullivan, Vincent Dudley, Mark Mehringer, Jason Sleeper, and Michael Trombley charge the defendant City of Springfield with discriminating against them during a lay-off in 2003. The five Plaintiffs are white police officers who maintain that they were laid off earlier, and/or recalled for duty later, than they should have been due to Defendant's consideration of race in determining seniority.[1]

_____

[1] Like the litigants in Quinn v. City of Boston, 325 F.3d 18 (1st Cir. 2003), the parties "have used the term 'black[s]' as opposed to 'African-Americans,'" the term "Hispanics" as "a proxy for the more cumbersome 'Spanish-surnamed individuals,'" and "the words 'minority' and 'minorities' to refer to blacks and Hispanics collectively." Id. at 24 n.2. This court will adhere to these usages and

Plaintiffs have moved for summary judgment as to liability on Count I, which alleges a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  Defendant does not dispute Plaintiffs' version of the facts, but, rather, opposes their motion as a matter of law.  Defendant has also filed its own motion for summary judgment with respect to Count I.

As will be seen below, although the defendant City has chosen not to contest the substance of the alleged factual record, the actual data (at least so far as the court's independent analysis reveals) simply fails to support any claim of racially discriminatory conduct by Springfield. Indeed, the table of seniority appears to flatly contradict the argument offered by Plaintiffs.  Without further clarification, judgment for Plaintiffs on their Fourteenth Amendment claim is not justified.  In the same vein, the defendant City's motion for summary judgment is either unsupportable as a matter of law, or requires additional evidentiary development to be considered.  For these reasons, both motions will be denied without prejudice.

## II. BACKGROUND

---

will employ the terms "white" or "non-minority" when referring to Plaintiffs and/or members of their racial group.

A.   <u>Statutory and Administrative Framework</u>.

To become a police officer in a municipality subject to the Commonwealth's civil service law an aspirant must pass an examination developed and conducted by the Massachusetts Human Resources Division ("HRD"). <u>See</u> Mass. Gen. Laws ch. 31, § 16.  After administering the examination, the HRD ranks those who pass on an "eligible list," placing the holders of certain statutory preferences, (e.g. veterans), at the head of the pack and ranking all other candidates in order according to their respective examination scores. <u>See</u> Mass. Gen. Laws ch. 31, § 26.

To fill police officer vacancies, a municipality requests a list of eligible candidates from the HRD, specifying the number of positions it wishes to fill.  Mass. Gen. Laws ch. 31, § 6.  When the HRD receives such a requisition, it "certifies from the eligible list sufficient names of persons for consideration" and forwards the certified list to the municipality.  <u>Id.</u>

Upon receipt of this list, the municipality then notifies the individuals on the HRD list and asks them to submit an application if they wish to be considered for one of the available positions. <u>Crete v. City of Lowell</u>, 418 F.3d 54, 58 (1st Cir. 2005) (citing Mass. Gen. Laws ch. 31, § 25), <u>cert. denied</u>, 126 S.Ct. 2287 (2006).

3

If a municipality decides to bypass a higher-ranking candidate in favor of a lower-ranking one, it must explain its decision to the HRD. <u>Donahue v. City of Boston</u>, 183 F. Supp. 2d 202, 204 (D. Mass. 2001) (citing Mass. Gen. Laws ch. 31, § 27). The HRD retains the right to reject any bypass appointment. <u>Bradley v. City of Lynn</u>, 443 F. Supp. 2d 145, 150 (D. Mass. 2006) (citing <u>MacHenry v. Civil Serv. Comm'n</u>, 666 N.E.2d 1029, 1030-31 (Mass. App. Ct. 1996)).

B.    <u>Plaintiffs' Statement of Undisputed Facts</u>.[2]

In 1996, when the City of Springfield decided to hire sixty police officers, Springfield's Police Commission Chairman requisitioned a list of eligible candidates from the HRD. (Dkt. No. 9, Ex. A., Cochrane Dep. 20:4-13, 21:2-8.) Pursuant to longstanding remedial orders arising from the case of <u>Castro v. Beecher</u>, 365 F. Supp. 655 (D. Mass.

---

[2] Ordinarily, in considering cross motions for summary judgment, a court must examine "the record evidence with respect to each motion separately 'to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed.'" <u>Philip Morris Inc. v. Harshbarger</u>, 122 F.3d 58, 62 n.4 (1st Cir. 1997) (quoting <u>Wightman v. Springfield Terminal Ry. Co.</u>, 100 F.3d 228, 230 (1st Cir. 1996)).

Here, however, because Defendant has not challenged the statement of material facts submitted by Plaintiffs, there is no need for separate factual recitations. <u>See Stonkus v. City of Brockton Sch. Dep't</u>, 322 F.3d 97, 102 (1st Cir. 2003).

4

1973) ("the <u>Castro</u> decree"),[3] the Chairman requested that the
HRD arrange this list "in a one-for-one order, that is, one
minority for every one [non-minority] on the list."  (<u>Id.</u>
21:10-15.)

On January 13, 1997, the HRD responded by generating a
list of those persons who had passed the most recent HRD
examination and were eligible for permanent employment.
(<u>See</u> Dkt. No. 9, Ex. C, HRD Certification No. 961295.)  Per
the Chairman's request, the HRD placed the highest ranking

_____

[3] Plaintiffs have referred to the consent decree that
governs the hiring of Springfield police officers as "the
<u>Beecher</u> Decree."  (<u>See, e.g.</u>, Dkt. No. 9, Pls.' Mot. Summ.
J. 2-4.)  A review of reported decisions reveals that "the
<u>Beecher</u> decree" has only been used to describe the consent
decree that circumscribes the selection of Massachusetts
firefighters.  <u>See, e.g.</u>, <u>Mackin v. City of Boston</u>, 969 F.2d
1273, 1274 (1st Cir. 1992), <u>cert. denied</u>, 506 U.S. 1078
(1993).
    For the sake of clarity, the court will adopt the
approach recently taken by Judge Saris and refer to the
decree that regulates the hiring of police officers as "the
<u>Castro</u> decree."  <u>See</u> <u>Deleo v. City of Boston</u>, No. 03-12538,
slip op. at 2 (D. Mass. Nov. 23, 2004).
    Although the original <u>Castro</u> decree has been modified by
several supplemental consent decrees, <u>see, e.g.</u>, <u>Castro v.
Beecher</u>, 522 F. Supp. 873, 875 (D. Mass. 1981) (describing
the approval of supplemental decree on July 7, 1975,
requiring the "certification of police applicants by methods
in essence designed to facilitate the appointment by . . .
Springfield of one minority policeman for each white
policeman"), <u>aff'd</u>, 679 F.2d 965 (1st Cir. 1982), <u>rev'd on
other grounds</u>, 461 U.S. 477 (1983), the court will refer to
this collection of decrees in the singular in keeping with
the practice of other courts, <u>see, e.g.</u>, <u>Deleo</u>, No. 03-
12538, slip op. at 4.

minority candidate and the highest ranking non-minority candidate at the top of the list and then repeated this process until all the names on the list were paired.  See Cochrane Dep. 21:17 (noting that ties were "grouped together").)[4]  It is helpful to underline at this point that Plaintiffs do not allege any constitutional violation in connection with this preliminary pairing.

Upon receiving this list, the Springfield Police Department sent letters informing these eligible candidates that if they wanted to be considered for a position with the Department they should appear and confirm their continued interest in writing.  (Id. 13:8-20.)  William Cochrane, the Commander of the Springfield Police Academy, then had his staff perform background checks on those candidates who indicated a willingness to accept employment.  (Id. 14:11-13; 44:12-13; see also id. 15:13-16:14 (noting that these investigations included inquiries regarding a candidate's "residency," "work history," "criminal record," and "character").)

---

[4] To the right of every name on HRD Certification No. 961295 is a one or two letter designation.  According to Sally McNeely, an HRD official charged with ensuring that certified lists were issued in accordance with the Castro decree, "CH" signifies a Hispanic applicant, "CB" signifies a black applicant, and "D" signifies a white applicant. (Dkt. No. 18, Ex. F, McNeely Dep. 51:8-12.)

After these background checks were completed, the Board of Police Commissioners interviewed those candidates who had not been eliminated.  (Id. 14:17-22; 44:11-20.)  The City then gave conditional offers of employment to candidates who surmounted these first two hurdles.  (Id. 16:2-20; 44:20-22.)  In order to be hired, however, candidates still had to satisfy certain medical, physical, and psychological criteria.

In his deposition, Cochrane testified that, during this process, each time a minority candidate was eliminated -- say, as a result of a background check or failure to obtain medical clearance -- he selected the next highest ranking minority to fill the vacancy.  In the same way, each time a white candidate was eliminated, he filled that vacancy by selecting the next highest ranking white candidate.  (Id. 32:21-33:10; 45:4-14.)  As a result of this process, minority candidates and white candidates from lower down the HRD list moved up artificially to higher positions.

On April 6, 1997, the City of Springfield hired approximately fifty individuals as permanent police officers and sent them to the Springfield Police Academy for training.  (Dkt. No. 9, Pls.' Statement of Undisputed Facts ¶ 21; Dkt. No. 18, Ex. A, Sullivan Aff. ¶ 1.)  On May 5, 1997, the Chairman sent the HRD an "Authorization of

7

Employment Form 14" ("Form 14"), which included the names of those officers who had graduated from the academy and had been selected for appointment. (See Dkt. No. 9, Ex. E, Form 14 (May 5, 1997).)[5]

According to Cochrane, the names on the Form 14 were arranged by matching the highest ranking minority officer with the highest ranking white officer and then repeating the process until the entire hiring class had been paired. (Cochrane Dep. 28:8-13.)  Prior to organizing the list in this fashion, Cochrane consulted a lieutenant who had overseen previous lists, and he conversed "many, many times" with HRD personnel.  (Id. 28:18-29:13.)  At the time, Cochrane believed that arranging the Form 14 on a one-for-one basis was necessary in order "[t]o comply with the Castro v. Beecher decision."  (Id. 28:14-17.)

If the process had unfolded in accordance with the approach described above, then the Form 14 would have had equal numbers of white and minority officers, all arranged in minority/white pairs.  Indeed, this supposed configuration, which Defendant has chosen not to dispute, is central to Plaintiffs' claim of a constitutional violation

---

[5] The time frame for hiring, mailing the Form 14, and completion of training seems short, but this is the sequence to which the parties have stipulated.

in Count 1.  (See Pls.' Statement of Undisputed Facts ¶¶ 13,
21, and 22.)  As will be seen, however, an analysis of the
record (ascribing to the officers on the Form 14 the race of
each officer as noted in the original HRD list) reveals that
this repeatedly assumed fact is simply not true.  The
relevant Form 14, in fact, contains more than twice the
number of white officers (30) as compared to minority
officers (13), with many of the white officers clumped in
large groups.  Unless the court has overlooked something,
there was no "pairing" on the Form 14, and there was no
equality of numbers between white and minority hires.

   In Springfield, badge numbers have an inverse
relationship to seniority: the higher an officer's badge
number, the less seniority that officer enjoys, and the more
vulnerable that officer's position is during a reduction in
force.  Pursuant to § 7.02 of the collective bargaining
agreement between the City and the Springfield Police Union,
IBOP, Local 364, the distribution of badge numbers to
officers hired on the same day was supposed to be done in
accordance with the order that the officers appeared on the
HRD list from which they were hired.  (Dkt. No. 9, Ex. D,
Arbitrator's Award 4-5 (June 25, 2004).)  Thus, an officer

9

placed higher on the HRD list should generally receive a lower badge number than an officer whose score placed him or her lower down on that list.

In determining the seniority of those officers hired between 1995 and 2004, however, it is undisputed that the City did not comply with the dictates of § 7.02.  Instead, Cochrane testified that the Department assigned badge numbers "based on the one-for-one ranking essentially as officers were listed on Form 14."  (Cochrane Dep. 45:17-23.)

This is where Plaintiffs argue the constitutional violation occurred.  Plaintiffs assert that this method "essentially ensured that for every one non-minority, one minority would receive alternating seniority."  (Pls.' Statement of Undisputed Facts ¶ 14.)  According to Plaintiffs, this arrangement resulted in minority officers taking places on the Form 14 above white officers who ranked higher than they did on the HRD list, in a system closely resembling a quota.

Two points about this alleged fact bear noting.  First, to the extent that certain minority officers did receive lower badge numbers than they would have received had the City allocated badge numbers in accordance with the

collective bargaining agreement, the advantage gained by minority officers on this particular Form 14 was entirely capricious.  It is undisputed that the same process, since it involved advancing white officers as well as minority officers, had an equal potential to advantage white officers over minority officers on other lists at other times.[6] Second, as noted above, despite Defendant's choice not to contest Plaintiffs' allegation that there were equal numbers of minorities and whites on the Form 14 and that minorities and whites were "paired" throughout, a review of the actual Form 14 reveals that this supposed fact is not true.  Many

---

[6] At the arbitration hearing, the Union introduced a one-page document, which illustrated how the proper implementation of § 7.02 would have effected white and minority officers hired between 1996 and 1998.  (See Dkt. No. 16, Ex. 7, Effect of Correctly Implementing § 7.02 on Whites/ Minorities.)  According to this document, whereas white officers hired in 1996 and 1997 would have been the primary, if not the sole, beneficiaries of badge number distributions done in accordance with § 7.02, minority officers hired in 1998 would have been the primary beneficiaries of a distribution done in accordance with § 7.02 that year.

That being said, there is reason to believe the Union's figures may not be accurate.  For example, the Union's document indicates that no white officers in the class of 1997 would have received less seniority (i.e. higher badge numbers) had the City complied with the terms of the collective bargaining agreement.  As will be seen, the first eight names on the Form 14 are those of white officers whose HRD scores placed them lower on the HRD list than the first two minority officers found on the Form 14.

more white than minority officers were placed on the Form

14, and white and minority officers were not paired.[7]

In early 2003, Springfield was forced to lay off
approximately seventy-five police officers.  Compare Dkt.
No. 9, Ex. I, Reinstatement List (indicating seventy-five
officers were laid off between February 15 and March 27,
2003), with Dkt. No. 9, Ex. B., Albano Dep. 10:5-7 (stating
that "the number that actually got laid off was reduced down
to 72").)  According to Plaintiffs,

> Instead of utilizing the original [HRD] list . . .
> to determine seniority for the purposes of layoff
> and recall, the City of Springfield actually laid
> off officers by going straight down the reorganized
> Form 14 . . . in order to ensure that exactly the
> same number of minorities and non-minorities were
> laid off.

(Pls.' Mot. Summ. J. 8.)  Starting with Mehringer on March

---

[7] While the Form 14 makes no mention of race, the race
of each officer on the Form 14 can be ascertained by
locating that officer's name on the original HRD list.  See
supra note 4.

An applicant's HRD ranking can be determined by looking
at the original HRD list, as well.  There, applicants' names
appear in order of their test scores AND in majority/
minority pairings.  By ascribing to each candidate a rank
that corresponds to his or her standing within his or her
racial group, and indicating where candidates have tied with
others in their racial group, one can see that the
configuration of names on the Form 14 does not preserve the
order created by the HRD.  The Form 14 ranking reflects
neither the ranking based on test scores nor a strict
alternating majority/minority order.  The ranking on this
form, in fact, appears entirely arbitrary.

13, 2003, the City laid off all five Plaintiffs over the course of a two-week period.  (Dkt. No. 18, Pls.' Reply to Defs.' Opp'n & Pls.' Opp'n to Defs.' Cross-Mot. Summ. J. 24.)

In February 2004, IBOP, Local 364 filed a grievance, alleging that the City's use of the Form 14 in determining seniority violated the parties' collective bargaining agreement.  On June 25, 2004, an Arbitrator found that the City had violated § 7.02 of the collective bargaining agreement by assigning badge numbers on a one-for-one basis. According to the Arbitrator,

> an individual who was moved up past certain other individuals on the original [HRD] List in order to occupy a vacant one-for-one slot received a badge number giving that individual more seniority protection and benefits than the individuals above him/her on the original [HRD] List who he/she passed in order to fill that vacant one-for-one slot.

(Arbitrator's Award 7.)[8]  In reaching this conclusion, the Arbitrator appears to have made the same error committed by the parties here, i.e. he assumed that the Form 14 contained equal numbers of minority and non-minority candidates,

---

[8] In response to the Arbitrator's Award, approximately twenty minority officers brought an action against IBOP, Local 364 and the Springfield Police Department, seeking damages, as well as declaratory and injunctive relief based on the system's unfair impact on minority police officers. See Toledo v. IBOP, Local 364, 04-cv-30163-MAP.  This lawsuit was settled on June 1, 2006.

13

arranged in pairs.

While the City eventually recalled Plaintiffs and every other laid-off officer willing to accept reinstatement, it is undisputed that recalls were done on the basis of seniority. Although Plaintiffs were generally aware that their badge numbers signified their seniority, they did not know how their seniority had been calculated. See, e.g., Sullivan Aff. ¶ 1.) Indeed, until Sullivan read the Arbitrator's award, none of the Plaintiffs knew "that the City had organized the layoffs from a seniority list that was compiled based upon a strict one-for-one pairing of minority to non-minority candidates." (Id. ¶ 4.)


## III. DISCUSSION

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is inappropriate when "there is a factual controversy pertaining to an issue that may affect the outcome of the litigation . . . , and the evidence is 'sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side.'"

<u>Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y
Beneficiencia de P.R.</u>, 394 F.3d 40, 42-43 (1st Cir. 2005)
(citations omitted).

A.    <u>Plaintiffs' Motion for Summary Judgment</u>.

In support of their claim that the 2003 lay-offs and
subsequent recalls were based upon an unconstitutional quota
system, Plaintiffs point out that they were given less
seniority than certain minority police officers with lower
ranks on the civil service examination.  Specifically,
Plaintiffs note that their names appear on pages 12-14 of
the original HRD list -- well before Kevin Bell and Angel
Perez, two minority candidates whose names appear above
Plaintiffs' on the Form 14.  Although Bell and Perez were
both laid-off, Plaintiffs highlight the fact that these
minority officers were reinstated on March 7, 2003, long
before Mehringer, who was not recalled until July 29, 2003,
Sullivan, Trombley, and Sleeper, who were not recalled until
September 14, 2003, and Dudley, who was not recalled until
February 29, 2004.

While the foregoing facts appear accurate, a review of
the documents submitted by Plaintiffs in support of their
motion casts considerable doubt upon their claim that badge

15

numbers were distributed on a strict one-for-one basis.
Indeed, a great deal of the data contained in the HRD list,
the Form 14, the Department's official roster prior to the
2003 lay-offs, and the Department's lay-off and
reinstatement list is utterly inconsistent with the parties'
representations.  As the following chart makes clear, these
discrepancies are by no means trivial.

| Name (in order that it appears on Form 14) | Race | Page where name appears on HRD list | Rank within racial group on HRD list | Badge # on 11-2-2002 | Date of Lay-off / Recall |
|---|---|---|---|---|---|
| David Gahm | White | 10 | T54 | N/A | N/A |
| Stephen Tyburski | White | 9 | T46 | 376 | N/A |
| Martin Curley | White | 11 | T63 | 377 | N/A |
| Jayme Sharpe | White | 8 | T36 | 378 | N/A |
| John Corey | White | 22 | T122 | 379 | N/A |
| Edward Seder | White | 20 | T97 | 380 | N/A |
| Daniel Reigner | White | 20 | T97 | 381 | N/A |
| Christopher Twining | White | 20 | T97 | 382 | N/A |
| William Berte | White | 1 | 3 | 383 | N/A |

| | | | | | |
|---|---|---|---|---|---|
| Daniel LeBlanc | White | 1 | T4 | 384 | N/A |
| Jose Diaz | Hispanic | 6 | T33 | 416 | 2-15-03 / 2-29-04 |
| Michael Dumas | White | 2 | 7 | 385 | N/A |
| Mark Kenney, II | White | 4 | T21 | 386 | N/A |
| Rafael Vega | Hispanic | 7 | T33 | 387 | N/A |
| Richard LaBelle, Jr. | White | 4 | T21 | 388 | N/A |
| Howard Lockwood | Black | 8 | T42 | 389 | N/A |
| Ronald Tatro | White | 5 | T21 | 390 | N/A |
| Hector Velazquez | Hispanic | 9 | T49 | N/A | N/A |
| Angel Barrios | Hispanic | 11 | T62 | 391 | N/A |
| Sean Murphy | White | 6 | T28 | 392 | N/A |
| Rodolfo Espinosa | Hispanic | 12 | T62 | 393 | N/A |
| William Kelly | White | 7 | T36 | 394 | N/A |
| Kevin Ashworth | White | 8 | T46 | 395 | N/A |
| Juan Estrada | Hispanic | 12 | T62 | 396 | N/A |
| Edward Kalish | White | 10 | T54 | 397 | N/A |

| Gregory McCain | Black | 13 | T74 | 398 | N/A |
|---|---|---|---|---|---|
| Brian Keenan | White | 10 | T54 | 399 | N/A |
| Leon Spradley | Black | 14 | T74 | N/A | N/A |
| Norman Shink | White | 11 | T54 | 400 | N/A |
| Joseph Brodeur | White | 11 | T63 | 401 | N/A |
| Donald Denault | White | 12 | T63 | 402 | N/A |
| Christopher Hrycay | White | 12 | T63 | 403 | 3-18-03 / 3-7-03 |
| Kevin Bell | Black | 16 | T91 | 404 | 3-18-03 / 3-7-03 |
| David Kane | White | 12 | T63 | 405 | 3-18-03 / 3-7-03 |
| Angel Perez | Hispanic | 17 | T91 | 406 | 2-15-03 / 3-7-03 |
| Mark Mehringer | White | 12 | T63 | 407 | 3-13-03 / 7-29-03 |
| Mike Rivera | Hispanic | 17 | T91 | 408 | 3-18-03 / 7-29-03 |
| Jason Sleeper | White | 13 | T63 | 409 | 3-18-03 / 7-29-03 |
| Martin Santa | Hispanic | 17 | T91 | 410 | 3-15-03 / 9-14-03 |
| Kevin Sullivan | White | 13 | T63 | 411 | 3-14-03 / 9-14-03 |
| Michael Trombley | White | 13 | T63 | 412 | 3-14-03 / 9-14-03 |

| Vincent Dudley | White | 14 | T78 | 413 | 3-27-03 / 2-29-04 |
|---|---|---|---|---|---|
| Brian Elliot | White | 5 | T28 | 374 | N/A |

Among other things, the record evidence cited by Plaintiffs in support of their motion appears to indicate that: (1) thirty of the forty-three new police officers listed on the Form 14 were white;[9] (2) eleven of the first twelve new officers listed on the Form 14 were white; (3) several white officers whose HRD scores placed them well below minority officers on the HRD list appeared above those same minority officers on the Form 14; and (4) the highest ranking minority officer on the Form 14 was laid off before, and for a longer period of time than, any of the

---

[9] The first officer listed by the City on the Form 14 was Brian Beliveau. His name was removed from the form by the HRD due to the fact that Beliveau had not been hired but rather reinstated. (Dkt. No. 9, Ex. E, Letter from Brenda Geoghan, Asst. Dir., Test Admin., Pub. Safety Unit, to Gerald Phillips, Chairman, Bd. of Police Comm'rs (Oct. 23, 1997).)

On April 6, 1997, the City also hired another white officer named Michael Sedergren. Although Sedergren took the HRD exam (see HRD Certification No. 961295, at 4), the City did not place his name on the Form 14 since Sedergren had transferred from another police department (see Letter from Brenda Geoghan, Asst. Dir., Test Admin., Pub. Safety Unit, to Gerald Phillips, Chairman, Bd. of Police Comm'rs (Oct. 23, 1997)).

Plaintiffs.[10]

Obviously, if less than one-third of the police officers hired in 1997 were minorities, the City could not have "ensured that for every one non-minority, one minority would receive alternating seniority."  Indeed, the manner of arranging the sequence on the Form 14 and the resulting distribution of badge number appears to be more of a mish-mash than anything resembling a consistent policy of any sort, racially discriminatory or otherwise.  Since Plaintiffs' equal protection claim appears to be predicated upon a misconception concerning the manner in which the City hired new officers and assigned badge numbers, the court cannot allow their motion for summary judgment with respect to Count I.

B.  <u>Defendant's Motion for Summary Judgment</u>.

While the City has observed, in a footnote, that the badge numbers allocated to Sullivan, Trombley, and Dudley call into question whether the Form 14 was actually reorganized on a one-for-one basis, it has chosen to rely on

---

[10] It also appears that the second minority certified by the HRD as an eligible candidate on January 13, 1997, had already been hired by the City on October 15, 1996.

20

five independent grounds for summary judgment: (1) that the
statute of limitations bars Plaintiffs' cause of action; (2)
that the actions of a non-policy-maker, i.e. Cochrane, could
not result in municipal liability; (3) that the City's
voluntary affirmative action plan did not violate the Equal
Protection Clause; (4) that Plaintiffs cannot demonstrate
"injury in fact to a cognizable interest" under applicable
Supreme Court authority; and (5) that the relief already
obtained by Plaintiffs at arbitration was, in substance,
what they would be entitled to under 42 U.S.C. § 1983.

These arguments are colorable, to some extent, but
ultimately unpersuasive.  First, while the allocation of
badge numbers did take place approximately eight years
before Plaintiffs brought this action, there is no
indication in the record that Plaintiffs knew, or should
have known, how their seniority was calculated.  Nor is
there any evidence that Plaintiffs suffered any tangible
harm because of their seniority prior to the 2003 lay-offs.
In sum, so far as the record suggests, Plaintiffs neither
knew of any harm they had suffered, nor of any cause of that
harm, until shortly before this lawsuit was filed.  At any
rate, the state of Plaintiffs' knowledge cannot be described

21

as undisputed.  Defendant is not entitled to summary
judgment based on the statute of limitations.

Second, with regard to the argument that Cochrane was
not a policy-maker, under state law, both the lay-offs and
the filing of the Form 14 could only be done by the
"appointing authority."  By approving Cochrane's allocation
of badge numbers and conducting lay-offs according to that
allocation, the City accepted responsibility for Cochrane's
actions.  The policy that Plaintiffs point to as the cause
of their injury emanated from the highest effective policy-
making level in the City.  Summary judgment cannot be
granted on this ground.

Third, because the City has not established that it was
acting in accordance with the Castro decree when it
allocated seniority for these plaintiffs, a disputed issue
of fact exists as to whether it did consider race in
distributing badge numbers and, if so, whether this action
was "narrowly tailored to further a compelling governmental
interest."  Cotter v. City of Boston, 323 F.3d 160, 168 (1st
Cir. 2003) (citing Adarand Constructors, Inc. v. Pena, 515
U.S. 200, 227 (1995)), cert. denied, 540 U.S. 825 (2003).
While the litigation that led to the Castro decree suggests

22

the possibility of a compelling interest, i.e. remedying the Department's prior racial discrimination, "[v]oluntary affirmative action plans cannot be constitutionally justified absent a particularized factual predicate demonstrating the existence of 'identified discrimination.'" Boston Police Superior Officers Fed'n v. City of Boston, 147 F.3d 13, 19 (1st Cir. 1998) (quoting Cohen v. Brown Univ., 101 F.3d 155, 171 (1st Cir. 1996)).  In this case, the City has made no effort to demonstrate that, as regards these Plaintiffs, it allocated badge numbers in a manner designed to redress the "vestiges of past discrimination."  Wessmann v. Gittens, 160 F.3d 790, 795 (1st Cir. 1998).  Nor has it attempted to show how such conduct was narrowly tailored to serve this, or any other, compelling state interest.[11]  While this showing may perhaps be made at trial, the record is insufficient to support summary judgment on this ground.

---

[11] Although the Superior Officers court stated that remedying past discrimination was the "only . . . goal sufficiently important to justify the use of affirmative action in public employment," 147 F.3d at 19, the First Circuit subsequently  expressed its sympathy for the argument that diversity is necessary to further a police department's "operational needs" and therefore may constitute a compelling state interest, see Cotter, 323 F.3d at 172 n.10.

23

Fourth, while the Supreme Court has determined that a municipality may not be held liable for a race-based decision if it can show that it would have made the same decision absent consideration of race, see Texas v. Lesage, 528 U.S. 18, 21 (1999) (per curiam), the City has made no such showing. Thus the City's reliance on Lesage to urge, as a matter of law, that Plaintiffs cannot show any cognizable injury is misplaced.

Finally, the record does not establish beyond dispute that the prior arbitration award was so complete that Plaintiffs could receive no additional relief as a result of this federal suit. As the City itself acknowledges, because of the union's delay in filing the case for arbitration, "the arbitrator specifically prohibited any remedy . . . as to any officer recalled prior to February 24, 2004." (Dkt. No. 16, Def.'s Mem. Opp'n & Cross-Mot. Summ. J. 22.) Thus, "[u]nder the Arbitrator's decision," four of the five Plaintiffs "were barred from any remedy." (Id.)

### IV. CONCLUSION

Based on the foregoing, Plaintiffs' Motion for Summary Judgment (Dkt. No. 9) and Defendant's Cross-Motion for Summary Judgement (Dkt. No. 15) are hereby DENIED without

prejudice.  Should either party wish to submit a substitute motion for summary judgment, it may do so by January 29, 2007.  In the event that either party does submit a substitute motion, the other party's opposition may be filed by February 26, 2007.

If no substitute motions are filed, the court will set the matter for a conference to establish a schedule for trial.  In light of the confusing state of the factual record, the parties would be well advised to attempt to reach a mutually acceptable resolution of this case, as the parties in <u>Toledo</u> did.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge

25