UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

―――――――――――――――――――――――――――
KEVIN SULLIVAN, VINCENT DUDLEY,  )
MARK MEHRINGER, JASON SLEEPER,   )
And MICHAEL TROMBLEY,            )
    Plaintiffs                 )
                             )   Civil Action No:
v.                              )   05-30004-MAP
                             )
CITY OF SPRINGFIELD, MASSACHUSETTS,  )
    Defendant                  )
―――――――――――――――――――――――――――)

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
<u>SUBSTITUTE MOTION FOR SUMMARY JUDGMENT</u>**

<u>I.</u>    <u>INTRODUCTION</u>

    In this case the plaintiffs allege that in 2003, the Springfield Police Department violated the Equal Protection Clause by its consideration of race as a determinative factor in how to layoff and recall Springfield police officers.  As a result of the defendant's improper racial considerations, the plaintiffs were subjected to layoffs of a greater duration than would have been the case had race not been a factor in the layoff and recall decisions.  Indeed, as is demonstrated below, the defendant utilized race in establishing the seniority of the plaintiffs and similarly situated police officers in a manner that not only violated the Fourteenth Amendment but also violated the very consent decree (<u>Castro v. Beecher</u>) to which the defendant was allegedly trying to achieve compliance.

    The parties to this action filed cross-motions for summary judgment in November and December of 2005, both of which were denied by order of the Court on January 3, 2007.  In denying the parties' motions for summary judgment, the Court drew the

parties' attention to certain anomalies in the hiring process that were unexplained by the record evidence. Upon leave of the Court, the plaintiffs conducted limited discovery – which took the form of Joint Stipulations of Fact (attached hereto as Exhibit M) – that explained all of the anomalies pointed out in the Court's decision and order. In this regard, the factual stipulations make clear that certain of the newly hired officers were formerly police cadets whom the City gave preference in hiring. In addition, one of the other non-minority hires was a lateral transfer who entered on duty more quickly than those entering the Academy (earning him a lower badge number), and one of the minority hires did not complete the Academy with the rest of his peers (earning him a higher badge number).

Therefore, because there are no material facts in dispute regarding the issue of liability, and because the anomalies pointed out by the Court have now been addressed, the plaintiffs are entitled to judgment on liability as a matter of law, and they hereby move for summary judgment.

II.    STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO DISPUTE.[1]

    A.    Background Regarding Police Hiring in Civil Service Communities

    1.    To become a police officer in a municipality subject to the Commonwealth's civil service law, a candidate must pass an examination developed

---

[1] The facts, as set forth herein, are consistent with the statement of material facts set forth by the Court in its previous order on the parties' cross-motions for summary judgment as modified by the additional discovery completed per leave of the Court. Exhibits A-L referenced herein are the exhibits attached to the plaintiffs' original summary judgment filing and have not been reproduced again. New Exhibit M is attached hereto. As before, most of the non-background facts relating to the instant case come from the depositions of Captain William Cochrane and Peter Albano, two Springfield police officials who were primarily responsible for, and had direct knowledge of, the material facts relevant to this case. Their depositions were attached as Exhibits A and B, respectively, to the plaintiffs' original summary judgment filing.

and conducted by the Massachusetts Human Resources Division ("HRD"). <u>See</u> Mass. Gen. Laws ch. 31, § 16.  HRD administers and grades the examination, placing all candidates who passed the exam on an eligibility list.  HRD places candidates with statutory preferences, such as veterans status, at the top of the list (by exam score) and then places all other candidates in order by exam score.  <u>See</u> Mass. Gen. Laws ch. 31, § 26.

2.      To fill police officer vacancies, a civil service municipality requests a list of eligible candidates from HRD, specifying the number of positions it wishes to fill.  Mass. Gen. Laws ch. 31, § 6. When HRD receives a requisition, it "certifies from the eligible list sufficient names of persons for consideration" in rank-order according to score (within statutory preferences) and forwards the certified list to the municipality. <u>Id.</u>  The list contains two times the number of vacancies plus one – the so-called *2n+1* formula.  <u>See</u> Ex. C.  Upon receipt of this list, the municipality then notifies the individuals on the HRD list and asks them to submit an application if they wish to be considered for one of the available positions. <u>Crete v. City of Lowell</u>, 418 F.3d 54, 58 (1st Cir. 2005) (citing Mass. Gen. Laws ch. 31, § 25), <u>cert. denied</u>, 126 S.Ct. 2287 (2006).

3.      If a municipality decides to bypass a higher-ranking candidate in favor of a lower-ranking one, it must explain its decision to HRD. <u>Donahue v. City of Boston</u>, 183 F. Supp. 2d 202, 204 (D. Mass. 2001) (citing Mass. Gen. Laws ch. 31, § 27).  HRD retains the right to reject any bypass appointment. <u>Bradley v. City of Lynn</u>, 443 F. Supp. 2d 145, 150 (D. Mass. 2006) (citing <u>MacHenry v. Civil Serv. Comm'n</u>, 666 N.E.2d 1029, 1030-31 (Mass. App. Ct. 1996)).

B.    The Castro Decree.

4.    In or about 1972, in the case of Castro v. Beecher, a federal district court

held that the entry-level civil service examination for police officers in the

Commonwealth of Massachusetts had a disparate impact on minority applicants and

therefore was unlawful under Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. §2000(e), the Equal Protection Clause of the Fourteenth Amendment, and 42

U.S.C. §1981.  See Castro v. Beecher, 365 F. Supp. 655 (D. Mass. 1973); Castro v.

Beecher, 522 F. Supp. 873 (1981); see also Quinn, et al. v. City of Boston, 325 F.2d 18;

DeLeo v. City of Boston, Civil Action No. 03-12538-PBS (D. Mass. 2004) (Ex. L) at pp 3-

4; Mackin v. City of Boston, 969 F.2d 1273, 1274 (1st Cir. 1992).

5.    As a result of that litigation and decision, the plaintiffs in that case and the

Commonwealth of Massachusetts negotiated and the court subsequently entered a

consent decree commonly referred to as the Castro Decree.  Castro, 522 F. Supp. at

655.  According to that decree, in those cities within the Commonwealth of

Massachusetts that had significant minority populations and that had a complement of

minority police officers significantly below the number of minorities in the general

population of that city, future entry-level hiring for police was to be made from a civil

service list prepared by the Commonwealth of Massachusetts that would rank one

minority on the list for every one non-minority.  See DeLeo, supra, at 3-5; Mackin,

supra; Quinn, supra; Castro v. Beecher, supra.

6.    Under the Castro Decree, when a municipality like Springfield sought to

hire a certain number of entry-level police officers, it would requisition a list from HRD,

and HRD would arrange the list in rank order so that there would be one minority ranked

together with every one non-minority and so on down the list.  See, e.g., DeLeo v. City of Boston, supra; Castro v. Beecher, supra; Quinn, supra.

7.      The Castro Decree was intended to create a more diverse applicant pool from which final selections would be made.  Id.

8.      The Castro Decree did not require the hiring of one minority for every non-minority, but only that the applicant pool to be considered had one minority for every non-minority.  Castro v. Beecher, supra.  It was recognized that after the list was compiled (one minority then one non-minority), applicants would then go through a series of hiring prerequisites in order to be actually offered a position and begin the police academy.  In Springfield these prerequisites involved (1) a background check; (2) a residency check; (3) an interview; (4) a conditional offer of employment after which there would be (5) a medical exam; (6) a psychological exam; and (7) a physical abilities test.  (See Deposition of Cochrane, attached as Ex. A, at 14-18); see also DeLeo, supra; Quinn, supra.  From 1975 until the present, the City of Springfield has been required to conduct its entry-level police officer hiring as described in the Castro Decree.  Id.

C.      Facts Underlying The Present Case.

9.      In 1996, when the City of Springfield decided to hire sixty police officers, Springfield's Police Commission Chairman requisitioned a list of eligible candidates from HRD. (Cochrane Dep., Ex. A., at 20-21.)  Pursuant to the Castro Decree, the Chairman requested that HRD arrange this list "in a one-for-one order, that is, one minority for every one [non-minority] on the list." (Id. at 21.)

10.     On January 13, 1997, HRD generated a *2n+1* eligibility list for police

officer candidates for the City of Springfield. (See Ex. C.) Per the Chairman's request,

HRD placed the highest ranking minority candidate and the highest ranking non-minority

candidate at the top of the list and then repeated this process until all the names on the

list were paired. (See Cochrane Dep., Ex. A, at 21.)

11.     After receiving this one-for-one certified list from the Commonwealth, the

defendant then proceeded to ascertain which of these candidates still wanted

consideration by having them come in and sign the certification list.  (See id. at 13.)

After this task was performed, the City performed a background check on the highest

ranked candidates, eliminating a number of candidates due to residency problems,

criminal convictions, work history, or issues of character.  (Id. at 13-18.)

12.     After the background checks were completed and certain individuals

eliminated, candidates were then given oral interviews before the Board of Police

Commissioners.  This resulted in some further candidates being eliminated by the

Board.  (Cochrane Dep., Ex. A, at 14-16; see also Arbitration Award, Ex. D, at 6.)

13.     During this process, each time a minority candidate was eliminated – for

example, as a result of a background check or failure to obtain medical clearance – the

City selected the next highest ranking minority to fill the vacancy.  In the same way,

each time a white candidate was eliminated, the City filled that vacancy by selecting the

next highest ranking white candidate. (Cochrane Dep., Ex. A, at 32-33, 45.) As a result

of this process, both minority candidates and white candidates from lower down the

HRD list could theoretically move up artificially to higher positions; however, the actual

result of the process was that only minority candidates ended up with higher positions

on the certification list.  (See Table 1, below at ¶ 23).  This reshuffling process continued to occur up through the conditional offer of employment.  (Cochrane Dep., Ex. A, at 24.)

14.    The reshuffling process that the City conducted did not include the police cadets who were eligible for employment as full-time officers.  The defendant subtracted the number of eligible cadets right off the top and only reshuffled the remaining candidates based on race.  (Cochrane Dep., Ex. A, at 23-24.)

15.    Those individuals still being considered who had passed the background check and the Board of Police Commissioners interviews were then given a conditional offer of employment and were required to undergo a medical examination, see Mass. Gen. Laws ch.31, § 61, a psychological test, and finally a physical aptitude test.  Those tests resulted in the elimination of a significant number of candidates.  (Cochrane Dep., Ex. A, at 14-23; Ex. D at 6-7.)  The fact that candidates were eliminated after the conditional offer had been made allowed for circumstances in which two (or more) white or minority officers would appear sequentially on the ultimate hiring list because the person between them had been eliminated at this late stage of the hiring process.  (See Table 1, below at ¶ 23.)

16.    On April 6, 1997, the City of Springfield hired approximately fifty individuals as permanent police officers and sent them to the Springfield Police Academy for training; and on May 5, 1997, the Chairman sent HRD an "Authorization of Employment Form 14" ("Form 14"), which included the names of those officers who had graduated from the Academy and had been selected for appointment. (Ex. E, Form 14 (May 5, 1997).)

17.    In addition to those who completed their Academy training, the Form 14 sent to HRD also included the name of Officer Jose Diaz, who was dismissed without prejudice from the Police Academy at that time but later enrolled and graduated.  (See Joint Stipulation of Facts, attached hereto as Ex. M, ¶ 3.)  This Form 14 also included the name of Officer Brian Elliott, who had been laterally transferred from a non-Civil Service Department and thus served a shorter training period than those candidates who went through the entire Academy training program.  (Id. ¶ 4.)

18.    At the completion of their training, upon formally beginning work as Springfield police officers, successful candidates were assigned badge numbers. (Cochrane Dep., Ex. A, at 32-37; see also Ex. D and E.)  The assignment of badge numbers was the equivalent of determining the officers' seniority ranking in the police department.  Id.

19.    Of the candidates appearing on Form 14 for certification number 96-1295, Officer Brian Elliott received the lowest badge number (and thus the highest seniority) because, as a lateral transfer, he completed his limited training requirements earlier than the candidates who had to complete the entire Academy training program.  (Ex. E & F; Jt. Stip., Ex. M, ¶ 4.)

20.    The first eight candidates appearing on Form 14 were the former police cadets who had completed their Academy training.  (Jt. Stip, Ex. M, ¶¶ 1 & 2.)  It was the custom or practice of the City of Springfield to give cadets hired as police officers preference in the assignment of badge numbers.  (Id. ¶ 2.)  These former cadets thus have the next lowest badge numbers after Officer Elliott even though they completed their Academy training at the same time as the other appointees.  (See Ex. E & F.)

21.    The remaining candidates appearing on Form 14 appear in the order they appeared in on the original certification list except that *all* of the minority candidates had been moved up into artificially higher places because the defendant had reordered the list to maintain a one-for-one listing up until the time of the conditional offers of employment.[2]  (See Table 1, below at ¶ 23.)  Except for Officer Jose Diaz, who did not complete his Academy Training with his fellow candidates, these new officers received their badge numbers in the order they appear on Form 14, which is the modified one-for-one ranking.  (See Ex. E.& F; Cochrane Dep., Ex. A, at 33-35.)  Accordingly (putting aside the lateral transfer and the cadets), seniority or "badge number" was determined not by score on the original civil service examination, or by how well one had done through the testing and academy process, or by a candidate's original placement on the civil service list, but rather was determined solely by the reconstituted one-for-one designation set forth on the Form 14.

22.    As a result of this procedure, as of November of 2002, the plaintiffs had badge numbers ranging from 406 to 411, meaning that they ranked 406th to 411th in seniority on the Springfield Police Department.  (See Ex. F.)

23.    The following Table lists the candidates in the order they appeared on Form 14 and demonstrates the artificially higher placement of the minority candidates pursuant to the processes described above:

---

[2]    As was explained above, supra ¶ 15, certain minority or non-minority candidates will be listed sequentially if the candidate appearing between them at the time of the conditional offer of employment was eliminated after that time.

**TABLE 1: LIST OF CANDIDATES IN ORDER OF FORM 14**

| Name (in order that it appears on Form 14) | Race | Page where name appears on HRD list | Rank within racial group on HRD list | Badge number on 11-2-2002 | Comments regarding badge number placement |
|---|---|---|---|---|---|
| David Gahm | White | 10 | T54 | N/A | Cadet |
| Stephen Tyburski | White | 9 | T46 | 376 | Cadet |
| Martin Curley | White | 11 | T63 | 377 | Cadet |
| Jayme Sharpe | White | 8 | T36 | 378 | Cadet |
| John Corey | White | 22 | T122 | 379 | Cadet |
| Edward Seder | White | 20 | T97 | 380 | Cadet |
| Daniel Reigner | White | 20 | T97 | 381 | Cadet |
| Christopher Twining | White | 20 | T97 | 382 | Cadet |
| William Berte | White | 1 | 3 | 383 | |
| Daniel LeBlanc | White | 1 | T4 | 384 | minority candidate in between must have been eliminated after the conditional offer of employment |
| Jose Diaz | Hispanic | 6 | T33 | 416 | did not complete Academy training on first attempt |
| Michael Dumas | White | 2 | 7 | 385 | |
| Mark Kenney, II | White | 4 | T21 | 386 | minority candidate in between must have been eliminated after the conditional offer of employment |
| Rafael Vega | Hispanic | 7 | T33 | 387 | |
| Richard LaBelle, Jr. | White | 4 | T21 | 388 | |
| Howard Lockwood | Black | 8 | T42 | 389 | |
| Ronald Tatro | White | 5 | T21 | 390 | |
| Hector Velazquez | Hispanic | 9 | T49 | N/A | |

| Name (in order that it appears on Form 14) | Race | Page where name appears on HRD list | Rank within racial group on HRD list | Badge number on 11-2-2002 | Comments regarding badge number placement |
|---|---|---|---|---|---|
| Angel Barrios | Hispanic | 11 | T62 | 391 | non-minority candidate in between must have been eliminated after the conditional offer of employment |
| Sean Murphy | White | 6 | T28 | 392 | |
| Rodolfo Espinosa | Hispanic | 12 | T62 | 393 | |
| William Kelly | White | 7 | T36 | 394 | |
| Kevin Ashworth | White | 8 | T46 | 395 | minority candidate in between must have been eliminated after the conditional offer of employment |
| Juan Estrada | Hispanic | 12 | T62 | 396 | |
| Edward Kalish | White | 10 | T54 | 397 | |
| Gregory McCain | Black | 13 | T74 | 398 | |
| Brian Keenan | White | 10 | T54 | 399 | |
| Leon Spradley | Black | 14 | T74 | N/A | |
| Norman Shink | White | 11 | T54 | 400 | |
| Joseph Brodeur | White | 11 | T63 | 401 | minority candidate in between must have been eliminated after the conditional offer of employment |
| Donald Denault | White | 12 | T63 | 402 | minority candidate in between must have been eliminated after the conditional offer of employment |

| Name (in order that it appears on Form 14) | Race | Page where name appears on HRD list | Rank within racial group on HRD list | Badge number on 11-2-2002 | Comments regarding badge number placement |
|---|---|---|---|---|---|
| Christopher Hrycay | White | 12 | T63 | 403 | minority candidate in between must have been eliminated after the conditional offer of employment |
| Kevin Bell | Black | 16 | T91 | 404 | |
| David Kane | White | 12 | T63 | 405 | |
| Angel Perez | Hispanic | 17 | T91 | 406 | |
| Mark Mehringer | White | 12 | T63 | 407 | |
| Mike Rivera | Hispanic | 17 | T91 | 408 | |
| Jason Sleeper | White | 13 | T63 | 409 | |
| Martin Santa | Hispanic | 17 | T91 | 410 | |
| Kevin Sullivan | White | 13 | T63 | 411 | |
| Michael Trombley | White | 13 | T63 | 412 | minority candidate in between must have been eliminated after the conditional offer of employment |
| Vincent Dudley | White | 14 | T78 | 413 | minority candidate in between must have been eliminated after the conditional offer of employment |
| Brian Elliott | White | 5 | T28 | 374 | lateral transfer completed his training earlier than the candidates who had to go through the Academy and thus received a lower badge number |

12

24.     Putting aside the cadets, the one lateral transfer (Elliott), and the one officer who did not complete his training with the rest of his class (Diaz), all of the non-minority candidates are in score order amongst themselves and all of the minority candidates are in score order amongst themselves, but all of the minority candidates appear higher in order among the non-minorities than they did on the original HRD certification list.  These minority candidates thus received preferential treatment in the assignment of badge numbers beyond that which was called for in the <u>Castro</u> Decree.

D.     <u>The Layoffs</u>.

25.     In early 2003, Springfield laid off approximately seventy-five police officers. (<u>Compare</u> Ex. I, Reinstatement List (indicating 75 officers laid off), <u>with</u> Albano Dep., Ex. B, at 10 (stating that 72 officers were laid off).)

26.     As required by the collective bargaining agreement covering these police officers, for those individuals who were hired on the same date, seniority for the purpose of deciding who would be laid off and/or recalled first should have been determined by where that individual's name ranked on the original civil service list.  (See Ex. D at 4, citing Section 7.02 of the relevant collective bargaining agreement.)   Because this civil service list (Ex. C) was already arranged by pairing one minority for every one non-minority, utilizing such civil service list (instead of utilizing one's civil service exam score) already benefited minority police officers who would have to be laid off.[3]  <u>Id</u>. (See also Ex. G and H.)

---

[3]     Prior to the provision in the collective bargaining agreement providing for placement on the original civil service list as determining badge number, the parties had used examination scores to determine seniority.  This changed in 1994.  (See Arbitrator's Award, Ex. D, at 6-9.)  If the parties had

27.     However, Instead of utilizing the original civil service list (Ex. C) to determine seniority for purposes of layoff and recall, the City of Springfield actually laid off officers in order of their badge numbers.  (Albano Dep., Ex. A, at 17-19.)  As explained above, the badge-number order was generally determined by the order of candidates on the certification list as had been modified by the defendant during the hiring process to move minority candidates into artificially higher positions in an attempt to equalize the number of minority and non-minority candidates who received conditional offers of employment.  (Ex. D; Ex. I.)

28.     In February of 2004 the Springfield Police Union filed a grievance alleging that the City's seniority ranking, which was utilized for layoff purposes, was violative of the collective bargaining agreement, because it did not utilize rank on the original "merged" civil service list.  (See Ex. D.)  Hearings were held before an arbitrator appointed under the parties' collective bargaining agreement and, in June of 2004, the arbitrator issued an award holding that the City had in fact violated the collective bargaining agreement by utilizing the reorganized list and not the original civil service list to determine layoff and recall.  (See Ex. D; see also Ex. C, H & I.)

29.     As stated above, approximately 75 police officers were laid off in the spring of 2003.  As the City obtained more money through grants, retirements, etc., it brought back laid off police officers as slots became open and financially affordable.  Over time between July of 2003 and the end of 2004, all of the laid off police officers were either brought back or had elected to take other positions elsewhere.  (Ex. B at 24-27; see also Ex. I.)

_____

continued to adhere to examination score, minorities would have been far more adversely impacted.  (Ex, D at 17-19.)

14

E.    Facts Demonstrating That Plaintiffs Were Adversely Affected By The City's Actions.

30.    The plaintiffs in this case were all hired on the same date, April 6, 1997. On that date, April 6, 1997, the City hired approximately 50 police officers. (Ex. J & K.) Had the City not reshuffled the names from the certification list to move up the minority candidates to replace other minority candidates who had been disqualified, the plaintiffs would have received higher seniority rankings (and thus lower badge numbers). This can be seen from Exhibits C, J and K. Exhibit C is the original civil service list from 1997 ranked according to score and the one-to-one formula required by the Castro Decree. The plaintiffs appear on pages 12 and 13, while police officers Angel Perez and Mike Rivera appear at page 17 and are twenty-five places below the plaintiffs. Id. Yet, as of the time of the layoffs, Perez and Rivera were given greater seniority than the plaintiffs. (Ex. F & K.) Exhibit I shows that Angel Perez was recalled from layoff on March 7, 2003, while the plaintiffs were not recalled for many months later. Id.

31.    A review of Exhibits C, I, J and K demonstrates that each of the plaintiffs would have had greater seniority had the City not reorganized the hiring list during the hiring process to pair one minority for every one non-minority who was given a conditional offer of employment. Id.

32.    Specifically, as found by the arbitrator and uncontested by the City, because the individuals initially disqualified during the hiring process in 1997 were more heavily minority, if seniority had been determined correctly under the collective bargaining agreement (i.e. ranking on the original one-for-one civil service list),

seventeen non-minority officers would have had greater seniority than that given to

them.  (See Arbitration Award, Ex. D at 9.)  This includes the plaintiffs.

33.    If the plaintiffs had had greater seniority, they would have been either not

laid off at all or recalled more quickly than they were; therefore, the plaintiffs have been

adversely affected by the City's conduct.  (Ex. C, I, J & K; see also Ex. B at 37-40.)

34.    As a result of the City's actions, the plaintiffs lost back pay, overtime,

details, health insurance contributions, time served for purposes of promotional exams,

pension eligibility, etc.  (Ex. B at 32.)

35.    In his award, the Arbitrator did not give any remedy to the plaintiffs

because of the Union's late filing of the grievance.  (See Award, Ex. D, at 18-19.)


III.    BECAUSE THE CITY'S SENIORITY DETERMINATIONS WERE IMPROPERLY
        RACE-BASED AND VIOLATED BOTH THE CASTRO DECREE ITSELF AND
        THE FOURTEENTH AMENDMENT, THE PLAINTIFFS ARE ENTITLED TO
        SUMMARY JUDGMENT ON LIABILITY.

        The facts are clear that the layoffs (and corresponding recalls) in the Springfield

Police Department were based upon a race-based system that gave minority

candidates a better chance to avoid layoff or to be recalled faster simply because of

their race.  As demonstrated below, not only does such a race-based layoff system

expressly violate United States Supreme Court precedent on this very issue, it also

violates the Castro Decree itself as that Decree has been interpreted by the First Circuit

for the last 25 years.

A.    The System for Layoffs, Which Was Based on Racially Configured Badge Numbers, Is Unconstitutional.

When a governmental entity utilizes race as a factor in making employment-related decisions, such determinations are subjected to strict scrutiny under the Fourteenth Amendment to the United States Constitution.  See Wygant v. Jackson Board of Education, 476 U.S. 267, 280-81 (1986); Quinn v. City of Boston, 325 F.3d 18 (1st Cir. 2003); DeLeo, et al. v. City of Boston, supra.  In order to pass muster under strict scrutiny, the government must have a "compelling state interest" justifying the use of such race-based considerations.  Such race-based considerations will only survive when they are required in order to remedy a documented history of past discrimination and are narrowly tailored in scope and time.  Mackin, supra, at 1274; Quinn v. City of Boston, supra.  However, when the issue is layoffs, the Supreme Court has expressly held that even where a governmental entity is under a remedial decree to hire more minority employees, it cannot require that layoffs based upon seniority be altered in order to prevent minority employees from being laid off in disproportionate numbers. Fire Fighters Local Union 1784 v. Stotts, 467 U.S. 561 (1984).[4]

In the present case, it is clear that the City utilized racial preferences in effectuating layoffs in 2003.  Indeed, the City has freely admitted that its layoffs were based upon badge numbers and that badge numbers were distributed during the years in question by racial quotas.  In this regard, the evidence shows that – putting aside the hiring of police cadets – the City made conditional offers of employment to one minority

---

[4]    Significantly, Stotts involved fire fighters in Nashville, Tennessee.  However, a companion case, decided that same term, involved Boston Fire Fighters and layoffs in communities covered by the Beecher Decree.  After deciding in Stotts that racial considerations and layoffs were impermissible, the Supreme Court reversed and remanded the First Circuit's decision in the Boston Fire Fighters' case which approved of racial preferences to prevent minority layoffs.  See Boston Fire Fighter Local 718 v. Boston Chapter NAACP, 468 U.S. 1206 (1984).

for every non-minority candidate regardless of where those individuals stood on the
original civil service list or what their civil service examination scores were.  For those
approximately 50 police officers hired at the same time in April of 1997, seniority was,
by contract, required to be determined in accordance with standing on the original civil
service list.  (Ex. C)  However, the City had rearranged that list to pair one minority
candidate with every non-minority candidate when it made conditional offers of
employment, and thus minority candidates received artificially higher places on the
appointment form (i.e., Form 14) and received correspondingly higher badge numbers.
Thus, seniority – which is calculated strictly based on badge numbers – was determined
based on race.  Under Stotts, effectuating these layoffs based on racially balanced
seniority ratings, as opposed to the system required by the union contract (which still
favored minorities), is unlawful under the Equal Protection Clause of the United States
Constitution.  Stotts, 476 U.S. at 579-583.

Though the Court suggested – before the anomalies regarding the cadets and
lateral transfer were explained – that the total number of non-minority appointments and
the assignment of the first ten badge numbers to non-minorities belied the plaintiffs'
argument regarding race discrimination, (Memo. & Order at 19), such a bottom-line
approach to Equal Protection analysis is disfavored.  See, e.g., Bradley v. City of Lynn,
443 F. Supp. 2d 145, 158-159 (D. Mass. 2006).  In the seminal case of Connecticut v.
Teal, 457 U.S. 440 (1982) (decided under Title VII), the Supreme Court eschewed a
bottom-line approach in judging discrimination in the employment context.  The Court
stated that antidiscrimination law "guarantees these individual respondents the
opportunity to complete equally . . . on the basis of job-related criteria."  Id. at 451.

Therefore, "under <u>Teal</u> and is progeny, individual components of [an employment practice]" may constitute discrimination "even if the overall decision-making process does not disparately impact the ultimate employment decisions involving a protected group." <u>Bradley</u>, 443 F. Supp. 2d at 158-159.

Here, the Court must put aside the special hiring protocols aimed at cadets and lateral transfers (which must be assumed to be open to both minority and non-minority candidates) and scrutinize the City's hiring and badge assignment decisions based on the actions taken for all non-cadets and non-transferees.  In so doing, the Court must find that the defendant gave minority candidates an unfair advantage when it reshuffled the hiring list (and thus the seniority list) to move up minority candidates to have equal numbers of conditional employment offers to minority and non-minority candidates.  The result of this unconstitutional action was lower badge numbers (and thus higher seniority) for minority candidates based solely on their race, and the defendant thus violated the plaintiffs' constitutional rights when using this race-adjusted list for purposes of layoffs and recalls.

        <u>B.</u>      <u>Because The Defendant's System for Assigning Seniority Went Far Beyond Its Obligations Under the Castro Decree, the City Cannot Justify Its Actions Based Upon That Remedial Decree</u>.

What is particularly troubling in the present case, and makes the defendant's actions particularly egregious, is that the City of Springfield not only violated the Equal Protection Clause, but it also violated the terms of the <u>Castro</u> Consent Decree under which it purported to act.  As described above, and as argued by the Commonwealth in the <u>Quinn</u> case, the <u>Castro</u> Decree did not require strict racial quotas in hiring (i.e. one-

for-one hiring); rather, it merely required civil service lists that had racial preferences. That is, the <u>Castro</u> Decree merely mandated that HRD arrange the certification lists with one minority for every one non-minority candidate.  <u>Castro</u> contemplated that once the lists were organized in this way, the candidates could be disqualified for a number of legitimate reasons (medical exam, psychological exam, background check, etc.) but that the list would not be reorganized as candidates were disqualified; hence, the <u>Castro</u> Decree did not contemplate, nor require, that hiring decisions strictly adhere to a racial quota of one minority for every one non-minority.  <u>Castro</u>, 365 F. Supp. at  655-660; <u>Mackin</u>, 969 F.2d at 1278; <u>Quinn</u>, 325 F.3d at 23-26.

The City of Springfield clearly did not adhere to the <u>Castro</u> requirements but instead went way beyond those requirements.  First, the City of Springfield actually implemented its hiring system in such a way as to produce conditional offers of employment on a strict one-for-one basis.  It did so by maintaining two separate reserve lists of candidates, and once one candidate was disqualified through the hiring process, a person of that same race was substituted to replace the disqualified candidate.  By so doing, the City ensured not just that minorities would receive preferential consideration for hiring but that the City would actually make conditional employment offers based upon a strict quota-based one-for-one system.[5]  Under the Equal Protection Clause, this system was clearly unconstitutional and, moreover, was neither narrowly tailored in time and scope nor established pursuant to the requirements of a lawful consent decree.

---

[5] It is immaterial that the City moved up non-minority candidates when higher ranking non-minorities were disqualified because no non-minority candidate ever leap-frogged ahead of a minority candidate.  By contrast, every single minority candidate who was given a conditional offer of employment appeared ahead of higher-ranking non-minority candidates on the same civil service list.

Therefore, this system was plainly unconstitutional.  Stotts, supra; Quinn v. City of Boston, supra; Wygant, supra; Mackin, supra.

The seniority system challenged here is the direct result of the City's unlawful system for hiring back in 1997.  As stated above, at the end of the hiring process, the City of Springfield made conditional offers of employment on a one-for-one racial basis, and the officers' badge numbers were the direct byproduct of the City's unconstitutional race-based reshuffling of the hiring list.  This reshuffling was not authorized by the Castro Decree and was certainly not permitted under the Equal Protection Clause.

Moreover, as the arbitrator held in his decision, the City's actions were not authorized under and indeed were violative of the collective bargaining agreement. There is no dispute but that the collective bargaining agreement between the Springfield Police Officers Union and the City of Springfield was amended in the early 1990s to provide that badge numbers, or seniority, must be assigned according to where the officer stood on the initial civil service list provided to the City of Springfield by the Commonwealth at the time the hiring process began.  See, e.g., Ex. D at 4-8; see also Ex. C.[6]

If the City of Springfield had calculated seniority as required by the collective bargaining agreement – i.e., based on original standing on the civil service list – there would still be a significant legal question as to whether such seniority determinations were lawful under Stotts, supra.  The plaintiffs, however, do not challenge here the agreement between the Union and the City to base seniority determinations and, hence, badge numbers, upon rank on the original civil service list, even though that list itself is the product of a one-for-one race-based formulation.  However, at least with respect to

---

[6]     Exhibit C is the original civil service hiring list for the class in question here.

that original list, since there would be significant disqualifications during the hiring process, the ultimate result would not have been a strictly one-for-one ratio of hiring. Accordingly, the original civil service list, while creating racial preferences, was not an absolute quota and, therefore, seniority was not assigned solely on the basis of race.

However, what is clear here is that the City violated the express terms of the Castro Decree when, during the hiring process, it moved up a minority candidate every time a minority was disqualified from the process in order to achieve a strict one-for-one result in making conditional offers of employment.  These actions pervert the Castro Decree, rather than adhere to it, and take what was intended to be a racially diverse hiring pool and turn it into a strict quota system — one that clearly violates the Equal Protection Clause.

As stated above, because seniority, or badge numbers, were assigned based upon this clearly unconstitutional race-based quota hiring system, the City determined seniority in 1997 based upon impermissible racial considerations.  Because the layoffs and recalls in 2003-2004 were based upon this illegal seniority system, both the layoffs of the plaintiffs and their delayed recall to service, were unconstitutional.  Had their badge rankings not been based upon these impermissible race-based factors, some plaintiffs may not have been laid off, and all plaintiffs would have been recalled sooner. They would have possessed lower badge rankings and, hence, greater seniority.

It is not necessary at this stage of the litigation for the court to determine exactly what remedy is due each plaintiff.  The plaintiffs are only now seeking judgment as to liability.  With respect to that inquiry, it is only relevant that at least one of the plaintiffs has demonstrated that, absent the unconstitutional actions of the City, he either would

not have been laid off at all or would have been recalled earlier.  As was demonstrated in the statement of facts, it is clear that virtually all of the plaintiffs would have been recalled earlier had their seniority been determined in accordance with the collective bargaining agreement and not based upon the racially reorganized hiring list. Therefore, at this stage of the proceedings, the plaintiffs have shown harm entitling them to judgment on liability.  See DeLeo v. City of Boston, Civil Action No. 03-12538-PBS at 10-13 (attached as Ex. L) (in which Judge Saris specifically held that so long as one of the plaintiffs in that litigation could demonstrate having been harmed by defendant's actions, a judgment on liability was warranted).


IV.    CONCLUSION

WHEREFORE, for the reasons stated herein, this Court should grant plaintiffs summary judgment on liability.

Respectfully submitted,
KEVIN SULLIVAN, VINCENT DUDLEY,
MARK MEHRINGER, JASON SLEEPER,
and MICHAEL TROMBLEY,

by their attorneys,


/s/ Alfred Gordon
Harold L. Lichten, BBO # 549689
Alfred Gordon, BBO # 630456
Pyle, Rome, Lichten, Ehrenberg &
        Liss-Riordan, P.C.
18 Tremont St., Ste. 500
Boston, MA 02108
Dated: May 14, 2007          (617) 367-7200

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served on the attorney of record for each party by electronic notice on May 14, 2007.

/s/ Alfred Gordon
Alfred Gordon

# EXHIBIT M

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KEVIN SULLIVAN, VINCENT DUDLEY,           )
MARK MEHRINGER, JASON SLEEPER,            )
And MICHAEL TROMBLEY,                     )
    Plaintiffs                            )
                                )           Civil Action No:
v.                                        )           05-30004-MAP
                                )
CITY OF SPRINGFIELD, MASSACHUSETTS,       )
    Defendant                             )
                                )

## JOINT STIPULATIONS OF FACT

Now come the parties to the above-captioned matter and hereby enter into these

Joint Stipulations of Fact.

    1.    The following individuals served as cadets for the Springfield Police

Department prior to their appointment as Police Officers: David Gahm, Martin Curley,

Jayme Sharpe, John Corey, Edward Seder, Daniel Reigner, and Christopher Twining.

    2.    It is the custom or practice of the City of Springfield to give cadets

hired as Police Officers preference in the assignment of badge numbers.

    3.    Officer Jose Diaz, as a result of his dismissal from the Police

Academy without prejudice and his subsequent enrollment and graduation, was given

preferential treatment in placement near the top of the list for the next class and

consequentially a lower badge number than others appointed at the same time as

Officer Diaz and a higher badge number than other candidates from certification number

961295 who entered the academy with Officer Diaz the first time and completed their

academy training at that time.

1

4.    Officer Brian Elliott, having been employed as a police officer in a non-Civil Service department prior to his employment with the Springfield Police Department, served a shorter training period than other appointees and received a lower badge number than those appointees graduating from the 1997 class.

KEVIN SULLIVAN, VINCENT
DUDLEY, MARK MEHRINGER,
JASON SLEEPER, and MICHAEL
TROMBLEY,

By their attorneys,

Harold L. Lichten, BBO # 549689
Alfred Gordon, BBO # 630456
Pyle, Rome, Lichten, Ehrenberg &
    Liss-Riordan, P.C.
18 Tremont St., Ste. 500
Boston, MA 02108
(617) 367-7200

Dated: April 16, 2007

CITY OF SPRINGFIELD

By its attorneys,

Edward M. Pikula, BBO # 399770
City of Springfield
Law Department
36 Court Street, Room 210
Springfield, MA  01103
(413) 787-6085

Dated: 4/30/07





2