UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KEVIN SULLIVAN, VINCENT DUDLEY,
MARK MEHRINGER, JASON SLEEPER,
And MICHAEL TROMBLEY,
    Plaintiffs

v.

Civil Action No:
05-30004-MAP

CITY OF SPRINGFIELD, MASSACHUSETTS,
    Defendant

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S SUBSTITUTE MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiffs have filed a Substitute Motion for Summary Judgment in response to the court's January 3, 2007 order. Defendant opposes the Motion for Summary Judgment and seeks a Cross Motion for Summary Judgment in its favor.

I. Material Facts Not In Dispute

Plaintiffs originally submitted a statement of material facts not in dispute which was not challenged (Decision p.4 n.2). This is reflected in the Court's decision and it's statement of facts (Decision pp 4-14) and the Defendant does not dispute these now, with the exception that the Court's discussion at pp 8-9 and 11-12 about the discrepancy on the record as to the pairing of whites and minorities is dealt with in Defendant's Exhibit M, a joint stipulation of facts. This

1

57609

hopefully explains why there is not a consistent alteration of whites and minorities on the list. Defendant accepts Exhibit M as an additional statement of facts not in dispute. The Defendant does not regard the Court's statement on page 13, that the arbitrator assumed Form 14 had equal numbers of whites and minorities to be an undisputed fact, but rather asserts that the arbitrator's decision stands on its own and is subject to interpretation, rather than standing as an undisputed fact.

Plaintiffs have again submitted a statement of material facts not in dispute. To some extent this tracks precisely the Courts findings, and the Defendant does not dispute these assertions. There are however differences. Statements 1-3 are agreed to. Statements 4-8 are largely interpretations of case law and not statements of fact. The Defendant does not dispute the statement of Springfield's hiring prerequisites contained in paragraph 8.

In paragraph 10, Plaintiff refers to a :"2n+1" eligibility list, a reference which is not on the document and whose meaning is uncertain to the Defendant, and the description is therefore disputed.

In paragraph 13, the Plaintiff states that only minority candidates moved up to higher positions. This contradicts the Court's statement on page 7 of the

2

57609

Decision, which the Defendant accepts. Plaintiff's assertion also seems to be contradicted by their own table at page 11, with respect to Angel Barrios.

Defendant disputes the assertions in paragraph 15 that Captain Cochrane testified candidates were eliminated by virtue of interviews, medical, psychological or physical tests. Captain Cochrane said he did not know the reasons why some candidates did not go on (Exhibit A p. 5.) The record does not reflect the particular stage or reason why, the candidate fell off the particular list, other than that contained in Exhibit M.

The Defendant disputes the assertion described in paragraph 21 that badge numbers were determined not by placement in the civil service list, but solely by the reconstituted one for one designation. The agreed order of the list (Ex. C) was determined by Civil Service. The order in which candidates appear within a minority or non-minority group was determined by Civil Service. White candidates could advance within their group for all of the same reasons that minority candidates could advance within their group, i.e. failure of some to accept a position, or failure to meet any of the subsequent conditions. Rising on either list had nothing to do with race, but was determined by race neutral factors such as the failure to pass a background check or other tests, or perhaps someone simply withdrawing. The _existence_ of a one for one ranking obviously reflected race, but that was only because of the consent decree. Whether or not

3

57609

whites or minorities jumped on the list was determined by the actions of others on their list, not by race. Whether or not more whites or minorities fell off the list for failure to meet a condition was not determined racially; no one could know in advance whether more whites or more minorities in an equal number would fail to meet a condition.  The reconstitution of the list was not designed to benefit minorities any more than whites.  Therefore, the assertion that any minorities were (or could be) "artificially" elevated by the process, is not true.  The Court correctly described this process as "capricious".  (Decision p. 11.)

For these reasons, Defendant also disputes the Plaintiff's assertions in paragraphs 26 and 27 of a "double" benefit for minorities.  Whether or not minorities benefited more from the "reconstitution" of the list was a matter of luck, not racial design.

The Defendant does not dispute the factual assertions in paragraphs 22, 25, 28, 29, and 30-35, except that the Defendant believes there is no need to characterize the arbitration award, as it stands on its own.  As to damages, Defendant notes that there is nothing in the record as to particular financial losses of the Plaintiffs, though it does not dispute the existence of some financial losses of some officers.

57609

**ARGUMENT**

I. <u>The City Did Not Violate The Fourteenth Amendment</u>

The Plaintiffs in this action challenge the City's seniority determination made in 1996 and 1997 of assignment of badge numbers at that time. It is clear from the substitute motion, as it is from the Court's decision, that the entire dispute arises from the decision to maintain throughout the selection process a one for one ratio of whites and minorities. That decision cannot be impermissible race discrimination because it was done solely to conform to the *Castro v. Beecher* consent decree and no other motivation any kind is even alleged by the Plaintiffs. While the Plaintiffs may attempt to claim that the City was not required to follow this procedure under *Castro v. Beecher*, they do not present any evidence at all of a prohibited racial motive to benefit or favor minorities on the part of the City or any individual acting on its behalf. Captain Cochrane's testimony as to his methods and motives is not disputed, and the court has found Captain Cochrane "consulted a lieutenant who had overseen precious lists and "conversed many many times with HRD personnel" and did so believing it was necessary to comply with *Castro v. Beecher*. (Decree p. 8). That was a reasonable belief.

A. *Castro v. Beecher*

The original Castro v. Beecher consent decree found that in addition to the use of discriminatory tests:

> "…the Massachusetts Civil Service Commission and most of the cities, towns, and state agencies have, albeit unintentionally for the most part, discriminated in recruiting policies."
>
> *Castro v. Beecher*, 365 F. Supp. 655, 659 (D. Mass 1973)

The decree itself was directed to the Civil Service Commission and the court noted that no other appointing authority, other than the City of Boston was ever a party to that action, *Id. at n.3*. The decree ordered the Civil Service Commission to certify conditions on alternating basis between whites and minorities. Since the decree was in and of itself only ordering the Civil Service Commission to act on candidate certification lists, it is true that it did not literally require cities and towns to hire on a one to one basis. However the whole purpose of the decree was to redress the effects of past discrimination by certifying qualified candidates on an equal, alternating basis.[1]

---

[1] To whatever extent the Plaintiffs assert a discrimination claim for hiring on a one for one basis or the effect of hiring on a one for one basis, it should be noted that this is not what happened anyway. Plaintiffs seem to claim that whatever the composition of the Civil Service list, the City was not absolutely obligated to hire in that order. As Exhibit M now shows, the City did not. The City first hired a group of cadets who traditionally had priority, and who were all white. (See Exhibit M.)

57609

A 1975 action to clarify the consent decree resulted in a further decree where:

> "…required certification of police applicants by methods in essence designed to facilitate the apportionment by Boston and Springfield of one minority policeman for each white policeman and to facilitate the apportionment by other appointing authorities on a ratio of one to three. The decree also provided that the method and ratios of certification provided for by the decree shall apply to all cities and towns which have a minority population of one percent or more until any such city or town achieves a complement of minorities commensurate with the percentage of minorities within the community, at which point further certification will be made in accordance with existing Massachusetts law."
>
> *Castro v. Beecher*, 522 F.Supp.873, 875 (D. Mass 1981)

As the above language shows, the intent of the decree was not just to change the Civil Service lists, but to create a one to one <u>hiring</u> procedure to increase the percentage of minority hires, until it was commensurate with the percentage in the community. (There is no dispute that Springfield is still below that percentage.)

Plaintiffs assert that the original decree was not about assignment of seniority or the methodology of layoffs. This is literally true, but it completely ignores common sense and the remaining history of the case, a history which is relevant here. In the 1981 *Castro v. Beecher* decision cited above, the District Court modified the previous order with respect to the reductions in force. *Castro v. Beecher*, 522 F.Supp.873 (D.Mass 1981). In doing so the court forbade

7

57609

reductions in force by the normal rules of seniority under G.L. c.39 §31, if it would result in a smaller percentage of minority officers in the force. The court required seniority not be used beyond any point where it would reduce the percentage of minority officers below a certain limit (11.7%). *Id at 877.*

While the particulars for Boston might differ from Springfield, it is clear that decision makers in Springfield had to assume that *Castro v. Beecher* was not just about civil service lists, but that it governed actual appointments and seniority, so much as it related to layoffs. Such a conclusion is perfectly logical since the whole point of the decree was to increase the percentage of minority officers. Not to consider these factors in assigning seniority and determining layoffs invited a reopening of the consent decree in order to prevent layoffs from destroying the gains achieved by the decree in the first place.

The procedures adopted by Springfield in 1997 and in the 2003 layoffs were an attempt to comply with *Castro v. Beecher* in a manner that had the least possible adverse in place on white officers.  By using a one to one ratio to establish seniority among what would otherwise be equals in time served, and by then following seniority in the order of layoffs, the City necessarily lost more minority officers than if it had laid officers off in a manner designed to maintain the same percentage of minorities that had already existed in the work force.  By deciding in 1997 to hire and assign badge numbers on a one to one ratio, the

8

57609

City created a solution where, at the time of the layoffs, white officers suffered less of an impact than they would have if minority officers had sought to enforce the *Castro v. Beecher* decree in the manner of Judge Caffrey's decree. As noted below, a decree such as Judge Caffrey's would probably not have been enforceable after 1984, but it still demonstrated the inescapable interrelation of hiring, seniority and the order of layoffs. As it stands the City still faced a suit by minority officers regarding the layoffs.

B.  <u>The City Did Not Violate the Equal Protection Rights of the Plaintiff.</u>

The undisputed evidence makes clear that none of the decision makers on the City's part had any motive other than compliance with the law, especially the existing consent decree. Even assuming, as the court has stated, that the City itself is responsible for Captain Cochrane's actions, there is still no policy of race discrimination, only a policy to comply with the existing decree.

It is not disputed that Captain Cochrane in making decisions as to badge numbers was guided only by the City's past practice under the decree described to him by Lt. Finn, and advice from the Civil Service Commission. (Decision p. 8) He believed that assignment of the badge number in the conformity to one for one was necessary to comply with *Castro v. Beecher*, (Decision p. 8) That belief was clearly warranted. Judge Caffrey's decision in *Castro v. Beecher* demonstrates that layoffs are part and parcel of the whole process and cannot be

excluded from consideration under *Castro v. Beecher*. Since the badge assignment's primary effect was on layoffs, it was perfectly reasonable, if not compulsory, to continue one for one assignments when the subject was seniority. Certainly if the one for one hire had occurred over time, the minority officers would have been entitled to greater seniority than white officers hired later, who might have been hired sooner if not for *Castro v. Beecher*.

It may be argued that the City did not follow Judge Caffrey's decree because instead of trying to layoff in such a way as to maintain the same percentage of minority officers, the City attempted to follow contractual seniority which had resulted from hiring on a one for one basis. This was done because of HRD advice and precedent from a prior post *Castro* layoff. There is nothing in the record to show Springfield was not advised to maintain a certain percentage of minorities, but there was a good legal reason not to. A system of layoffs which ignored seniority and attempted to maintain a certain racial percentage would be very similar to the plan found unconstitutional in *Fire Fighters Local Union 1784 v. Stotts*, 476 U.S. 581 (1984). This decision came after Judge Caffrey's decision, and it's intervention made it inappropriate to engage in an affirmative action in reverse with respect to layoffs.

The Plaintiffs rely on *Stotts*, but such reliance is misplaced. In *Stotts*, the Superior Court found unconstitutional an order which required ignoring seniority in favor of minorities so as not to decrease the percentage of minority firefighters.

10

57609

*Id at 567*.  Here the City tried to follow the seniority system in conducting layoffs and made no attempt to retain any particular percentage of a racial group.  The only reason here that the seniority was to any degree one for one, white and minority, is that, that is the way the hiring had been conducted, and the hiring was conducted in a accordance with the *Castro v. Beecher* decree.  While the Plaintiffs argue that the reconstitution of the list at the time of hire was not based on the decree, the reconstitution, as noted above was not racial, but only based on the fortuity of who happened to fail a particular condition, whatever their race was.  The arbitrator may have found this violated the contract, but it did not violate the contract because it was racially motivated.  Not replacing slots on the list on a one for one basis would have been contrary to the way the list was structured by Civil Service in the first instance, because that list already had minorities listed higher than they otherwise would have been.

II     The Court Should Reconsider Its Ruling on the Statute of Limitations Issue
       In Light of the Supreme Court's Decision

In its prior decision the Court rejected the Defendant's argument that the Plaintiff's cause of action was barred by the Statue of Limitations because it complains of actions which occurred in 1997.  The court held that that there was no evidence that Plaintiffs "knew or should have known, how their seniority was calculated." (Decision p. 21)

57609

In a subsequent and recent case, *Ledbetter v. Goodyear Tire and Rubber Co., 127 S. Ct. 2162* (2007) the Supreme Court held that the charging period:

"is triggered whether a discrete unlawful protected takes place. A new violation does not occur when a new charging period does not commence upon the occurrence of subsequent non discriminatory acts that entail adverse effects resulting from post discrimination."

*Id, at 2169.*

This fits the situation here. The Court previously stated that there was no (at least undisputed) evidence that plaintiffs knew <u>how</u> their seniority was calculated. But in *Ledbetter* the Supreme Court makes clear whether the <u>decision</u> at issue was communicated to the party is the determining factor, not necessarily knowledge of the surrounding evidence.

> For example, in such case as this in which the plaintiff's claim concerns the denial of raises, the employer's challenged acts (the decisions not to increase the employee's pay at the time in question) will almost always be documented and will typically not even be in dispute. By contrast, the employer's intent is almost always disputed, and evidence relating to intent may fade quickly with time. In most disparate-treatment cases, much if not all of the evidence of intent is circumstantial. Thus the critical issue in a case involving a long-past performance evaluation will often be whether the evaluation was so far off the mark that a sufficient inference of discriminatory intent can be drawn. *See Watson*, 487 U.S., at 1004 (Blackmun, J., joined by Brennan and Marshall, JJ., concurring in part and concurring in judgment) (noting that in a disparate-treatment claim, the *McDonnell Douglas* factors establish discrimination by inference). See also *e.g. Zhuang v. Datacard, Corp.*, 414 F. 3rd 849 (CA8 2005) (rejecting inference of discrimination

12

57609

>from performance evaluations); *Cooper v. Southern Co.*, 390 F. 3d 695, 742-733 (CA11 2004) (same). This can be a subtle determination, and the passage of time may seriously diminish the ability of the parties and the factfinder to reconstruct what actually happened…
>
>We therefore reject the suggestion that an employment practice committed with no improper purpose and no discriminatory intent is rendered unlawful nonetheless because it gives some effect to an intentional discriminatory act that occurred outside the charging period. Ledbetter's claim is, for this reason, timely.
>
>*Id, at 2171-2172.*

Here, the individuals do not appear to dispute knowledge of the annual publication of the police roster which showed the seniority decision. As in *Ledbetter* the parties are confronted with trying to reconstruct events, motives and judgments which occurred long ago and are now obscured by time. For these reasons the Court should reconsider its decision and grant the Motion for Summary Judgment for failure to comply with the Statute of Limitations.

## **CONCLUSION**

For the reasons stated above, the Court should deny the Plaintiff's Motion for Summary Judgment and grant the Defendant's Cross Motion for Summary Judgment.

57609

|  |  |
|---|---|
| **CERTIFICATE OF SERVICE**<br>Harold L. Lichten<br>Pyle, Rome Lichten, Ehrenberg & Liss-Riordan, P.C.<br>18 Tremont Street, Ste. 500<br>Boston, MA  02108<br><br>I hereby certify that I caused the within document to be served on plaintiff by delivering a copy to the above named Attorneys on  this  date.<br>Date:  9/5/2007<br><br><br>s/s<br>_____<br>Maurice M. Cahillane, Esq. | THE DEFENDANT,<br>CITY OF SPRINGFIELD<br>**BY:**<br><br><br><br>s/s<br>_____<br>Maurice M. Cahillane, Esq.<br>Associate City Solicitor<br>BBO# 069660<br>City of Springfield Law Department<br>36 Court Street<br>Springfield, MA 01103<br>(413) 787-6085<br>Fax: (413) 787-6173 |

57609