UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KEVIN SULLIVAN, ET AL.,
            Plaintiffs        )
                              )
            v.                ) C.A. No. 05-30004-MAP
                              )
CITY OF SPRINGFIELD,          )
            Defendant         )

MEMORANDUM AND ORDER REGARDING
CROSS-MOTIONS FOR SUMMARY JUDGMENT
AND PLAINTIFFS' MOTION TO STRIKE
DEFENDANT'S CROSS-MOTION FOR
SUMMARY JUDGMENT
(Dkt. Nos. 27, 35, 38)

May 23, 2008

PONSOR, D.J.

I. INTRODUCTION

This is an action brought by five individuals, Kevin
Sullivan, Vincent Dudley, Mark Mehringer, Jason Sleeper, and
Michael Trombley, who were laid off from the Springfield
Police Department in 2003. Plaintiffs allege that the City
of Springfield discriminated against them by considering
race when determining seniority for the purpose of effecting
the 2003 layoffs. The court previously denied the parties'
cross-motions for summary judgment because the data then
before the court did not support a claim of racially
discriminatory conduct on the part of Springfield. (Dkt.
No. 23, Mem. and Order Regarding Cross-Motions for Summ. J.
(Jan. 3, 2007) [Sullivan I].) Pursuant to the court's

earlier order the parties have supplemented the record and
again filed cross-motions for summary judgment.
Additionally, Plaintiffs have moved to strike Defendant's
motion for summary judgment on the ground that it was not
timely filed.

After reviewing the augmented record and hearing
argument from the parties on October 31, 2007, the court on
March 28, 2008 issued a memorandum and order denying
Plaintiffs' motion for summary judgement on two grounds:
first, Plaintiffs have failed after several efforts to
marshal adequate record support for their claims and,
second, the actions taken by Defendant in relation to
Plaintiffs were reasonably required to comply with a
controlling consent decree.  At the same time, the court
allowed Defendant's motion for summary judgment and denied
Plaintiffs' motion to strike.  In its brief March 28, 2008
memorandum, the court promised a lengthier explanation of
its reasoning.  This memorandum fulfills that promise.

## II. BACKGROUND

The events giving rise to this dispute are entwined
with a complicated set of facts related to the consent
decree entered more than thirty years ago in Castro v.
Beecher, 365 F. Supp. 655 (D. Mass. 1973).  As the court's
previous order reviewed the statutory and administrative

-2-

framework governing the hiring of police officers in municipalities subject to the Commonwealth's civil service law, that framework will not be detailed here.  (<u>Sullivan I</u> at 3-4.)

Plaintiffs argue that certain actions taken by the Springfield Police Department went beyond the <u>Castro</u> consent decree.  In order to address that argument the court will review the background of the <u>Castro</u> decree in some detail, including an unpublished stipulation of facts contained in the court records from the initial action, attached hereto as Exhibit A.  Because the parties have embraced the court's recitation of the facts underlying this case in <u>Sullivan I</u>, subject to some modifications based on additional discovery, the court will focus its review of the material facts on those additions, certain gaps remaining in the factual record, and specific aspects of the hiring process on which the court's decision is based.  (Dkt. No. 28, Pls.' Memo. in Supp. of Their Substitute Mot. for Summ. J. 2 n.1; Dkt. No. 37, Def.'s Memo. in Opp'n. to Pls.' Substitute Mot. for Summ. J. and In Support of Def.'s Cross-Mot. for Summ. J. 1-2.)

A. <u>The Castro Consent Decree</u>.

In the early 1970s six blacks and two Hispanics[1] brought suit against the commissioners and director of the Massachusetts Civil Service Commission[2] [hereinafter "HRD"] and the Commissioner of Police of the City of Boston, alleging that various eligibility requirements for police officer positions were racially discriminatory.  Castro v. Beecher, 334 F. Supp. 930, 934 (D. Mass. 1971) [Castro I]. At the time, the HRD was responsible for providing municipalities in Massachusetts with lists of individuals eligible for appointment as police officers.  Id. at 937. In order to be eligible for appointment candidates had to take and pass a written exam of general knowledge, a physical fitness test, and a medical test, as well as meet other eligibility requirements related to citizenship, education, age, height, and moral character.  Ex. A, Stipulations of Fact Relevant to Defs. Nancy Beecher, Joseph Duffy, Aaron Feinberg, Ernest Laflamme, Jr., Helen Mitchell,

---

[1] The terminology used to refer to the minority groups has evolved over time and the court therefore has several choices about how it refers to them.  For the sake of consistency, the court follows Sullivan I and uses "blacks" instead of African-Americans and "Hispanics" in place of "Spanish-surnamed individuals."  Additionally, "minority" refers only to the group comprised of blacks and Hispanics, while "non-minority" refers to the group comprised of individuals of all other races and ethnicities.

[2] The Massachusetts Civil Service Commission has since become known as the Human Resources Division.  For simplicity, the agency will be referred to as the HRD throughout.

-4-

Members of the Massachusetts Civil Service Commission, and
Def. Mabel Campbell, Dir. of Civil Service, <u>Castro v.
Beecher</u>, No. 70-1220W (D. Mass. Apr. 23, 1971) [April 23,
1971 Stipulation] ¶¶ 113-14); <u>see also Castro I</u>, 334 F.
Supp. at 937.

     The HRD determined which applicants met the
requirements and placed their names on an eligibility list.
<u>Id.</u>  Applicants were ranked by standing, except that all
disabled veterans were moved to the top of the list,
followed by non-disabled veterans, and then all other
applicants.  Ex. A, April 23, 1971 Stipulation ¶ 207; <u>see
also</u>, <u>Castro I</u>, 334 F. Supp. at 937.  Standing was based on
an applicant's "total point score" on the examinations plus
possible increases based on an applicant's previous training
or experience.  Ex. A, April 23, 1971 Stipulation ¶¶ 113-14.
Eligibility lists expired two years after they were
established and applicants were chosen from the oldest
available eligibility list first.  <u>Id.</u> ¶ 114.  The HRD rules
required, and still require, appointing authorities to
select candidates for appointment in rank order from the
eligibility lists.  When an appointing authority bypassed a
candidate in favor of a lower ranked candidate it was, and
still is, required to provide the HRD with a written
explanation for the deviation.  <u>Id.</u> at ¶ 206; Dkt. No. 39,

Ex. N, Personnel Administration Rules, PAR.08.

Of the several eligibility requirements challenged by the plaintiffs in <u>Castro</u>, the district court judge found that all but one were either not shown by the evidence to be discriminatory or were permissible because they were sufficiently related to the job requirements for law enforcement officials.  The written exam, on which a passing score of 70 or better was required, was the lone exception.  The court concluded that

> [i]nasmuch as the civil service examinations were
> not job related and were discriminatory against
> the plaintiffs, any state or city official, who
> innocently or otherwise, used the results of those
> examinations to deprive a plaintiff of a job
> opportunity deprived him of the equal protection
> of the laws ....

<u>Castro I</u>, 334 F. Supp. at 943.

The district court declined to certify the plaintiffs' requested class, though it prohibited the further use of existing exam results and ordered that future exams be both non-discriminatory and significantly related to job requirements and performance of police officers.  The First Circuit reversed the district court on the class certification and remedy issues because "[t]he relief ordered by the district court [was] unlikely to increase significantly [the current] level of [minority] representation," which was then 2.3 percent.  <u>Castro v.</u>

Beecher, 459 F.2d 725, 730 (1st Cir. 1972) [Castro II].  On
remand the First Circuit directed the district court to
order "some form of compensatory relief" for class members
and suggested that the relief include the establishment of
priority pools to facilitate the hiring of qualified
minority applicants.  Id. at 736.  Recognizing that any
remedy affecting the way the HRD developed its eligibility
lists would not be "fully effective without the cooperation
of the appointing authorities in the various police forces,"
the First Circuit retained the Boston Commissioner of Police
as a party.  Id. at 737.  The First Circuit did not seek to
add any other appointing authorities as parties because it
anticipated that these other appointing authorities would be
just as willing to cooperate in efforts to diversify their
departments.  Id.

Following the Castro II remand, the parties entered
into a consent decree (the "Castro decree"), which was
approved by the district court in April of 1973.  Castro v.
Beecher, 365 F. Supp. 655 (D. Mass. 1973) [Castro III].  The
decree required the HRD to change its recruitment program,
report data about applications and employment to the
plaintiffs' counsel, and ensure future exams were "validated
in conformity with the Testing Guidelines of the Equal
Employment Opportunity Commission."  Id. at 662.

Additionally, and relevant to this case, the decree altered
the way the HRD would assemble the eligibility lists sent to
appointing authorities.

The Castro decree created four groups of applicants.
Within each group candidates would be "ranked in accordance
with existing Massachusetts law." Id. at 661. Group A
included minority candidates who took and failed the exams
given in 1968-1970, but passed the exam given in 1972 and
were "otherwise qualified for appointment." Id. Group B
included all individuals who were on three eligibility lists
as a result of passing exams between 1968 and 1970. Id.
Each of the three lists was given an expiration date no more
than approximately sixteen months from the entry of the
decree. Group C included all minority candidates, not
included in Group A, who took and passed the exam in 1972
and were "otherwise qualified for appointment." Id.
Finally, Group D included anyone who passed the 1972 exam,
was "otherwise qualified for appointment," and was not
included in Groups A, B, or C. Id. The list of Group D
candidates was set to expire two and a half years after the
administration of a 1972 interim exam. Id.

When an appointing authority requested a list of
eligible candidates the groups would be combined into a
single list such that there would be "one candidate from

-8-

Group A for every candidate certified from Group B" until
Group A was exhausted.  Id.  At that point there would be
"one candidate from Group C for every three candidates
certified from Group B" until Groups B and C were exhausted.
Id.  Once Groups A, B, and C were exhausted, and as long as
no more than two and a half years had passed since the 1972
exam, candidates from Group D could be certified.  Id.
Finally, in the event that a municipality's appointing
authority failed to offer an appointment to the next highest
candidate certified from any of the groups, the order
required the HRD to obtain a written statement explaining
why the candidate was bypassed before the HRD could
authorize any appointment.  Id.

        The initial Castro decree was revisited and amended in
1975 by Chief Judge Caffrey.  Castro v. Beecher, 386 F.
Supp. 1281, 1282 (D. Mass. 1975) [Castro IV].  At that time,
the district court issued an order clarifying the way that
statutory preferences were to be handled under the Castro
decree.  Id. at 1286-87.  The court also requested proposals
from the parties to modify the consent decree to prevent the
HRD from having to certify only minority candidates (Groups
A and C) indefinitely following the expiration of Groups B
and D.  Id. at 1286.  The district court suggested that the
parties model their solution on the remedy adopted in a

parallel case involving the hiring of firefighters, <u>Boston Chapter, NAACP, Inc. v. Beecher</u>, 371 F. Supp. 507 (D. Mass. 1974), <u>aff'd</u>, 504 F.2d 1017 (1st Cir. 1974).  <u>Id.</u>  A revised decree was subsequently entered by the court.  Ex. B, <u>Castro v. Beecher</u>, Nos. 70-1220-W, 74-2982-C (D. Mass. June 27, 1975) [June 27, 1975 Consent Decree].

As revised, the <u>Castro</u> decree provided for the continued use of minority and non-minority groups, at a ratio of one to one in Boston and Springfield and three to one in other municipalities, until the percentage of minorities in the police force was commensurate with the percentage of minorities in the community.  <u>Id.</u>  Over the years a number of municipalities reached the milestones for minority representation in their police forces and now no longer hire police officers in accordance with the <u>Castro</u> decree.  <u>See</u> <u>e.g.</u> <u>Deleo v. City of Boston</u>, No. 03-12538-PBS, 2004 U.S. Dist. LEXIS 24034 (D. Mass. Nov. 23, 2004) (releasing Boston from the <u>Castro</u> decree).  The First Circuit has also rejected modifications of the <u>Castro</u> and <u>Beecher</u> decrees to address layoffs based on seniority, though it did so without ruling that such modification would have been unconstitutional.  <u>Boston Chapter, NAACP, Inc. v. Beecher</u>, 749 F.2d 102, 104 (1st Cir. 1984) (distinguishing the case from <u>Firefighters Local Union No. 1784 v. Stotts</u>,

-10-

467 U.S. 561 (1984)).

B. Factual Overview of This Case.

There are two time periods during which the events underlying Plaintiffs' discrimination claim in this case occurred.  In 1996 Defendant began the process of hiring a new group of officers.  That process continued through mid-1997 when seniority among the newly appointed officers was determined and badge numbers (which correlate with seniority) were assigned.  This is the period during which Plaintiffs allege that Defendant impermissibly considered race.  Later, in 2003 and 2004, Defendant carried out the layoffs and recalls that are the basis of Plaintiffs' claim that they were laid off earlier and recalled later than they should have been solely due to their race.

1. 1996-1997.

a. Hiring Process.

In 1996 Defendant decided to hire sixty new police officers, and the Police Commission Chairman requisitioned a list, called a certification, of eligible candidates from the HRD.  In the years since Castro the HRD has delegated most of the responsibility for determining the eligibility of candidates to appointing authorities.  See Ex. C (attached to this memorandum), A Certification Handbook: Entry Level Police Officer Appointments Subject to Civil

Service (Castro v. Beecher), http://www.mass.gov/Ehrd/docs//

cs/publications/entry_ level_police_appointment_consent.doc

[Certification Handbook], 6-7.  As a result, the list

generated by the HRD, Certification No. 961295,[3] included

applicants who had passed the written exam, but whose

overall eligibility for appointment had not yet been

determined.  (Dkt. No. 39, Ex. N, Personnel Administration

---

[3] Two points about this list deserve clarification. First, in its previous order the court described the list generated by the HRD as containing the names of "those persons who had passed the most recent HRD examination and were eligible for permanent employment." (Sullivan I at 5.)  To avoid potential confusion the court now clarifies that it did not mean to imply that the HRD had already established that the persons whose names were placed on the list met all the eligibility requirements.  The court merely meant that those on the list had overcome the first eligibility hurdle by passing the written exam.

Second, Plaintiffs have described Certification No. 961295 as a 2n+1 list.  (Dkt. No. 28, Pls.' Mem. 3.) Defendant disputes this reference on the basis that the meaning of the term 2n+1 is unclear.  The term 2n+1 is used by the HRD to describe the formula that limits the pool from which an appointing authority may make appointments.  (Dkt. No. 39, Ex. N, Personnel Administration Rules, PAR.09.)  N is the number of appointments being made and the rule allows the appointing authority to consider up to twice that number of candidates, plus one additional candidate.

Although the record contains a definition of the term 2n+1, it is clear that Plaintiffs have misapplied the term to Certification No. 961295.  A quick count reveals that the certification contained significantly more than the one hundred twenty one names that an appointing authority could consider when seeking to make sixty appointments.  Candidates who did not sign the certification or who later indicated that they would not accept a position were not considered part of the 2n+1 group, even though their names appeared on this certification.  The record contains no explanation of how the 2n+1 rule was or was not applied in this case, one of the many unexplained obscurities in this record.

-12-

Rules, PAR.07.)    After receiving a certification, appointing authorities governed by the <u>Castro</u> decree, such as Defendant here, had to ensure that the candidates listed on the certification met the eligibility requirements.    Ex. C., Certification Handbook, 6-7.    Though candidates were subject to local review, the HRD retained oversight of the process to ensure compliance with its rules.    Once final selections were made, appointing authorities had to submit an Authorization of Employment Form 14 ("Form 14") to the HRD for approval prior to the appointment of the selected candidates.    <u>Id.</u> at 9.

Pursuant to the <u>Castro</u> decree, the HRD generated the initial certification list by merging a ranked list of all minority applicants and a ranked list of all non-minority applicants.    The list alternated so that the name of one minority candidate was followed by the name of a non-minority candidate, which was in turn followed by the name of a minority candidate, and so on down the list.    Each of the separate lists was made by taking all the members of one group, applying the relevant statutory preferences, and ranking the applicants by their exam score.    The combined list sent to Defendant did not include the actual exam score

of any applicant,[4] though instances where multiple
applicants within one group had the same exam scores
(whatever they may have been) are marked as ties.  Thus
there is no accurate way to compare scores between members
of different groups.  Significantly, though race obviously
was a factor explicitly used to establish the 1996
certification, Plaintiffs have not alleged that the creation
of Certification No. 961295 violated their constitutional
rights.

     Once Defendant received the certification, candidates
were notified that they would need to sign the list in order
to be considered for a position.  The record before the
court does not indicate which candidates, if any, were
eliminated at this stage on the basis of their failure to
appear and sign the certification.[5]  After candidates had an

_____

     [4]  The HRD does not include applicants' scores on
certifications.  Prior to 1995, the Collective Bargaining
Agreement ("CBA") covering the Springfield Police Department
stipulated that seniority be assigned based on applicants'
scores on the written exam. (Dkt. No. 9, Ex. D, Arbitrator's
Award 4 (quoting 7/1/91-6/30/94 CBA, 7.02).)  The current
method for assigning seniority, discussed below, was adopted
after the city became unable to assign seniority based on exam
scores.  (Id. at 5.)  Plaintiffs' memorandum at times appears
to assume that the construction of the list necessarily meant
that minorities with lower exam scores occupied higher
positions on the list than higher-scoring non-minorities.  No
evidence of record supports this assumption.

     [5] There is a form, 16II, that may exist and indicate which
candidates did not appear to sign.  (Dkt. No. 18, Ex. F,
McNeely Dep. 48:5-19.)   Neither party has provided this form

-14-

opportunity to confirm their interest in being appointed,
William Cochrane, then Commander of the Springfield Police
Academy, and his staff began performing background checks on
applicants, setting up applicant interviews with the Board
of Police Commissioners, issuing conditional offers of
appointment, and coordinating additional testing.  The only
information in the record about how this process was
conducted comes from Cochrane's uncontested deposition
testimony.  Although <u>Sullivan I</u> recounted this process in
some detail, it is now clear that an even more detailed
review is warranted.

    Cochrane and his staff first determined a target number

---

to the court.  Plaintiffs have provided the court with the
Form 16II created in 1998 in reference to a different HRD
list, Certification No. 970976.  (Dkt. No. 9, Ex. G, Form 16II
for Certification No. 970976.)  Not only does the 1998 form
not provide the court with any information about which
candidates did not sign the 1997 list, it suggests that at
that time the Form 16II did not in fact delineate which
candidates signed the list indicating a desire to be
appointed.  On that 1998 form applicants are marked as either
minority, non-minority, eliminated, or self-removed.  The
self-removal tag appears next to several names marked as
having been selected though not appointed, indicating that it
did not refer to individuals who did not sign the list.  The
eliminated tag does not instruct the court as to the reason
why a candidate was eliminated, unless candidates were only
eliminated due to their failure to sign the list, an
assumption the court is not prepared to make.  As a result,
the court has no information from which it, or a jury, could
draw a reasonable conclusion about how many applicants were
eliminated from consideration in 1997 because they did not
sign to indicate their interest in being appointed.  Again,
this is another part of the confusion Plaintiffs have been
unable to dispel from the record.

of new officers by subtracting the number of cadets eligible
to become officers from the total number of appointments to
be made.  (Dkt. No. 9, Ex. A, Cochrane Dep. 24:1-8.)  They
then conducted background checks of applicants and scheduled
applicant interviews with the Board of Police Commissioners.
(Id. at 14:11-22.)  The background investigations were
conducted to ensure that applicants met the civil service
and HRD requirements for becoming police officers in
Massachusetts.  (Id. at 16:2-6.)  Applicants were eliminated
if they could not, for example, prove they possessed (or
could obtain) a Massachusetts driver's license, or if they
had felony convictions, or had lied about being city
residents.  (Id. at 15:13-24, 24:16-24.)  The background
investigations also looked at each applicant's work history
and character.  (Id. at 16:11-24.)  Cochrane and his staff
did not actually eliminate candidates on the basis of these
background investigations, but they could often predict
which applicants were likely to be eliminated following
their interviews with the Board of Police Commissioners.
(Id. at 14:23-15:1-4, 24:9-24.)  Applicants who were not
eliminated were given conditional offers of employment.
(Id. at 16:15-20.)

    After a conditional offer was extended, an applicant
would have to pass (a) a medical screening test administered

-16-

by Defendant; (b) a physical abilities test, paid for by the
applicant and administered by the HRD; and (c) a
psychological screening test administered by Defendant.
(<u>Id.</u> at 16:21-17:23.)  Candidates could be eliminated based
on the results of any of these tests.  (<u>Id.</u> at 17:15-24.)
Successful applicants were then placed on a list for
admission to the police academy.  (<u>Id.</u> at 17:21-18:2.)

        Cochrane testified that his general target was to have
half of the appointments go to minority applicants and half
the appointments go to non-minority applicants.  (<u>Id.</u> at
25:1-3.)  Despite Cochrane's formulation of a general
target, to comply with the <u>Castro</u> decree, there was never a
"quota" for minority officers, as Plaintiffs claim.  Quotas
are set-asides of a certain number of positions for members
of certain groups.  While parity may have been a goal, the
result in this case was quite different.  Defendant did not
rigidly ensure that half of the hires would be minorities.
Indeed, as the court noted in its previous order, the
information on Form 14 shows that in the spring of 1997
Defendant hired more than twice as many white officers as
minority officers.  Even if cadets are not counted,
Defendant hired almost twice as many non-minority officers
as minority officers.

        Prior to the extension of conditional offers of

-17-

employment, applicants were evaluated on a rolling basis.
(Id. at 24:7-12, 25:1-12, 30:5-15.)  Cochrane stated that he
and his staff basically worked from two lists in an attempt
to maintain parity.  (Id. at 31:2-33:10.)  If a minority
candidate was eliminated, or expected to be eliminated,
Cochrane and his staff would begin a background check on the
next minority candidate; if a non-minority candidate was
eliminated they would begin processing the next non-minority
candidate.  (Id. at 31:2-7.)  The two lists were later
dovetailed to create a new list which alternated between
minority and non-minority names.  (Id. at 32:8-20.)  During
his deposition Cochrane emphasized that the new list was
created to comply with the Castro decree.  (Id. at 28:14-
17.)  In addition, he expressed his belief that the Form 14
sent by Defendant to secure approval of the appointments
from the HRD would have matched this dovetailed list.  (Id.
at 32:17-20.)  However, as the court painstakingly detailed
in its previous order, and even after accounting for the
presence of cadets, the names of newly appointed officers do
not alternate between one minority and one non-minority
candidate, and there is no parity at all between minority
and non-minority appointees.  (Dkt. No. 9, Ex. E, HRD Letter
and Form 14; see also Sullivan I, 8-11.)

        Something happened; no one knows what.  All that is

-18-

clear is that Cochrane, in his deposition testimony, was simply incorrect in suggesting that the pertinent Form 14 contained equal numbers of minority and non-minority candidates. Form 14 is just not an example of the reconstituted list he described.

Plaintiffs now suggest that a new alternating list was created when conditional offers of employment were made, and that Form 14 was prepared from that list after several additional candidates had been eliminated based on the medical, physical abilities, or psychological testing. (Dkt. No. 28, Pls' Memo. ¶¶ 15-21.) Plaintiffs' position is superficially plausible, but it is only one explanation for what might have happened, and is unsupported by the documentary evidence. Another possibility is that Defendant created a reordered list that included only those individuals who had signed the certification and that was subsequently reordered only to the extent that eliminated candidates' names were removed. That list, rather than the initial list, would then have formed the basis for the Form 14. Such an approach would have been in keeping with rules promulgated by the HRD for appointing authorities covered by the Castro decree. Ex. C, Certification Handbook, 6. Finally, it is possible that both occurred. A reordered

-19-

list may have been created after the signing period, then
been broken apart into two lists, which were later
recombined before the last several candidates were
eliminated and the Form 14 was created.

Based on the available evidence, the court cannot be
sure when Defendant created one or more reordered, one-for-
one lists.[6]  Plaintiffs suggest that Defendant created an
alternating list when the conditional offers of employment
were made; that race was not considered past that point;
that some candidates were eliminated based on medical,
physical abilities, or psychological testing; and that the
Form 14 list was created by removing the names of eliminated
candidates from the interim list.  This suggestion is
speculative but, as will be seen, even if the court assumes
it is correct, Plaintiffs have failed to show any
entitlement to a remedy.

     b. <u>Assignment of Seniority</u>.

---

[6] That the court finds itself having to make assumptions
without record support about something as central to the case
as when Defendant may have reordered the hiring list is yet
another example of the confusion in the record.  Not only have
Plaintiffs failed to dispel this confusion, they have taken
inconsistent positions about when the Form 14 list itself was
created.   In their memorandum in support of this motion
Plaintiffs assert that one individual listed on the 1997 Form
14, José Diaz, did <u>not</u> complete the police academy in 1997 and
then in the following paragraph they state that the Form 14
list showed "those officers who <u>had</u> graduated from the Academy
and been selected for appointment."  (Dkt. No. 28, Pls.' Memo.
¶¶ 16-17 (emphasis supplied).)

However created, Defendant used the Form 14 list to designate seniority through the assignment of badge numbers. The greater an officer's seniority, the lower the badge number.  Section 7.02 of the collective bargaining agreement ("CBA") required that when multiple new officers were appointed and completed training on the same day, their badge numbers, and thus their seniority, would be "based in the order of the civil service list from which applicants [were] appointed."[7]  (Dkt. No. 9, Ex. D, Arbitrator's Award 4 (quoting CBA language adopted in 1995).)  This meant that the higher an applicant's name on the civil service list, the lower that applicant's badge number should be. Plaintiffs take the position that the CBA provision required that seniority be based on the initial list sent by the HRD, not the eventual Form 14.[8]

_____

[7] The applicable provision of the CBA was adopted in 1995. (Dkt. No. 9, Ex. D, Arbitrator's Award 4.)  Previously, new officers were assigned seniority based on written exam scores. (Id.)  As noted above, supra n.4, actual scores did not appear on Certification No. 961295.

[8] The outcome of related arbitration was premised on this same position; that use of the Form 14 rather than the original list provided by the HRD violated the collective bargaining agreement.  The city does not appear to have disputed that interpretation of the relevant provision of the CBA, and the arbitrator assumed that Defendant should have been assigning seniority based on the original HRD list. Neither party has challenged this reading of the CBA here because the violation of the CBA is not before the court.  If, however, the court were required to interpret the CBA, it is doubtful that it would agree that Defendant's method of

-21-

The reader will recall that the original HRD list (of more than 121 candidates for the sixty available positions) contained equal numbers of minority and non-minority candidates, listed alternately, to comply with <u>Castro</u>. The uncontested facts are that seniority was, in fact, assigned based on the Form 14 list. Although it had its origins in the HRD list, the Form 14, for reasons no one can adequately explain, contained the names of far more non-minority candidates and exhibited no consistent alternate listing.

In 1997, the year Plaintiffs were appointed, the process through which the Form 14 list was created resulted by happenstance in these five Plaintiffs' names appearing lower on the Form 14 in relation to the names of certain minority applicants, though their names had been higher than those minority applicants on the original certification sent by the HRD. This repositioning was pure accident, not based on race. The capriciousness of this ranking is evidenced by the fact that the next year the result was reversed. (Dkt. No. 9, Ex. D, Arbitrator's Award 9.) It is undisputed that in the following year, 1998, had seniority been assigned based on the original list sent by the HRD, twelve minority officers and one non-minority officer would have received lower badge numbers (and greater seniority), while eighteen

---

assigning seniority based on the Form 14 violated the CBA.

non-minority officers and one minority officer would have
received higher badge numbers (and less seniority).  (Id.)
Despite the absence of any evidence of discriminatory
intent, and no evidence whatsoever of consistent or
inevitable discriminatory impact, Plaintiffs take the
position that Defendant's failure to assign seniority based
on the original, alternating HRD certification, and instead
use the Form 14, violated both the Castro decree and the
Equal Protection Clause.

    2.  2003-2004.

    The effect of the 1997 assignment of badge numbers came
home to roost when Defendant laid off approximately seventy-
five officers during the first quarter of 2003.  Non-
disabled officers were laid off in the order of their badge
numbers such that those with the highest badge numbers were
laid off first.  (Dkt. No. 9, Ex. B, Albano Dep. 12:18-
16:21.)  The layoffs impacted officers hired in 1997 and
1998.  (Dkt. No. 9, Ex. D, Arbitrator's Award 7.)
Plaintiffs were laid off during a two week period.  Had the
five Plaintiffs' badge numbers been assigned based on their
positions on the original list sent by the HRD, rather than
the Form 14, they would have been laid off at a later time
and recalled somewhat earlier.

    Around the time the layoffs occurred, the union raised

concerns with Defendant about the way in which seniority had been assigned when officers were hired in 1997 and 1998. (Dkt. No. 9, Ex. D, Arbitrator's Award 8.)  These concerns culminated in the arbitration referenced above.  None of the Plaintiffs had any knowledge of how his seniority was determined until 2003.  (Dkt. No. 18, Exs. A-E, Pls.' Affs.)

### III. <u>DISCUSSION</u>

As explained above, the purpose of the <u>Castro</u> decree was to increase the number of minorities hired by ensuring that minority applicants made up a certain proportion of the applicants considered for positions.  In the case of Springfield, the decree required that one minority be considered for every non-minority.  Plaintiffs do not object to this requirement in itself, nor do they claim that it violated their rights.

This case turns on two questions.  First, was the Defendant's creation of a new alternating list during the hiring process in 1997 necessary to fulfill the requirements of the <u>Castro</u> decree, or did it in fact exceed the scope of the decree and violate the Equal Protection Clause?  Second, did Defendant's system for layoffs violate the Equal Protection Clause?  As Defendant has again chosen not to contest the substantive facts before the court, the court's task is to apply the law to the facts established by the

-24-

record, such as they are.

A. Creation of the Interim List and Scope of the Castro Decree.

     With respect to the first issue, whether Defendant's creation of the interim, alternating list during the 1997 hiring process constituted a violation of the Equal Protection Clause, the court's task is complicated by two aspects of this case.  First, though the reach of the Castro decree is clearly central to this case, neither party here was a party to that decree.  Second, very significantly, Plaintiffs have not challenged the Castro decree itself, but rather argue that Defendant's actions somehow exceeded the scope of the decree.  As this case has been formulated, Plaintiffs agree that if Defendant's actions necessarily flowed from its obligations under Castro, Plaintiffs are entitled to no remedy.  In other words, a finding that Defendant's actions were within the scope of the Castro decree marks the end of the court's inquiry.[9]

     Plaintiffs argue that with regard to Defendant's 1997 hiring process the requirements of the Castro decree were fulfilled when the HRD sent Springfield a list of applicants who had passed the civil service exam arranged so that the

_____

     [9] Compliance with a consent decree may not always end the constitutional inquiry.  Martin v. Wilks, 490 U.S. 755 (1989). But no argument on this line of authority is offered here.

names of minority and non-minority candidates alternated.
After assuming that the HRD satisfied the requirements of
the <u>Castro</u> decree when it provided the initial, alternating
certification to Defendant, Plaintiffs assert that further
use of the minority/non-minority groupings was a <u>per</u> <u>se</u>
violation of both the <u>Castro</u> decree and the Equal Protection
Clause.  An examination of law in this circuit reveals how
unconvincing this assertion is.

In determining the scope of the <u>Castro</u> decree, the
court looks to the framework the First Circuit provided for
interpreting this type of consent decree in <u>Mackin v. City</u>
<u>of Boston</u>, 969 F.2d 1273, 1276 (1st Cir. 1992).  In <u>Mackin</u>
the First Circuit interpreted the <u>Beecher</u> consent decree,
finding that it continued to govern hiring of firefighters
until the racial make-up of the force was proportional to
the racial make-up of the city.  When interpreting the
specific meaning of the decree, the court looked first to
the language of the decree.  Second, the court looked to the
way the parties acted pursuant to the decree because "[f]ew
things evidence a decree's meaning more persuasively than an
immutable, decade-old pattern of past practice under the
decree, consensually engaged in by all sides in the
underlying litigation that produced the decree."  <u>Id.</u>
Finally, the court relied on its own common sense as to what

-26-

the decree must have required in order to satisfy its underlying goal.

Turning first to the language of the consent decree, the court begins with the undisputed fact that <u>Castro</u> required the HRD to establish separate groups of minority and non-minority applicants who had passed the written exam and were "otherwise qualified for appointment on the basis of existing requirements." Ex. B, June 27, 1975 Consent Decree 1; <u>see also Castro III</u>, 365 F. Supp. 655, 660 (D. Mass. 1973). As described above, the HRD provided appointing authorities with lists created by alternating the names of members of the two groups. Ex. B, June 27, 1975 Consent Decree 3. The decree also required that if an appointing authority bypassed a candidate in favor of another candidate lower on the list the director of the HRD was to "disapprove any [such] appointment unless the appointing authority [] furnished [] a written statement of the reasons for rejecting the appointment of any candidate higher on the list." <u>Id.</u> Any written statements were then to be provided to the <u>Castro</u> plaintiffs' attorneys and the bypassed candidate upon request. <u>Id.</u> The language requiring the HRD to reject bypass appointments recognized that appointing authorities, such as Defendant here, would play an important role in achieving the purposes of the

-27-

Castro decree and directed the HRD to manage that role.

The second Mackin factor, the evolution of practices implementing Castro, also undercuts Plaintiffs.  At first, the HRD determined the eligibility of applicants before placing their names on a certification.  In other words, the HRD determined not only whether the applicant had passed the written examination, but also whether the applicant had passed physical fitness and medical examinations and whether the applicant met requirements "pertaining to citizenship, education, moral character, age, and height."  Ex. A, April 23, 1971 Stipulation ¶ 114.  This initial approach meant that little preliminary screening fell to municipalities. Fewer opportunities arose for individual applicants to be rejected once their names reached the municipality.  As a result, the initial list provided by the HRD was closely related to the list of applicants actually appointed.

Over the decades the process has changed.  HRD currently certifies names to appointing authorities solely based on written test scores.  The appointing authority now has a much greater role in determining the eligibility of candidates.  Thus, there are now many more opportunities for candidates to be eliminated after their names have been certified to the municipality.  Moreover, two elements of eligibility, successful completion of medical and physical

-28-

fitness tests, which were once determined before an applicant's name was submitted to a municipality, now are not determined until <u>after</u> a conditional offer of employment has been made.

The upshot of all this is self-evident. There is now a much greater chance that in any given year a significant number of applicants from one group will be eliminated from the initial HRD list. As a result, unless adjustments are made, a disproportionate number of members of one group would be hired before any additional members of the other group would be appointed. Sometimes this would affect minorities, sometimes non-minorities.

This is exactly what occurred here. By reformatting the original HRD list, Defendant was merely carrying out the purposes of the <u>Castro</u> decree, in exactly the same way that the HRD did in the early days of the decree's implementa- tion. There was no violation of the decree and certainly no actionable discrimination.[10]

Finally, the third <u>Mackin</u> factor, common sense, cuts against Plaintiffs here. From the time it was entered, the success of the <u>Castro</u> decree depended on the cooperation of

_____

[10] **Even if this practice might have theoretically produced discrimination, which it did not, there was no discrimination in the formulation of the 1997 Form 14 <u>in</u> <u>fact</u>, since it actually favored non-minorities overwhelmingly.**

-29-

appointing authorities.   The decree required the HRD to
exercise its authority to ensure their cooperation.   Over
time, the level of cooperation required from appointing
authorities has grown because the HRD has delegated more
eligibility determinations.   The lists sent by the HRD no
longer represent the pool of eligible candidates that a
municipality is to consider.   The HRD has promulgated a
guide and provides specific advice to appointing authorities
to facilitate their cooperation.   See Ex. C, Certification
Handbook.   Common sense dictates that when an appointing
authority, such as Defendant here, takes on tasks which the
Castro decree contemplated being done exclusively by the
HRD, they bring themselves within the decree.

     For all these reasons, Defendant's hiring process
simply did not exceed the scope of the Castro decree.

B. Defendant's System for Layoffs.

     Plaintiffs rely on Firefighters Local Union No. 1784 v.
Stotts, 467 U.S. 561 (1984), to assert that "the Supreme
Court has expressly held that even where a governmental
entity is under a remedial decree to hire more minority
employees, it cannot require that layoffs based on seniority
be altered in order to prevent minority employees from being
laid off in disproportionate numbers."   (Dkt. No. 28, Pls.'
Memo., 17.   While Plaintiffs' description of Stotts is

accurate, Stotts is inapplicable here because Defendant did not take race-based action at the time of the layoffs in violation of its own bona fide seniority system.  The uncontradicted deposition testimony of Officer Peter Albano, the officer who assembled the layoff list, is clear that he used only the badge numbers in the police roster to make the list without regard to race.

Plaintiffs attempt to analogize this case to Stotts by equating the initial assignment of seniority with the type of alteration of the seniority system the Court dealt with in Stotts.  However, Defendant's actions are distinguishable in important ways.  In Stotts the lower court amended a consent decree to prevent all recent hires, a group which included a much higher percentage of minorities than the fire department as a whole, from being laid off before at least some more veteran firefighters, a group which was disproportionately white, were laid off.  Such action deprived individual officers of the earned benefits of their seniority, solely because of their race.  In this case, Plaintiffs cannot claim that race was used at the time of layoffs to deprive Plaintiffs of the earned benefits of their seniority.  Plaintiffs' only legitimate complaint is with the initial hiring decision, which, for the reasons set forth above, is beyond challenge.

IV. <u>CONCLUSION</u>

For the reasons discussed above, Plaintiffs' Motion for Summary Judgment (Dkt. No. 27) was DENIED, Defendant's Motion for Summary Judgment (Dkt. No. 35) was ALLOWED, and Plaintiffs' Motion to Strike Defendant's Motion for Summary Judgment was DENIED.

The Clerk is ordered to enter judgment for Defendant; this case may now be closed.

It is So Ordered.

                                   /s/ Michael A. Ponsor
                                   MICHAEL A. PONSOR
                                   U. S. District Judge

**Exhibit A**

applicants, setting of education requirements pursuant to the pro-
visions of G.L. c. 31, § 6A, designing and administering com-
petitive examinations, establishing eligibility lists, and cer-
tifying persons as eligible for appointment.

104.    Bernard Sexton is the Assistant to the Director of
Civil Service, and is responsible for directing and supervising the
activities of the Bureau of Examinations of the Division of Civil
Service.   The Bureau of Examinations is charged with the respon-
sibility of preparing, administering, and scoring examinations for
competitive civil service positions.   Bernard Sexton has filled
this position since 1965.

105.    Oliver Hunt Bowman is a Supervising Civil Service
Examiner in the Bureau of Examinations of the Division of Civil
Service.   He is charged with the responsibility of preparing a
number of civil service examinations, including the police entrance
examination.   Preparation of the police entrance examination has
been the responsibility of Oliver Hunt Bowman since 1967.   Prior
to 1967, he assisted in preparing the police entrance examination.

106.    Neither Bernard Sexton nor Oliver Hunt Bowman
have had a college course or a graduate course in the subject
of test design and police selections.

107.    Daniel T. Keady is the Recruitment Supervisor of the
Division of Civil Service, and is responsible for recruiting
applicants for all entrance level positions subject to civil serv-
ice protection in Massachusetts and its political subdivisions.
Daniel T. Keady has filled this position since its creation in
1968.   The Massachusetts Legislature enacted a law effective
March 12, 1968, that required the Director of Civil Service to
establish a recruitment program to recruit persons to fill
vacancies for offices and positions in the classified service
(M.G.L. Chapter 31, § 2A).

- 2 -

108.   The recruitment staff of the Division of Civil Service, consists of Daniel T. Keady and two assistants; a senior clerk stenographer and a senior clerk and typist.  The persons identified in the above paragraphs are Caucasian.

109.   For many years prior to 1968, and continuing to the present, the Division of Civil Service has prepared notices of the police entrance examination, and has sent them to the clerks of the cities and towns to be posted.  On two occasions, in 1970, the Division of Civil Service was able to obtain, free-of-cost, advertising space in the New England Times Jobfinder Edition, a weekly with regional circulation, for the purpose of publicizing an upcoming police entrance examination.

110.   The Division of Civil Service sends notice of all examinations to the State House News Service.

111.   The first step in the selection procedure for appointment to the Boston Police Department is to file an application at the Division of Civil Service.  A Police Entrance Examination is administered approximately every six months.  A police entrance examination is also a requirement for police positions in the 38 other Massachusetts cities, 143 towns, the Metropolitan District Commission, the Massachusetts Bay Transportation Authority, and the Bureau of State Buildings (Capitol Police).

112.   Applicants for the police entrance examination are notified in writing of the date, time and place of the examination during the week preceding the examination.

113.   To achieve a "passing grade" on the police entrance examinations since April, 1967, an applicant must answer correctly at least 70 of the 100 questions.  An applicant may receive additional "points" for his training and experience, but only if he first reaches the cut-off score of 70 on the written examina-

- 3 -

tion.

114.  Persons meeting certain other entrance requirements, pertaining to citizenship, education, moral character, age, and height, are required to pass physical fitness and medical examinations.  The names of those persons meeting the foregoing requirements are placed on an eligibility list of each police department for which they applied.  The names of disabled veterans must be placed in a category at the head of the eligibility list; the names of all other veterans must be placed on the list in a second category, to be followed by a third category consisting of non-veterans.  Persons are eligible within each category on the basis of total point score, but each candidate's eligibility expires two years after the eligibility list is established.  If more than one eligibility list for a particular police department exists, certification is made from the list with the earliest date of establishment.  If there is no suitable eligibility list, the director may authorize provisional appointments.

115.  Persons between the ages of twenty-one and thirty-five are eligible for appointment to the Boston Police Department if they meet all other requirements.

116.  Prior to 1967, all applicants to the Boston Police Department were required to have resided in Boston for two years preceding appointment to the patrolman job.  Between 1967 and 1969 the only residency requirement was that six months after appointment to the Boston Police Department the patrolman must have moved to within ten miles of Boston.  Today, the residency requirement is that nine months after appointment to the Boston Police Department a patrolman must have moved to within ten miles of Boston.

117.  Prior to the police entrance examination of April 20, 1968, there was no education requirement for persons seeking appointment to civil service police positions in Massachusetts.

- 4 -

118.   In 1968 and 1969, persons applying for the police entrance examination for certain cities and towns, were required to possess a high school diploma or an equivalency certificate issued by the Massachusetts Department of Education at the time of the examination.  An honorable discharge after three years' military service was not acceptable as an alternative to a high school diploma or an equivalency certificate.  The requirement of a high school diploma or an equivalency certificate was authorized by the Director of Civil Service upon request of said city or town, and at the request of Police Commissioner Edmund MacNamara of the Boston Police Department, was made a requirement for the Boston Police Department, for the police entrance examinations of 1968 and 1969.

119.   Starting with the police entrance examination of February 28, 1970, Chapter 484 of the Acts of 1969, G.L. c. 31, § 6A, requires all applicants to possess a high school diploma, an equivalency certificate issued by the Massachusetts Department of Education or an honorable discharge after three years' military service.  At the request of an appointing authority, the Director of Civil Service may waive the education requirement for a subsequent police entrance examination if no person meeting such requirement applied for the preceding examination.  There is no education requirement for applicants for police promotional examinations.

120.   To qualify for an equivalency certificate approved by the Massachusetts Department of Education, an applicant must pass five separate tests, each of which requires two hours to complete.  Test one covers spelling, punctuation and grammar. Test two consists of selections from the social studies.  Test three consists of selections from the natural sciences.  Test four is a test of ability to understand selections from prose and poetry.  Test five covers general mathematics.  The tests are administered only in English.  To qualify for an equivalency certificate, an applicant must achieve a  standard score of 35 in

each test and an average standard score of 45 on all five tests.

121.  To qualify for an equivalency certificate awarded by the armed forces, an applicant is required to achieve a standard score of 35 on each test or an average standard score of 45 on all five tests.

122.  Upon request of an appointing authority, the Director of Civil Service is authorized to establish the education qualifications for  entrance to the police service above the level of a high school education or its equivalent  (M.G.L. c. 31 § 6A).

123.  Certain candidates for civil service police positions in Massachusetts in the discretion of the Director of Civil Service may be denied eligibility for appointment on account of criminal records.

124.  Applicants who receive a score of at least 70 on the police entrance examination are subjected to a physical fitness test provided they pass the medical examination.  The scope and passing score of the physical fitness test are within the discretion of the Director of Civil Service.  Nine athletic skills comprise the physical fitness test.  An overall average score of seventy is passing.

125.  Prior to 1968, one of the athletic skills comprising the physical fitness test was a fifty-yard swim test.  Persons failing the fifty-yard swim test were certified as eligible for appointment to the Boston Police Department so long as they achieved an overall average score of seventy on the physical fitness test and met  all other prerequisites.  The fifty-yard swim test was weighted two points of a total of fifty points for the entire physical fitness test.  Since 1968, all applicants for appointment to the Boston Police Department have been required to pass a mandatory 100-yard swim test.

126.  Civil Service does not require applicants for the

- 6 -

position of Capitol Police officer, M.B.T.A. Police officer,

Public Works Building Police officer or corrections officer to

pass the swim test; all other police departments require the swim
test.

127.  Persons applying for appointment to the Boston

Police Department and certain other police forces in Massachusetts

are required by law to meet a minimum 5'7" height requirement

(M.G.L. c. 31 § 5B).

128.  Applicants for appointment to the Boston Police

Department are required to pass a police entrance examination

administered by the Division of Civil Service.  The Director of

Civil Service has the duty of holding examinations for the purpose

of establishing eligible lists of persons for appointment or pro-

motion to positions in the official service of the Commonwealth

and the cities and towns thereof which are subject to General

Law Chapter 31, (G.L. c. 31 § 2A(e)).

129.A Person who has received a medal of honor may apply

to the Director for appointment or employment in the classified

Civil Service without examination. Age, loss of limb or other

disability which does not in fact incapacitate shall not disqualify

him for appointment or employment under this section.  Appointing

officers may make requisition for the names of any or all such

veterans and appointment or employment of them.  A person who has

received a distinguished service cross or navy cross may, upon the

recommendation of the Director and with the approval of the

Commission, be appointed under the same conditions as are provided

in this section in the case of a person who has received a medal

of honor (G.L. c. 31, § 22).  Daniel F. Sullivan Jr., and Paul

V. Healey, without taking the police examination, at the request

of Police Commissioner Edmund MacNamara were certified as eligible

for appointment to the Boston Police Department because they had

been awarded, respectively, the navy cross and the distinguished

service cross.

130.   The form, method and subject matter of the police entrance examination are within the discretion of the Director of Civil Service; provided that it relates to matters which will fairly test the fitness of applicants actually to perform the duties of the position for which they apply (M.G.L. c. 31 § 10).

131.   Immediately prior to 1967, the police entrance examination for appointment to the Boston Police Department and certain other police departments,consisted of fifty questions based on a police manual prepared and distributed by the Division of Civil Service, fifteen questions intended to measure memory, and ten questions intended to measure general information.

132.   In 1967, the two police entrance examinations for appointment to the Boston Police Department and certain other police departments consisted of sixty questions based on a police manual prepared and distributed by the Division of Civil Service, and forty questions intended to measure general information. Questions intended to measure memory were eliminated because they had no testing value because all the applicants were receiving high marks on those questions.

133.   During the years 1968-1970, the seven police entrance examinations for appointment to the Boston Police Department and certain other police departments consisted of one hundred questions. One of the purposes of these police entrance examinations was to screen out applicants lacking the minimum intelligence required for the performance of the patrolman job.

134.   One of the reasons for changing the examination in 1967 was to increase the number of applicants by eliminating the need to study the police manual in preparation for a police entrance examination.

135.   During the years 1968-1970, the design of the police

entrance examination was the immediate   responsibility of Oliver
Hunt Bowman and two other employees of the Division of Civil Ser-
vice under his direct supervision.  They prepared these examina-
tions without the advice of consultants experienced in test design
and selection, but studied police entrance and general intelligence
examinations of other jurisdictions.

136.  The police entrance examinations of 1968, 1969
and February 28, 1970, each consisted of one hundred items,
approximately twenty of which were intended to measure general
knowledge.

137.  A substantial majority of the questions on the
seven police entrance examinations between 1968 and 1970 require
familiarity with vocabulary words.

138.  The passing score of the police entrance examination
is within the discretion of the Director of Civil Service.  Since
the depression years it has been the custom to use 70 as the
passing score.

139.  The percentage of applicants passing the seven
police entrance examinations between 1968 and 1970 has ranged
from a low of forty-three percent (February 28, 1970) to a high
of sixty-two percent (August 23, 1968).  The percentage of appli-
cants passing the police entrance examination of September 26,
1970, is approximately sixty percent.

140.  Applications for the police entrance examination
of September 26, 1970 were accepted for filing at the Division of
Civil Service between February 18, 1970 and September 25, 1970.

141.  The decision to schedule the police entrance
examination on September 26, 1970, was made by the Director of
Civil Service in August, 1970.

142.  Applicants for the police entrance examination of
September 26, 1970 were sent written notice of the date, time

and place of examination between September 22, 1970 and September 25, 1970.

143. Thirteen hundred and twenty-four applicants did not appear at the police entrance examination of September 26, 1970.

144. Three thousand, two hundred and seventy-two took the police entrance examination of September 26, 1970, of whom approximately sixty percent passed and forty percent failed.

145. Approximately eighty-five percent (two thousand, five hundred and thirty-one persons) of the examinees responded in writing to a request at the police entrance examination of September 26, 1970, to provide background information about the examinee's race, color and national origin, of whom approximately three percent responded that they were either black or Spanish Surname. Also see paragraph 202 below.

146. Approximately thirty-five percent of the examinees who stated that they were neither black nor Spanish Surname failed the police entrance examination of September 26, 1970.

147. Approximately eighty percent of the examinees who stated that they were either black or Spanish Surname failed the police entrance examination of September 26, 1970.

148. The police entrance examination of September 26, 1970, was the first police entrance examination for which the Division of Civil Service requested examinees to provide background information about the examinee's race, color and national origin.

149. The decision to request such background information was made by the Director of Civil Service after the filing of this lawsuit.

150. Oliver Hunt Bowman states that based on his observations, approximately two percent of the persons taking the police entrance examinations at testing sites in Boston, between 1968 and

- 10 -

September 26, 1970, were black.

151. All applicants are required to complete a Training and Experience Sheet at the time of the police entrance examinations. Only those persons who receive seventy or above on the written examination have their Training and Experience Sheet graded.

152. The weight of the police entrance examination is within the discretion of the Director of Civil Service. The grade on the Training and Experience Sheet constitutes approximately thirty percent of the total police entrance examination score.

153. The police entrance examination of September 26, 1970, was administered at test sites in eight Massachusetts cities, but approximately sixty-five percent of the examinees took the examination in the City of Boston. Approximately twenty-five percent of the examinees were residents of the City of Boston. Approximately five percent of the examinees who are residents of the City of Boston responded that they are either black or Spanish Surname, of whom approximately eighty-five percent failed the police entrance examination.

154. The police entrance examination of September 26, 1970, was administered only in the English language.

155. Applicants are notified in writing at the time they receive their police entrance examination scores that the grade may not be reviewed by the Director of Civil Service nor appealed to the Civil Service Commission. General Law c. 31, § 8A provides that those applicants taking an open competitive examination do not have the right to have their examinations reviewed by the Director of Civil Service. The Director of Civil Service approved an increase in the examination scores of ten applicants who took the police entrance examination of February 28, 1970;

- 11 -

answers to seven different test questions were re-graded. The Director of Civil Service approved an increase in the examination scores of five applicants who took the police entrance examination of May 31, 1969; answers to four different test questions were re-graded. The Director of Civil Service approved an increase in the examination scores of twenty-five applicants who took the police entrance examination of January 1, 1969; answers to three test questions were re-graded. The Director of Civil Service approved an increase in the examination scores of three applicants who took the police entrance examination of August 23, 1968; answers to two test questions were re-graded. The Director of Civil Service approved an increase in the examination score of one applicant who took the police entrance examination on April 20, 1968; answers to three test questions were re-graded.

156. The eligibility list for the police entrance examination of September 26, 1970 was established on March 26, 1971. The list contained the names of 264 persons certified as eligible for appointment to the Boston Police Department. If other applicants, who received a passing score on the police entrance examination of September 26, 1970, meet the civil service requirements, their names will be added to the eligibility list. There are four prior lists with the names of men eligible for appointment to the Boston Police Department. These lists contain an additional two hundred and forty-seven persons eligible for appointment to the Boston Police Department as of February 23, 1971. Also, see paragraph 204 below.

157. Between 1960 and 1969, 672 men were appointed to the Boston Police Department. In 1970, 291 men were appointed to the Boston Police Department, including 232 men subsequent to the filing of this lawsuit.

- 12 -

158. Approximately forty percent of the persons who took the police entrance examination of September 26, 1970 applied for appointment to the Boston Police Department; among the persons who responded that they are either black or Spanish Surname, approximately sixty percent applied for appointment to the Boston Police Department.

159. Persons appointed to the Boston Police Department serve a probationary period of nine months. The Director of Civil Service may establish procedures assuring the evaluation by the Boston Police Department of the performance of patrolmen during the probationary period.

160. Officials of the Boston Police Department may request, and the Director of Civil Service will grant, permission to review a copy of any and all police entrance examinations and the examination papers of any and all persons certified for appointment to the Boston Police Department.

161. In 1968, officials of the Boston Police Department concurred in a decision of the Director of Civil Service that the subject matter of the police entrance examination be changed to a test of general intelligence.

162. Prior to the filing of this lawsuit, officials of the Boston Police Department had not stated to the Director of Civil Service any criticism of the 1968-1970 police entrance examinations for appointment to the Boston Police Department.

163. Plaintiff Pedro Castro took the police entrance examination of September 26, 1970, and received a failing score of 41. Previously he had taken the police entrance examination of February 28, 1970 and received a failing score of 35, and the police entrance examination of August 22, 1969, for which he received a failing score of 49. He was a member of the police department of the Commonwealth of Puerto Rico from August

- 13 -

3, 1964 to September 27, 1968.

164.   Plaintiff Jose Garcia took the police entrance examination of September 26, 1970 and received a failing score of 69.   Previously he had taken the police entrance examination of February 28, 1970 and received a failing score of 58, and the police entrance examination of August 22, 1969 for which he received a failing score of 69.

165.   Plaintiff David O'Bryant took the police entrance examination of September 26, 1970, and received a failing score of 55; previously he had taken the police entrance examination of February 28, 1970 and received a failing score of 62, the police entrance examination of August 22, 1969, for which he received a failing score of 49, and the police entrance examination of January 25, 1969 for which he received a failing score of 55. Previously, according to his application, he had taken several police entrance examinations, for which he received failing scores.

166.   Plaintiff Spencer Franklin took the police entrance examination of September 26, 1970, and received a passing score of 73 on the general intelligence test, a grade of 88.4 on his Training and Experience Sheet, and a total score of 77.62. He took the physical fitness test administered by the Division of Civil Service.   He did not participate in the mandatory 100-yard swim test.   He received 0 as a mark on the swim test.   He was denied eligibility for appointment to the Boston Police Department. If he had passed the physical fitness test, with preference for being a veteran, on the eligibility list for the examination of September 26, 1970  he would have been number 101, as of March 26, 1971.

167.   Plaintiff Spencer Franklin previously had taken the police entrance examination of February 28, 1970, and received a

failing score of 49, the police entrance examination of May 31,
1969 for which he received a failing score of 59, and the police
entrance examination of May 18, 1968, for which he received a
failing score of 50. According to his application, he had been
an Air Policeman in the U. S. Air Force for four years.

168. Plaintiff Charley Green, Jr. was provisionally
appointed to the police force of the Massachusetts Bay Transporta-
tion Authority (M.B.T.A.) in July, 1969. He received a failing
score on the police entrance examination of August 22, 1969. His
provisional employment was terminated in April, 1970. Subse-
quently, he received a passing score on the police entrance
examination of February 28, 1970.

169. Plaintiff Charley Green, Jr. took the police
entrance examination of February 28, 1970, and received a passing
score of 72 on the general knowledge test, a grade of 91.8 on his
Training and Experience Sheet, and a total score of 77.94.

170. Plaintiff Charley Green, Jr., took the physical
fitness test. He did not participate in the mandatory 100-yard
swim test. He received 0 as a mark on the swim test. He was
denied eligibility for appointment to the Boston Police Depart-
ment. Previously, according to his application, he was an
Air Policeman in the U. S. Air Force for approximately six years.

171. Plaintiff Solomon Upshaw took the police entrance
examination of March 26, 1966, and received a total passing score
of 80.21. Subsequently he took the police entrance examination
of April 22, 1967, for which he received a failing score of 59,
the police entrance examination of September 14, 1968, for which
he received a failing score of 59, and the police entrance
examination of February 28, 1970, for which he received a failing
score of 55. Also, see paragraph 194 below.

172. Plaintiff Lewis Cuff was provisionally appointed
to the police force of the M.B.T.A. in August, 1969. Since

- 15 -

December 6, 1969, he is no longer employed as an M.B.T.A. policeman.

173.   Plaintiff Lewis Cuff took the M.B.T.A. police entrance examination of August 22, 1969, which is the same as the police entrance examination, and received a failing score of 62.   Previously he had taken the police entrance examination of January 25, 1969, and received a failing score of 59, and the police entrance examination of April 29, 1968, for which he received a failing score of 57.

174.   Plaintiff Rufus Darby took the police entrance examination on February 28, 1970, and received a failing score of 26.   Previously he had taken the police entrance examination of August 22, 1969, for which he received a failing score of 27. According to his application, he was not awarded a high school diploma or an equivalency certificate; nor has he completed any military service.

175.   Sherman Brown took the police entrance examination of September 26, 1970, and received a passing score of 72 on the written examination, 80.4 on the Training and Experience Sheet, and an overall score of 74.52.   On January 6, 1971 he was dis-qualified on the basis of his failure to meet the 5'7" height requirement.   He was told that his height was 5'6-1/4".   Sherman Brown was re-examined on January 25, 1971, at his request;   his height was determined to be 5'7".

176.   Sherman Brown took the physical fitness test.   He did not participate in the mandatory 100-yard swim test.   He re-ceived 0 as a mark on the swim test.   He was denied eligibility for appointment to the Boston Police Department.   If he had passed the physical fitness test, with preference for being a veteran, on the eligibility list for the examination of September 26, 1970 he would have been number 123, as of March 26, 1971. According to his application, he has not received a high school

diploma or an equivalency certificate, but has completed four years of military service.

177.    James Marshall took the police entrance examination of January 25, 1969, and received an overall grade of 83. He took the physical fitness test. He did not participate in the mandatory 100-yard swim test. He received 0 as a mark on the swim test. He was denied eligibility for appointment to the Boston Police Department. If he had passed the physical fitness test, with preference for being a disabled veteran, on the eligibility list for the examination of January 25, 1969  he would have been number 45, as of June 27, 1969.

178.    James Marshall took the physical fitness test for appointment to the M.B.T.A. Police Department in March, 1971. The physical fitness test for the M.B.T.A. Police Department does not require a 100-yard swim test. He passed the physical fitness test. He was certified as eligible for appointment to the M.B.T.A. Police Department. Previously, according to his application, he was an Air Policeman in the U.S. Air Force; since 1968 he has been a Campus Policeman in the employment of Boston University.

179.    Manual Lopes took the police examination of April 20, 1968, and received a failing score of 58. He took the police entrance examination of September 14, 1968 and received a score of 53. He took the police entrance examination of January 25, 1969 and received a passing score. He took the physical fitness test. He did not participate in the mandatory 100-yard swim test. He received 0 as a mark on the swim test.  He was denied eligibility for appointment to the Boston Police Depart-ment. If he had passed the physical fitness test, with preference for being a veteran, on the eligibility list for the examination of January 25, 1969 he would have been number 86, as of June 27, 1969. Subsequently he took the physical fitness test for

- 17 -

appointment to the M.B.T.A. Police Department. This test does not require a 100-yard swim test. He was certified as eligible for appointment to the M.B.T.A. Police Department and was appointed to the M.B.T.A. Police Department in January, 1971. He took the police entrance examination of September 26, 1970, and received a score of 76 on the written test, a grade of 82.8 on the Training and Experience Sheet, and an overall grade of 78.04. Previously, according to his application, he was a security guard at Boston City Hall for approximately one year; he was also a railroad policeman.

180. Robert Workman took the police entrance examination of September 26, 1970, and received a passing score of 78 on the written examination, a grade of 83.1 on his Training and Experience Sheet, and an overall score of 79.53. He took the physical fitness test. He did not participate in the mandatory 100-yard swim test. He received 0 as a mark on the swim test. He was denied eligibility for appointment to the Boston Police Department. If he had passed the physical fitness test, with preference for being a veteran, he would have been number 90 on the eligibility list for the Boston Police Department, as of March 26, 1971.

181. Troy Garron was provisionally appointed a patrolman in the Framingham Police Department in May, 1970, and is still provisionally employed there. He took the police entrance examination of September 26, 1970, and received a failing score of 69. The key to question 62 in the morning exam of September 26, 1970, was incorrect. Mr. Garron, and all candidates similarly situated, were graded to reflect a correction made to question 62. Mr. Garron's mark is now 70 on the written examination, 90 on the Training and Experience Sheet, and an overall 76.00. He took the physical fitness test. He did not participate in the mandatory 100-yard swim test. He received 0 as a mark on the swim

- 18 -

test.  He was denied eligibility for appointment to the Boston Police Department and the Framingham Police Department.  If he had passed the physical fitness test, for the examination of September 26, 1970 he would have been number 245 on the eligibility list for the Boston Police Department, as of March 26, 1971, and on the eligibility list for the Framingham Police Department he would have been number 34, as of March 26, 1971.  Previously, according to his application, he had been a police officer in the employment of the Chicago Police Department, and has completed three and one half years of college education.

182.  The decision of the Director of Civil Service to require a mandatory one hundred-yard swim test for applicants to the Boston Police Department was not based on information pertaining to the inability of a particular Boston policeman to affect a life-saving rescue from water.

183.  Valentin Ortega took the police entrance examination of September 26, 1970, and received a failing score of 65. Previously, according to his application, he was appointed an Auxiliary Policeman in the New Bedford Police Department. Subsequently, in October, 1970, he was provisionally appointed to the Framingham Police Department.  The eligibility list for the Framingham Police Department, established for the police entrance examination of September 26, 1970, as of March 26, 1971, contains the names of 40 persons.

184.  Roderick Burdette took the police entrance examination of September 26, 1970, and received a failing score of 53. Previously, he took the police entrance examination of February 28, 1970, for which he received a failing score of 54.  According to his application, he was a Deputy Sheriff in the employment of Suffolk County, Massachusetts, for fourteen months.

185.  Lawrence Stead took the police entrance examination of September 26, 1970, and received a failing score of 54.  Accord-

ing to his application, he has completed three years of college education.

186.    Robert L. Perryman took the police entrance examination of September 26, 1970, and received a failing score of 63. According to his application, he has completed three years of college education; according to his Training and Experience Sheet, his field of study was in health and physical education.

187.    Raymond Armstead took the police entrance examination of September 26, 1970 and received a failing score of 56. Previously he had taken the police entrance examination of August 22, 1969, for which he received a failing score of 63, the police entrance examination of January 9, 1969 for which he received a failing score of 58, and the police entrance examination of April 20, 1968, for which he received a failing score of 48.    According to his application, he has not received a high school diploma or an equivalency certificate, but has completed three years' military service.

188.    Robert Peace took the police entrance examination of May 31, 1969, and received a failing score of 57.    According to his application, he had taken the police entrance examination previously, for which he received a failing score.    According to his application, he was an Air Policeman in the U. S. Air Force for approximately six years.

189.    Vernon Belden took the police entrance examination of August 22, 1969 and received a failing score of 68.    Previously, according to his application, he had taken the police entrance examination, for which he received a failing score.

190.    Lionel Jones took the police entrance examination of September 26, 1970, and received a failing score of 49; previously, he had taken the police entrance examination of February 28, 1970, and received a failing score of 45, and the police entrance examination of August 22, 1969, for which he

received a failing score of 47. According to his application, he was appointed a police cadet in the Boston Police Department on October 10, 1968, where he is still employed.

191. Freddie Rivers was provisionally appointed a patrolman in the Barnstable Police Department on March 24, 1968. His provisional employment terminated on November 14, 1970, because of the establishment of a civil service eligibility list. He took the police entrance examination of April 20, 1968, and received a failing score of 54; the police entrance examination of October 23, 1969, and received a failing score of 57; and the police entrance examination of May 31, 1969, and received a failing score of 55.

192. Freddie Rivers filed an application on August 7, 1970, to take the next police entrance examination. Because he did not receive notice of the date, time and place of the examination of September 26, 1970, he did not take the examination. This was an administrative oversight. He was given a police entrance examination on March 13, 1971, and received a failing score of 61. Subsequently, he was appointed as a patrolman in the Yarmouth Police Department, which department is not subject to the provisions of M.G.L. c. 31.

193. William Celester took the police entrance examination of April 22, 1967, and received an overall passing score of 75.06. On June 19, 1967, he passed the physical fitness test with an overall score of 79.60. He did not take the optional 50-yard swim test. In August, 1968, he was appointed a patrolman in the Boston Police Department. At the time of his appointment, he had not received a high school diploma or an equivalency certificate, nor had he served in the armed forces.

194. Solomon Upshaw took the police entrance examination of March 26, 1966, and received an overall passing score of 80.21. He did not take the optional fifty-yard swim test.

- 21 -

On July 25, 1966, he passed the physical fitness test with an overall score of 91.50. He was ranked number twelve on the eligibility list for appointment to the Boston Police Department. He was not appointed to the Boston Police Department.

195.   Raymond Johnson took the police entrance examination of September 26, 1970, and received a passing score of 79 on the general intelligence test, a grade of 89.3 on the Training and Experience Sheet, and a total score of 82.09. He will take the physical fitness test on April 28, 1971. He will not participate in the mandatory 100-yard swim test. He will receive 0 as a mark on the swim test. He will be denied eligibility for appointment to the Boston Police Department. If he were able to pass the physical fitness test, with preference for being a veteran, on the eligibility list for the examination of September 26, 1970 he would have been number 74, as of March 26, 1971. According to his application, he was a security guard for ten months.

196.   Leslie Lewis took the police examination of September 26, 1970, and received a passing score of 76 on the general intelligence test, a grade of 86.1 on the Training and Experience Sheet, and a total score of 79.03. He took the physical fitness test. He did not participate in the mandatory 100-yard swim test. He received 0 as a mark on the swim test. He was denied eligibility for appointment to the Boston Police Department. If he had passed the physical fitness test, with preference for being a veteran, on the eligibility list for the police examination of September 26, 1970 he would have been number 93, as of March 26, 1971. According to his application, he has been a Campus Policeman in the employment of the Massachusetts Institute of Technology since September, 1969.

197.   The persons described in paragraphs 163 through 196 above are black or Spanish Surname.

198.  Approximately twenty-five percent of the applicants who passed the police entrance examination of April 22, 1967 possessed neither a high school diploma nor an equivalency certificate.  Approximately fifteen percent of the applicants who passed the police entrance examinations of April 20, 1968, August 23, 1968, January 25, 1969, May 31, 1969, and August 22, 1969 possessed neither a high school diploma nor an equivalency certificate.

199.  In 1960, according to the U. S. Census, forty-seven percent of Massachusetts residents (forty-five percent of Boston residents) who were white and at least 25 years of age, had a high school diploma.  Thirty-seven percent of Massachusetts residents (thirty-six percent of Boston residents) who were non-white and at least 25 years of age, had a high school diploma.  In 1969, sixty-eight percent of Boston's white adults had a high school diploma; forty-six percent of Boston's black adults had a high school diploma.

200.  In 1968, according to Uniform Crime Reports, published by the Federal Bureau of Investigation, 27.5% of the persons arrested were blacks, and 29.6% of the persons arrested in cities were blacks; 87% of the persons arrested, in 1968, were males. In 1968, according to the Bureau of the Census, blacks constituted 11.1% of the population.

201.  In 1969, less than ten percent of the adult males of Boston's Spanish Surname community had completed high school.  In 1969, approximately four percent of the residents of the City of Boston were Spanish Surname.

202.  At the testing sites for the police entrance examination of September 26, 1970, all examinees were given a sheet requesting information concerning their race, color, and national origin.  It was stated on that sheet that it was not necessary for an applicant to divulge the information requested

- 23 -

on the sheet. The September 26, 1970 examination was the first time such information had been requested by the Massachusetts Civil Service. The request was made subsequent to the filing of the instant lawsuit at the request of the Massachusetts Law Reform Institute. It was necessary to secure the permission of the Massachusetts Commission Against Discrimination in order for the Civil Service Commission legally to request information concerning race, color, or national origin. (G.L. c. 151B, § 4(3)).

203. Thirteen applicants who stated they were either black or Spanish Surname applied for appointment to the Boston Police Department and received a passing score on the police entrance examination of September 26, 1970. The eligibility list for appointment to the Boston Police Department, established on March 26, 1971, does not contain the names of any of these applicants. At least seven of these applicants took the physical fitness test but not the mandatory 100-yard swim test. Applicants who do not pass the 100-yard swim test are not eligible for appointment to the Boston Police Department.

204. Among the applicants who passed the police examination of September 26, 1970, approximately 600 hundred persons have not taken the physical fitness test. The names of applicants who do not pass the physical fitness test administered by the Division of Civil Service cannot be placed on an eligibility list.

205. Between 1960 and 1970, in the exercise of his discretion as appointing authority, the commissioner of police of the Boston Police Department has rejected approximately seventeen percent of the persons whose names have been requisitioned and certified for appointment.

206. In order to fill a vacancy for the position of patrol-

man in the Boston Police Department, the Police Commissioner of the City of Boston must first file a requisition request with the Division of Civil Service setting forth the number of vacancies that need to be filled. The Director of Civil Service certifies a list of eligible candidates. The list is prepared in the following manner: 1) disabled veterans in the order of their respective standing; 2) veterans in the order of their respective standing; and 3) all other applicants in the order of their respective standing. If more than one eligible list exists for the same position, certification must be made from the list with the earliest date of establishment and in accordance with the civil service laws and rules governing certification. Chapter 571 of the Acts of 1955. For each vacancy three names are certified by the Director of Civil Service. For each multiple of five vacancies, seven names are certified.

207.  In the event an appointing authority appoints any person other than the person whose name appears highest on a list certified to him by the Director of Civil Service, the appointing authority must deliver to the Director of Civil Service a written statement of his reason for so appointing the person and no appointment of any person other than the person whose name appears highest on the list shall become effective until such statement has been received by the Director of Civil Service.

208.  Roland Ferguseon, a black person, took the police entrance examination of September 26, 1970. He received a passing score of 90 on the general intelligence test, a grade of 80.2 on the Training and Experience Sheet, and an overall grade of 87.06. He took the physical fitness test. He did not participate in the mandatory 100-yard swim test. He was denied eligibility for appointment to the New Bedford Police Department. If he had passed the physical fitness test, with preference for being a

- 25 -

veteran, on the eligibility list for the examination of September 26,1970 he would have been number three, as of March 26, 1971. According to his application, he did not receive a high school diploma or an equivalency certificate, but did complete three years' military service.

209.  The average height of Anglo males is 5'7-1/3".  The average height of Spanish Surname males is 5'4-1/2".  See Rosenquist and Megargee, Delinquency in Three Cultures,  1969,page 387.

The foregoing is hereby stipulated to by:

Thomas A. Mela
Counsel for Plaintiffs

Charles Mone
Counsel for Civil Service

April 23, 1971

- 26 -

**Exhibit B**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Pedro Castro, et al

    **v.**

Nancy B. Beecher, et al

Civil Action
No. 70-1220-W
No. 74-2982-C

## CONSENT DECREE

In accordance with the Opinion and Order of this Court, dated January 7,

1975, and with the assent of counsel, the Court hereby enters this Consent Decree.

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED BY THE

COURT AS FOLLOWS:

### PRESENT CERTIFICATIONS

1.  The Director of Civil Service (hereinafter Director shall mean the Director and

his successors, or after July 1, 1975, the Personnel Administrator and his successors)

shall  on July 8, 1975 establish groups of police candidates in accordance with Para-

graph 2 of this Consent Decree, rank candidates within each group in accordance

with Paragraph 3 of this Consent Decree, and certify police candidates as eligible

for appointment to each appointing authority subject to Civil Service in accordance

with Paragraph 4 of this Consent Decree.

2.  The Director shall establish the following groups:

      i.  Group A shall consist of all Black and Spanish-surnamed applicants

who failed any of the 1968-70 Police Entrance Examinations, but passed the 1972

Interim Police Entrance Examination and are otherwise qualified for appointment on

the basis of existing requirements.

112

-2-

    ii. Group C shall consist of all Black and Spanish-surnamed persons, excluding those in Group A, who passed the 1972 Interim Police Entrance Examination and are otherwise qualified for appointment on the basis of existing requirements.

    iii. Group D shall consist of all other persons, excluding those in Groups A and C, who passed the 1972 Interim Police Entrance Examination and are otherwise qualified for appointment on the basis of existing requirements.

    The eligible lists for all three groups shall expire on January 4, 1976. However, the City of Boston shall make no police officer appointments and accept no police officer transfers prior to January 5, 1976. If the eligible list based on the Examination scheduled to be administered in October, 1975 is not established by January 5, 1976, or if other circumstances prior to January 5, 1976 lead the City of Boston to believe it must hire, the City of Boston reserves its right to move this Court to authorize police officer appointments from the eligible list based on the 1972 Interim Police Entrance Examination. All parties fully anticipate that in the event the City of Boston is permitted to hire from the eligible list based on the 1972 Interim Police Entrance Examination after July 7, 1975, if the plaintiffs and the City of Boston cannot themselves agree upon compensatory relief, this Court shall order such limited additional compensatory relief beyond certification of one candidate from Group A for every candidate from Group B after the eligible list for the Examination scheduled to be administered in October, 1975, is established as it deems appropriate.

    3. The Director, if petitioned by an appointing authority prior to certification to impose a residency preference pursuant to c.31, s.48A, shall impose such residency preference within each of the three groups described in Paragraph 2 of this Consent Decree.

-3-

4. The Director shall certify police applicants as follows:

i. In response to requisitions submitted by appointing authorities, candidates shall be certified on the basis of one candidate from Group A for every candidate certified from Group D until the list of candidates in Group A is exhausted.

ii. Upon the exhaustion of Group A, candidates shall be certified to requisitioning appointing authorities on the basis of one candidate from Group C for every three candidates certified from Group D, until the candidates in Groups C and D are exhausted.

iii. Should a candidate qualify to be placed into Groups A, C or D after exhaustion of the Group for which he is eligible, said Group will be revived for purposes of affording the candidate the position he would have enjoyed.

iv. The Director shall not certify or approve appointments for positions of reserve police officer on any new or existing police reserve list.

5. The Director shall disapprove any appointment unless the appointing authority has furnished said Director with a written statement of the reasons for rejecting the appointment of any candidate higher on the list. Said Director shall furnish a written statement of these reasons to the plaintiffs' attorneys, and also to the candidate upon written request of the candidate.

## RECRUITMENT

6. At least ninety (90) days prior to the administration of each future police entrance examination, the Director shall submit to the parties a plan detailing the Director's proposed affirmative program to recruit Black and Spanish-surnamed applicants. Said recruitment program shall include public statements, advertising in the media of press, radio, and television, direct contact with minority organiza-

-4-

tions; and, in advance of the Examination scheduled to be administered in October,
1975, training to prepare minority candidates to pass said Examination, provided
that the Director receives an anticipated grant for minority recruitment from the
United States Law Enforcement Assistance Administration. Said program shall
also include a report containing, for each appointing authority, the number and
percentage of Black and Spanish-surnamed police officers, provided that the re-
port of the racial composition of each appointing authority may be submitted to the
parties as late as thirty (30) days prior to administration of the Examination scheduled
for October, 1975. The plaintiffs shall have fifteen (15) days to object to the Director's
program. The Director shall have five (5) days to respond to plaintiffs' objections,
if any, to the Director's program. Any dispute between the parties regarding the
recruitment program, which cannot be resolved, will be resolved by this Court upon
motion of any party. Any objection to the recruitment program, not made in writing
within fifteen (15) days, shall be deemed to have been waived.

## FUTURE EXAMINATIONS

7. The Director, in implementing this Consent Decree, shall administer on
or before October 19, 1975 (hereinafter the October Exam) a police written exam-
ination battery as described in a letter dated June 27, 1975 from the Director of
Civil Service, Edward W. Powers, to the Attorney General of the Commonwealth
of Massachusetts, Francis X. Bellotti, a carbon copy of which has been received
by Thomas Mela, Esq. The contents of this letter, which identifies and explains
the use of each examination component including the "ranking", "flagging" and
"literacy" components shall remain confidential until after the administration of

115

-5-

the October Exam so as not to compromise the security of said examination. Said Examination shall be administered to all police officer applicants to appointing authorities within the jurisdiction of Civil Service. Said Examination shall be administered only after said Director has satisfied the recruitment obligations imposed by Paragraph 6 of this Consent Decree.

8. The plaintiffs take no position with respect to the validity of the October Exam but agree to its use to establish an eligible list for the purpose of implementing this Consent Decree. The plaintiffs do not agree to administration of the October Exam after its administration in October, 1975, and the Director agrees that no police entrance examination shall be administered in the future unless it has been validated in conformity with the Testing Guidelines of the Equal Employment Opportunity Commission, 29 C.F.R. s.1607.1, et. seq.

9. With respect to the administration of the October Exam, the cut-off score for determining which candidates have passed said Exam will be set by agreement of the parties. The plaintiffs or the Director may submit the question of the appropriate cut-off scores on the "ranking" and "flagging" components of said Exam and, relative to the "flagging" instrument, the manner in which applicants may be subjected to further individualized psychological "screening" to this Court for resolution. In any event, the cut-off scores and "screening" should be set so that the method and ratios of certification described in Paragraph 23 of this Consent Decree can be implemented.

10. If subsequent to the administration of the October Exam it appears that pools A or B in Paragraph 21 below are inadequate or will become depleted so as to prevent the effectuation of the method and ratios of certification described in Paragraph 23 of this Consent Decree, the Director shall administer a second police entrance examination. It shall be left to the parties or the Court, upon motion of any party, to

-6-

determine what examination will be given, which candidates will be eligible to take the examination, and the time period within which the examination will be given, provided that this Paragraph shall not effect the authority of the Director to select and hold regularly scheduled police entrance examinations in contemplation of the expiration of an eligible list as provided by Massachusetts law.

11. Spanish-surnamed applicants for the October Exam will be given the option of taking said Exam in Spanish. However, the Director shall require such persons who take said Exam in Spanish to pass a literacy test to demonstrate their ability to read and write the English language.

12. Within thirty (30) days after the administration of said literacy test, the Director shall submit to the parties a report showing the number of individuals who took the October Exam in Spanish, and the pass/fail rate of those individuals on the literacy test.

13. All candidates who take the October Exam shall be informed, individually, and in writing, prior to the time that eligibility lists are established, that they are required to meet the following criteria before they can be appointed:

a. Receive a passing mark on the October Exam. Those individuals who take the October Exam in Spanish must pass the literacy test.

b. Pass a medical examination. It will be noted that said medical examination will be available for inspection at the office of the Director.

c. Be determined by the Director to be of good moral character. It will be noted that a copy of the Standards and Procedures for the Screening of Ex-offenders will be available for inspection at the office of the Director.

d. Provide a certificate of birth or other evidence of date and place of birth satisfactory to the Director.

-7-

Further, each candidate shall receive, at the time provided above:

e. A list of all appointing authorities which require an applicant to have a driver's license.

f. A list of all appointing authorities which have a minimum height requirement.

g. A list of all appointing authorities which require an applicant to pass a swim test.

The Director fully anticipates funding from the United States Law Enforcement Assistance Administration with which to employ a College Intern during twenty (20) hours per week for the life of the eligibility list based on the October Exam, who will be responsible for establishing and maintaining contact with Black and Spanish-surnamed candidates and for assisting said candidates to satisfy the criteria described in this Paragraph.

14. The eligibility list established as a result of the October Exam shall be established within six (6) months of said Exam and shall expire two years from the date said list is first established.

15. Nothing in this Consent Decree shall be construed to limit the authority of the Director to delegate the administration of Civil Service functions so far as practicable to the cities and towns, nor to limit the right of the plaintiffs to move this Court to modify any entrance requirement with the exception of the October Exam itself, whether imposed or delegated by the Director, provided that any Black or Spanish-surnamed person who failed a Police Entrance Examination administered by the Director between 1968 and 1970 and was then eligible on account of age shall be eligible to take the October Exam, not withstanding his failure to meet the current age requirements.

-8-

16. At each future police entrance examination (which, hereinafter, shall include the said October Exam), the Director shall require all candidates for police officer positions to provide under penalty of perjury the following information: Whether the candidate is (a) caucasian (white); (b) black; (c) Spanish-surnamed (i.e., the candidate was born in a Spanish-speaking country or if the candidate was raised in a home where the primary language was Spanish); (d) other. Within sixty (60) days after the administration of each future police entrance examination, the Director shall furnish the parties with a summary of the racial composition of the candidates examined.

17. Within sixty (60) days after each future police entrance examination has been graded, the Director shall submit a report to the parties showing the results by race of all persons taking said examination, and the name, address, and grade of each Black or Spanish-surnamed individual. The parties shall also receive an item analysis of the results of the said examination, by race.

18. The Director shall notify the plaintiffs and supply evidence to the plaintiffs whenever a particular appointing authority has informed the Director that it has achieved a complement of Black and Spanish-surnamed post-probationary police officers commensurate with the percentage of minorities within the community or that the appointing authority is serving a jurisdiction with less than one per cent (1%) Black and Spanish-surnamed population. The plaintiffs shall have thirty (30) days to object to the evidence contained in the Director's notification. If such objection is not made within thirty (30) days the particular appointing authority will no longer be subject to Paragraph 23 of this Consent Decree, and certification to that appointing authority will be made according to existing Massachusetts law. Any disputes between the parties in this regard which cannot be resolved by the parties will be resolved by this Court upon motion by any of the parties.

119

-9-

19.  Following establishment of the eligibility list based on each future police entrance examination, and every six (6) months thereafter, plaintiffs will be furnished with a copy of the eligibility list for each appointing authority subject to the jurisdiction of the Director.  Further, plaintiffs will receive from the Director the following information:

On a monthly basis:

(a)  A copy of the requisition, certification, and report on certification for each requisitioning appointing authority.

(b)  The name of each Black and Spanish-surnamed candidate from said eligibility list whose employment is terminated.

(c)  The name of each police officer whose transfer between appointing authorities has been approved by the Director subsequent to the date of this Consent Decree.

Every three months:

(d)  The name and address of each Black and Spanish-surnamed candidate who has passed a future police entrance examination, including the status of each such candidate's eligibility, and, if any such candidate is ineligible, the reasons therefor.

## FUTURE CERTIFICATIONS

20.  Subsequent to obtaining the results of each future police entrance examination, the Director shall promptly establish groups of police candidates in accordance with Paragraph 21 of this Consent Decree, rank candidates within each group in accordance with Paragraph 22 of this Consent Decree, and certify police candidates as eligible for appointment to each appointing authority subject to Civil Service in accordance with Paragraph 23 of this Consent Decree.

120

-10-

21. The Director shall establish the following groups:

i. Group A shall consist of all Black and Spanish-surnamed applicants who pass a future police entrance examination and are otherwise qualified for appointment on the basis of existing requirements.

ii. Group B shall consist of all other persons who pass a future police entrance examination and are otherwise qualified for appointment on the basis of existing requirements.

Eligible lists shall expire two years from the date of their establishment.

22. The Director, if petitioned by an appointing authority-prior to certification to impose a residency preference pursuant to c.31, s.48A, shall impose such residency preference within each of the two groups described in Paragraph 21 of this Consent Decree.

23. The Director shall certify police applicants as follows:

i. In response to requisitions submitted by the appointing authorities of the cities of Boston and Springfield, candidates shall be certified on the basis of one candidate from Group A for every candidate certified from Group B.

ii. In response to requisitions submitted by all other appointing authorities subject to Civil Service, candidates shall be certified on the basis of one candidate from Group A for every three candidates from Group B.

iii. Should a candidate qualify to be placed into Group A or Group B after exhaustion of the Group for which he is eligible, said Group shall be revived for purposes of affording the candidate the position he would have enjoyed.

121

-11-

iv. Should an appointing authority fail to offer an appointment to a candidate, the Director shall disapprove any appointment unless said appointing authority has furnished said Director with a written statement of the reasons for rejecting the appointment of any candidate higher on the list. Said Director shall furnish a written statement of those reasons to the plaintiffs' attorneys, and also to the candidate upon written request of the candidate.

v. Should there be any modification of Rule 14 of the Civil Service Rules, the parties shall monitor the effect of any such change on the purposes and intent of said Decree for a period of six months. If, at the end of this time, any party is of the opinion that such modification of Rule 14 is frustrating the implementation of the method and ratios of certification described in this Paragraph, the parties will enter into negotiations to modify the method and ratios of certification or other aspects of this Consent Decree in order to effectuate the compensatory relief of said Decree. If, after the six month period has elapsed, the parties cannot themselves agree upon such modifications in said Decree, this Court shall order such additional compensatory relief beyond the method and ratios of certification as described in this Paragraph as it may deem appropriate.

24. The method and ratios of certification described in Paragraph 23 of this Consent Decree shall apply to all eligibility lists established subsequent to future police entrance examinations, and shall apply to all cities and towns subject to Civil Service law which have a minority population of one per cent (1%) or more and shall apply to the Capitol Police, the M.B.T.A. Police and the M.D.C. Police. As a city or town achieves a complement of minorities commensurate with

122

-12-

the percentage of minorities within the community, certification will be made according to existing Massachusetts law, and as the Capitol Police achieves a complement of minorities commensurate with the percentage of minorities within the City of Boston, and the M.B.T.A. Police or the M.D.C. Police achieves a complement of minorities commensurate with the percentage of minorities within the jurisdiction served by the M.B.T.A. Police or the M.D.C. Police, certification will be made in accordance with existing Massachusetts law, provided that appointing authorities under the jurisdiction of Civil Service shall, pursuant to this Paragraph, be exempted only from subparagraphs i, ii, iii, and v of Paragraph 23 of this Consent Decree.

25. The Court retains jurisdiction of this case.

Patrick J. King
Counsel for Plaintiffs

Thomas A. Mela
Counsel for Plaintiffs

Alan K. Posner
Counsel for Civil Service

Nicholas Foundas
Counsel for Boston Police Commissioner

Caffrey, C. J.

Dated:  June 27, 1975

123

**Exhibit C**

# *A Certification Handbook*

Entry Level
Police Officer Appointments
Subject to Civil Service
(Castro v. Beecher)

Civil Service Unit
Human Resources Division
One Ashburton Place
Boston, Massachusetts 02108

## CERTIFICATION INSTRUCTIONS

## <u>CASTRO v. BEECHER</u> CONSENT DECREE COMMUNITIES

### POLICE OFFICER

The information contained in this booklet applies specifically to municipalities in which entry level Police Officer appointments are subject to the provisions of the <u>Castro v. Beecher</u> Federal Consent Decree as well as to the requirements of Civil Service law and rule. Police Service Appointing Authorities are advised to review this information carefully prior to making any appointments to the position of Police Officer.

Please remember that this certification instruction packet is intended as a general guide and cannot provide complete detail on all aspects of the selection process. Appointing Authorities and Police Chiefs are encouraged to review the provisions of MGL Chapter 31, the Personnel Administration Rules and other applicable statutes and policies to insure compliance and to prevent delays or problems in appointment approval. Appointments which do not comply with the provisions of applicable law, rule and consent decrees cannot be approved by the Human Resources Division.

**Local officials are advised to retain and refer to this material until an updated version is issued.**

## TABLE OF CONTENTS

**SUBJECT**                                                          **PAGE**

The Certification                                                      1

Signing the Certification                                             1

Certification Order                                                   2

Applicant Marks                                                       3

Insufficient Applicants Responding                                   3

Background Investigations, Reference                                 3

       Checking and Interviews

By-pass and Removal                                                   5

Making the Selections                                                5

Appointment Papers                                                   6

Return of the Certification                                          6


**SUBJECT**                                                      **APPENDIX**

Personnel Administration Rules                                       A

By-pass and Removal Guidelines                                       B

Medical Examination and Physical Abilities Testing                  C

Police Academy Dates Memorandum                                     D

Police Reserve Force Limitation                                     E

Process for Requesting Exemption from Consent Decree                F

Post-Appointment Smoking Prohibition                                G

## THE CERTIFICATION

When a vacancy requisition is filed by the Appointing Authority with the Human Resources Division, a list of candidates is forwarded to the Appointing Authority. This list is called a certification.

The number of names sent out on a certification is based on the number of vacancies reported to the Human Resources Division on the requisition. Personnel Administration Rule .09 requires that the certification contain enough names to reflect at least twice the number of vacancies plus 1 ($2n + 1$). The Human Resources Division usually certifies names in excess of the minimum number to insure adequate response from applicants on the list.

The certification is mailed to the Appointing Authority whose name and address appear on the municipality's requisition. An original list and one copy are forwarded to the Appointing Authority. The heading of the certification summarizes primary information about the position; that is, the number and type of vacancies, the name and address of the Appointing Authority, and a statement of any required licenses which the applicant must present at the time of the interview. The Appointing Authority should take a few moments to review this information to insure its accuracy when the certification is received.

The last page of the certification contains in the lower left-hand corner the date by which the signed certification and appointments must be returned to the Human Resources Division. All processing of applicants should be completed by that date; if the Appointing Authority finds that, due to unusual circumstances, the certification cannot be returned by the due date, a written request for extension must be forwarded to the Human Resources Division, signed by the Appointing Authority and stating the reason for the delay and the length of time which will be required for its completion. Extension requests are subject to the approval of the Personnel Administrator.

At the time that the certification is mailed to the Appointing Authority, interview notices are mailed by this department to all those applicants whose names appear on the certification. The notice tells applicants to whom and where they must report to sign the certification if they wish to be considered for appointment; this information is drawn from the requisition submitted by the community. Applicants are given a specific date by which they must respond.

If the person identified as interviewer is different from the Appointing Authority, the Appointing Authority should provide the interviewer with the certification package immediately upon its receipt, to insure that applicants will have access to a list to sign when they report for interview.

## SIGNING THE CERTIFICATION

The interviewer must insure that the original certification form **is available for signature for every applicant who may come in during the interview period indicated on the interview notice**.

Under no circumstances may the interviewer refuse to let a person whose name appears on the certification sign the list if the person has appeared within the required time period.

Each applicant who appears should be instructed to indicate on the original certification whether he or she **WILL ACCEPT** or **WILL NOT ACCEPT** the position. The applicant's signature should appear on the line directly across from his or her name and address. The Notice to Appear for the interview (Form 17) is to be retained by the applicant and does not have to be signed by the interviewer or returned to the Human Resources Division.

4

If under unusual circumstances applicants have received interview notices and appear to sign the list, and the list has not yet been received by the community, the applicant should be asked to write a brief statement indicating his or her interest or lack of interest in the position. This statement should be signed and dated by the applicant and attached by the interviewer to the original certification form when it is received by the Municipality. This eliminates the inconvenience to the applicant of having to return at another time to sign the certification.

## CERTIFICATION ORDER

For those municipalities subject to the provisions of **Castro v. Beecher**, applicant names are certified in a ratio stipulated by that court order. The name of one minority applicant (identified by the letter **"C"** to the right of the applicant's name) is certified first, followed by the names of three non-minority applicants (identified by the letter **"D"** to the right of the applicants' name). Please note that under the terms of the Consent Decree, **minority is defined as Black or Hispanic.**

Within the "C" and "D" groups, the order of certification is as follows. Candidates determined eligible for resident preference are certified first, if the community has adopted applicable statutes regarding resident preference within that community. Resident disabled veterans, veterans, and non-veterans are listed in that order, based on the preferences provided in MGL Chapter 31. Within each such group applicants are listed in descending order by score. The names of nonresidents are then certified, within the appropriate "C" and "D" groups after all residents have been listed. Again, within the non-resident group disabled veterans are listed first, followed by veterans and non-veterans. Disabled veterans are identified by two asterisks; veterans by one asterisk.

In some instances, Appointing Authorities may receive a certification showing an applicant by whose name appears the legend **"402 Applicant" or "534 Applicant."** The provisions of Chapter 402, Acts of 1985, provide for preferred placement on the certification for initial appointment of applicants who are sons or daughters of deceased or disabled Fire Fighters or Police officers subject to those applicants having met applicable requirements of that statute.

A **534** applicant is one for whom special action has been ordered as the result of a Civil Service Commission decision. Such an applicant has been given specific placement on the certification by direction of the Commission pursuant to Chapter 534 of the Acts of 1976, as amended by Chapter 310 of the Acts of 1993.

If the vacancies being filled are permanent full-time, and the community in question has a reserve or intermittent force, certification is made first from the names of those appointed to the reserve or intermittent positions. In this instance, if there are Black or Hispanic reserve or intermittent officers, those officers will be listed in first, fifth, etc., position on the full-time certification regardless of the date of original appointment. If no minorities have been appointed to the reserve or intermittent force, the names of minorities from the current eligible list will be certified in accordance with Consent Decree ratio requirements.

The names of non-minority reserve or intermittent Police Officers will be certified in order of their seniority dates in accordance with the Consent Decree requirements. If there are insufficient names on the reserve or intermittent roster, additional names will be certified from the current eligible list.

When a certification is issued from the reserve or intermittent roster, the interview notices for those listed on that roster are mailed to the Police Chief. **It is the Chief's responsibility to insure that they are mailed, delivered or handed to the candidates in adequate time to insure their ability to be considered on the certification.** The original certification is mailed to the Appointing Authority.

5

**Note:**   Police Service Appointing Authorities are reminded that MGL Chapter 147, Section 12 1 limits the number of Reserves allowed in any community statutorily defined as a city.   Reference information is included in Appendix E.

## APPLICANT MARKS

The current provisions of the relevant consent decrees preclude printing of applicants' marks on entry level public safety certifications.   Applicants within a tie group are identified by the printed words "Tie" and "Tie Ends" to the right of these names.   Please note that the scores are limited to the ethnic group identified in the certification; that is, **"C"** candidates are tied only with other **'"C"** candidates and **"D"** candidates with other candidates from that group.   Tie score applicants are listed alphabetically within their preference groups.

## INSUFFICIENT APPLICANTS RESPONDING

At the close of the interview period indicated on the Form 17, the Appointing Authority should review the response received to determine whether a sufficient number of applicants have indicated willingness to accept.

In this regard, Appointing Authorities are advised that in order to comply with the provisions of the Castro v. Beecher Consent Decree, particular attention must be paid to the number of minority applicants willing to accept on the certification. **There must be enough active minority candidates to be considered for existing vacancies on the basis of one minority in the first place and thereafter a minority in every fourth place on the certification.** In very rare instances the Appointing Authority may encounter insufficient non-minority candidates willing to accept.   If this is the case a copy of the signed certification should be returned with a request for additional minority names.

The Appointing Authority must replace the name of any **"C"** candidate who fails to respond or who declines the position with the name of the next **'"C"** candidate who is willing to accept, so that the 1 to 3 ratio of selection consideration is maintained.   All **"C"** candidates who are willing to accept must be moved up into **"C"** slots as outlined above.

In the event that an insufficient number of **"C"** applicants respond for existing vacancies, Appointing Authorities should send a written request for the certification of additional minority names from the Human Resources Division.   Every effort will be made to expedite additional name certifications to reduce any delay in the process, but Appointing Authorities are advised that appointments made without following this procedure or without giving consideration to minority candidates according to the ratio format cannot be approved.

## BACKGROUND INVESTIGATIONS, REFERENCE CHECKING AND INTERVIEWS

The results of background investigations, reference checking, and interviews may all be used as part of the selection process at the Appointing Authority's discretion and subject to policies and procedures established locally and to general provisions of state and federal law.   Complete and accurate records should be maintained of all such processes.

Candidates listed on the certification have not been reviewed for ability to acquire a gun permit or for possession of a valid Massachusetts driver's license.   Possession of such permit and license is required and should be verified at the time of interview.   The Human Resources Division does not check court records on public safety applicants.   However, an Appointing Authority may, under limited circumstances, initiate its own inquiry as to whether or not an applicant has a court record which would legitimately affect candidacy for employment as a Police Officer.   Appointing Authorities are strongly encouraged to consult with their legal staff, Town Counsel, or City Solicitor before pursuing such inquiry.

Appointing Authorities are reminded that under the provisions of MGL Chapter 41, section 101 A, no person appointed from an eligible list established as a result of an examination may smoke tobacco products after appointment. This prohibition applies to appointments made from the Police Officer eligible list established on June 7, 1988, and to all appointment made from subsequent entry-level eligible lists. (Appendix G)

Please note that the certification package contains notices for applicants regarding the no-smoking provisions. The interviewer is asked to insure that copies of these notices are provided to each candidate who appears to sign the certification. The Appointing Authority and interviewer are also asked to review carefully the information in this regard.

Medical examinations for public safety appointees are not administered by the Human Resources Division. Communities may choose to administer such medical examinations via a municipal doctor or nurse or via a contracted physician or medical group. All medical examinations must be conducted in accordance with the guidelines and requirements contained within the **HRD Physician's Guide - Initial-Hire Medical Standards** and the Initial-Hire Medical Standards for Municipal Police Officers (effective April 3, 2000.) Examining physicians must record the results of a medical examination on the HRD's Medical Examination Form included in Appendix C.

Any use of medical examination results for by-pass or removal must be based on a clear narrative statement, signed by the Appointing Authority, of the ways in which the candidate is unable to perform specific essential functions of the job. That statement should include an explanation of whether reasonable accommodation has been considered and is feasible for the candidate.

Police Officer candidates must have taken and passed the Physical Abilities Test (PAT) administered by the Human Resources Division prior to the approval of their appointments. The Appointing Authority may request the scheduling of applicants for the PAT at any time during the appointment process, but no appointments should be returned to HRD until the selected candidates have been verified as passing the test. Detailed information on the PAT schedule and the procedure for scheduling applicant names is included in Appendix C.

The use of psychological screening as a selection instrument for appointments to the position of Police Officer may be used only when a municipality has an approved psychological screening plan on file with the Human Resources Division. The results of psychological screening conducted when no approved plan is on file will not be accepted in the review or approval of appointments.

If a candidate is determined, based upon the results of an approved psychological screening plan, to be unqualified for the position of Police Officer, the Appointing Authority should return with the certification a request for removal under the provisions of PAR .09 together with a clear narrative statement signed by the Appointing Authority detailing the ways in which the candidate is unable to perform the specific essential functions of the job.

Appointing Authorities whose communities utilize a medical examination, PAT and an approved psychological screening plan must insure that such screening is initiated **only after a conditional offer of employment has been made to selected appointees, as required by MGL Chapter 151B.**

If in the course of the interview or background investigation the Appointing Authority believes that there is reason to question an applicant's right to the minority, resident, or veteran's preference indicated on the certification, a letter challenging that preference and stating the basis on which the challenge is made should be forwarded **immediately** to the Civil Service Unit. The Human Resources Division will schedule a hearing for the candidate based on the information and challenge presented by the Appointing Authority, who will be notified of

the findings. It is not advisable to wait until after selections are made and the certifications forwarded to HRD to file such challenges, since the results of the hearing may not uphold the basis on which an Appointing Authority has by-passed a candidate with preferred placement on the certification.

## BY-PASS AND REMOVAL

Under the terms of the Consent Decree, the Personnel Administrator may not approve any appointments unless the Appointing Authority has furnished a written statement acceptable to the Administrator for rejection of any candidate whose name appears higher on the list than those selected for appointment and who signed the certification indicating willingness to accept the appointment. By-pass reasons are carefully reviewed by the Personnel Administrator and are furnished to Plaintiff's Counsel and to the candidate in question. In stating reasons for by-pass, the Appointing Authority must be **specific, factual and detailed**. Appendix B contains additional information relative to documentation of by-pass, and Appointing Authorities are urged to review these requirements carefully before submitting by-pass reasons for any candidate.

In extreme instances, an Appointing Authority may conclude that the appointment of an applicant whose name appears on an eligible list would be detrimental to public safety and to the community. Request for removal under PAR .09(2) or PAR .03 must be made in writing and accompanied by specific reasons documenting the circumstances under which the request is made. Appendix A contains more specific information relative to PAR .09 and PAR .03 removals.

The provisions of the Castro v. Beecher Consent Decree require the Appointing Authority to **notify any applicant who has indicated willingness to accept but was not appointed of the basis for his or her non-selection and of applicable appeal rights.**

## MAKING THE SELECTIONS

Entry level public safety appointments must be made in accordance with the provisions of Personnel Administration Rule .09, a copy of which is included in this booklet for your reference in Appendix A. PAR .09 requires appointments to be made within the formula of twice the number of vacancies plus one; that is, if three appointments are being made, the appointments must be made from among the first seven people willing to accept; if ten appointments are being made, from among the first twenty-one willing to accept, and continuing in accordance with that formula.

Applicants with tie scores are listed alphabetically within their tie groups on the certification. If one applicant within a tie group is reachable under the provisions of PAR .09, any applicant with that score and certified within that tie group may also be reached. As an example, if three vacancies are to be filled, the appointments must be made from among the top seven willing to accept. Candidate number seven on the certification is shown as having a tie score with candidates number eight and nine. In this instance, the Appointing Authority could choose to appoint the ninth candidate and still remain within the requirements of the Personnel Administration Rules. This expansion of the provisions of the rule occurs only when the last person normally reachable under its provisions begins or continues a tie score.

The certification packet contains a PAR .09 worksheet called a Form 16II. **All** applicants willing to accept appointment should be listed on this worksheet in the order in which they appeared on the certification (**or in accordance with the ratio provisions of Castro v. Beecher if it has been necessary to move "C" candidates higher on the certification**). Reference to the worksheet will then provide you with an easy visual assessment of those candidates who are reachable under the provisions of PAR .09. The completed worksheet should be signed and returned with your report on certification and appointment papers.

        When you have listed on the worksheet the names of all candidates who signed the original certification indicating their willingness to accept, make sure that minorities have been moved up as necessary to insure compliance with Consent Decree requirements. Then please indicate in the right-hand column of the worksheet and on the signed certification those who have been selected for appointment.

        Review the form to insure that the appointments as projected fall within the requirements of PAR .09. Next, insure that for each person who is listed higher on the certification but was not selected one of the following pieces of documentation is prepared and attached: (1) a letter of declination or withdrawal from the candidate or signed memorandum of the conversation during which declination or withdrawal was officially relayed; (2) individual narrative reasons for by-pass of such candidates, signed and dated by the Appointing Authority, substantiating the specific reasons for the by-pass request; or (3) a narrative statement, signed and dated by the Appointing Authority, specifying the reasons for any removal request made under the provisions of PAR .03 or PAR .09.

## APPOINTMENT PAPERS

        When all local review has been completed and the final selections of candidates is made, and the Appointing Authority has insured that all provisions of civil service law and rule and of the Consent Decree have been met, **the names, social security numbers, dates of birth, addresses, and effective dates of employment are typed on the Authorization of Employment Form 14** which is included with the certification package. Please note that the effective date of employment shown on that form may not in any case precede the date of the certification.

        Personnel Administration Rule .09 requires that an appointee must actually be employed in the position within 30 days of the appointment. Because permanent full-time Police Officers must participate in Basic Police Recruit Training at the Police Academy, and because available academy openings may be limited, a separate policy has been developed to allow for police appointments which must be postponed due to academy enrollment. A detailed description of this process is contained in Appendix D.

## RETURN OF THE CERTIFICATION

        After the local appointment processing is completed, the Appointing Authority should return the following materials to the Civil Service Unit:

1.      The original certification list, signed by the applicants and by the Appointing Authority.

2.      The completed Form 16II (Report on Certification) on which the names of all applicants willing to accept are listed in the order in which they appeared on the certification or in required Consent Decree format if "C" candidates have been moved up, and identifying those applicants selected for appointment.

3.      A completed Form 14 (Appointment Form), signed by all appointees and by the Appointing Authority, and containing the effective dates of appointment.

4.      Any letters of declination or withdrawal received from applicants.

5.      Written reasons, signed by the Appointing Authority, for requesting the by-pass or removal of candidates willing to accept and higher on the list than those selected.

6.      Letters of appointment for those appointees whose academy dates are more than thirty days away. (Appendix D)

All materials should be returned in one package to the Human Resources Division, One Ashburton Place, Room 301, Boston, MA 02108, Attn: Civil Service Unit.